UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

MR. PAUL C. ULRICH,

               Plaintiff,

          -against-

MOODY'S CORP. & MOODY'S INVESTORS
SERVICE, INC.,

            Defendants.
-----------------------------------x

3/31/14

**REPORT & RECOMMENDATION**

**13 Civ. 0008 (VSB) (MHD)**

TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:

    Pro se plaintiff Paul Ulrich brings this lawsuit against his former employers, defendants Moody's Corp. ("Moody's") and Moody's Investors Service, Inc. ("MIS"), asserting claims under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(b)(1)(A); the Dodd-Frank Act, Public Law 111-231, 124 Stat. 1376 ("Dodd-Frank"); the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34; the New York State Human Rights Law § 296; and the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiff also asserts common-law claims for breach of contract, breach of an implied covenant of good faith and fair dealing, defamation, and false-light publicity.

Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), arguing that plaintiff has failed to state a claim under any of his theories.

For the reasons that follow, we recommend that defendants' motion be granted in part and denied in part.

## I.   Facts as Alleged in Plaintiff's Amended Complaint

Plaintiff, a United States citizen residing in Hong Kong, began his employment on February 11, 2008 as a Financial Writer for Moody's Investors Service Hong Kong Ltd. ("MIS"),[1] a subsidiary of Moody's. (Id. at ¶ C.i). Plaintiff was 45 years old when he began his employment. (Id. at ¶ 89).

Plaintiff asserts that when he first considered the job offer from Moody's, a recruiter told him that if he joined, he could "spend half [his] time at work writing another novel". (Id. at ¶ 126). When plaintiff joined MIS, he "recognized that [his starting salary] was exceedingly low", but reasoned that "minimal work for minimal pay seemed reasonable." (Id.).

---

[1] MIS is a Nationally Recognized Statistical Rating Organization ("NRSRO") regulated by the Securities and Exchange Commission (SEC). (Am. Compl. ¶ C.ii).

Plaintiff worked in Hong Kong, primarily under Australia-based group managing director Brian Cahill ("Cahill") beginning on February 11, 2008 and continuing until November of 2010, when plaintiff began reporting to John Forrey ("Forrey"), a managing director based in New York. (Id. at ¶ 3). According to plaintiff, both Cahill and Forrey reported to Michael West ("West"), a senior managing director also based in New York. (Id.).

Plaintiff asserts that when he was hired in 2008, he was earning only about half the total compensation that colleagues in similar positions in New York and London were earning. (Id. at ¶ 89). When plaintiff asked Cahill why this was the case, Cahill responded that plaintiff's background was different (id.), and that his pay was in line with Hong Kong salaries. (Id. at ¶ 92). Within a few months of plaintiff informing Cahill that he felt underpaid, plaintiff contends, Cahill began a "harassing pattern" of retaliation. (Id. at ¶ 93). For example, plaintiff cites an email dated October 15, 2009 from Cahill to his four subordinate managers in which he stated that plaintiff "finds it difficult to operate as a team player." (Id.).

Notwithstanding this criticism, plaintiff was promoted to an assistant-vice-president position in October 2010, finally allowing him to vote in rating committees. (Id. at ¶ 98). However, not long after his promotion, Forrey told plaintiff that research writers would no longer be able to vote in committees. Plaintiff believes that West was "behind" this policy. (Id. at ¶ 99).[2]

In June 2011, plaintiff provided Moody's with a doctor's findings and recommendation, hoping to receive an alternative seating arrangement due to a diagnosis of osteoporosis and kyphosis. (Id. at ¶ 117). According to plaintiff, Moody's initially demurred and then delayed in providing this alternative seating arrangement, telling him that he could not be provided with a standing desk, even though plaintiff notes that Jeannie-Marie Noyce, a younger colleague working out of the Sydney office, was provided a standing desk. (Id. at ¶ 118).

Plaintiff compares his treatment to that of Jean-Francois Tremblay, a younger research writer who was hired a few months

---

[2] It is unclear from the complaint whether, at the time of imposition of this new policy, plaintiff was employed as a research writer or an assistant vice president (or both), and therefore unclear whether plaintiff was allowed to vote in committees.

4

after him. (Id. at ¶ 101). Plaintiff asserts that they can be compared because they both had similar qualifications, including a graduate economics degree and previous work as a government economist. (Id.). According to Ulrich, Tremblay was hired in New York at the level of Vice President, several grades above plaintiff, and subsequently received a promotion to assistant managing director in late 2011. Plaintiff contends that Tremblay was allowed to make presentations to external audiences and receive credit for research as a senior analyst and author, while plaintiff was prevented from doing so by Cahill. (Id. at ¶ 102).

On July 8, 2011, Moody's published a research report titled "Red Flags in China", which plaintiff claims contained factual errors due to faulty data or analysis conducted by analysts at Moody's. (Id. at ¶ 4). The report dealt with Chinese issuers of internationally-rated bonds, and, according to plaintiff, its publication led to inquiries from the Securities and Futures Commission of Hong Kong, the local securities regulator. (Id.). In response to an internal investigation of this report, plaintiff provided to defendants' counsel and regulatory-affairs officer about 30 pages of notes regarding the research process, which, according to plaintiff, showed that Cahill had been

responsible for rushing the research. (Id. at ¶ 6). In January 2012, plaintiff objected to the planned publication of a report on "red flags" surrounding Indonesian corporate bonds. (Id. at ¶ 11). After plaintiff complained to Forrey about the research methodology for this report, plaintiff asserts, Cahill's "bosses in New York" quashed the planned publication. (Id. at ¶ 12). Plaintiff contends that Cahill would have known that he had intervened in the report's publication. (Id.).

Plaintiff asserts that in retaliation, Cahill (and possibly West) engaged in a number of actions designed to undermine plaintiff's position at Moody's, including, inter alia, attempting to keep plaintiff out of an annual training session (id. at ¶ 8), reducing his responsibilities in the research process beginning in October 2011 and continuing into early 2012 (id. at ¶¶ 9, 14), preventing him from receiving a promised promotion to research director (id. at ¶¶ 6, 8), ignoring his objections to research methodologies and attributing allegedly shoddy work to him that he did not in fact perform (id. at ¶¶ 20, 22, 32), forcing him to leave his private office and share office space, even though others in his position were not forced to do so and despite the fact that empty offices were available (id. at ¶¶ 23-26), and ignoring his requests to telecommute to

avoid overhearing disruptive phone calls made by his new officemate. (Id. at ¶¶ 28, 97). Additionally, he contends that his work was increasingly subjected to onerous approval processes (id. at ¶¶ 14-16, 97), and that he began to notice hostile behavior coming from West. (Id. at ¶ 19).

On May 9, 2012, plaintiff called Forrey in New York to complain about "longstanding discrimination" towards him and informed Forrey that forced exposure to such "ongoing aural harassment in the shared office" could force plaintiff to quit. (Id. at ¶ 29). In that phone call, Forrey responded that he had heard from Cahill that plaintiff had been refusing work. (Id. at ¶ 30). Plaintiff asserts that he only declined work on two occasions: one involving an article on a Japanese pharmaceutical firm with which plaintiff had a potential conflict of interest, and the other where work was diverted from him to another research writer because plaintiff had taken bereavement leave in April 2012. (Id. at ¶ 31).

On May 15, 2012, plaintiff's officemate led a conference call from their shared office instead of a secure conference room. At the same time, plaintiff made two external phone calls to the Hong Kong tax bureau, not realizing that the conference

call was taking place. According to plaintiff, the recipients of his calls could have overheard a discussion of ratings recommendations on Sony and Panasonic corporations, which plaintiff contends is a violation of securities law. (Id. at ¶ 40). That same evening, plaintiff reported his concern to the Moody's "integrity hotline" that he (and unknown recipients) had overheard a confidential ratings committee meeting without prior clearance. (Id. at ¶ 41). He also lodged complaints of alleged "long-standing age discrimination and harassment" in that same hotline call. (Id.). The next day, plaintiff was contacted by a local compliance officer at Moody's who asked him whether he had overheard any material non-public information, and plaintiff replied that he had. (Id.). A few days later, plaintiff was contacted by Moody's internal counsel and a senior compliance officer to begin a 120-day investigation into the alleged violations of securities law, age discrimination, and harassment. (Id.). On May 28, 2012, at the request of the investigators, plaintiff began sending information to the compliance officer to document his charges. (Id. at ¶ 42).

On May 31, 2012, Forrey issued to plaintiff a two-month Performance Improvement Plan ("PIP"), which was then extended for a further two months, through October 16, 2012. (Id. at ¶¶

42-43). Forrey posted the original PIP on plaintiff's shared Microsoft calendar on May 31, 2012, ostensibly making it visible to other Moody's employees. (Id. at ¶ 73). Plaintiff contends that his previous performance evaluation by Forrey, completed in February 2012, praised his work and scored him a four out of a best-possible five. (Id. at ¶¶ 43-44). According to plaintiff, the May 2012 PIP caused his colleagues to bypass him in the editing process, choosing instead to go directly to another financial writer. (Id. at ¶ 60). On June 4, 2012, plaintiff warned Forrey, West, and Moody's chief human resources officer in New York that the PIP constituted libel. (Id. at ¶ 73).

The PIP, to which plaintiff repeatedly cites in his amended complaint, notes that plaintiff's performance was "unsatisfactory" in three areas: productivity, quality of work, and teamwork/commitment. (Decl. of Joseph A. Nuccio, dated May 9, 2013 (Dkt. No. 29) ("Nuccio Decl.") Ex. E at 1). As to productivity, Forrey wrote that plaintiff was having issues with "[d]rafting and editing reports and comments when requested by analysts. For example, [plaintiff was] recently approached to help with an Asian LNG report but [he] refused to do so on the basis that [he was] fully occupied (despite the lack of evidence

showing other significant work flows)."[3] (Id.). To remedy this, Forrey noted the following action plan: "provide a list of reports drafted and edited on weekly basis (the list is to be submitted every Friday). If you are fully occupied, you should get clearance from the Research MD to have another financial writer to cover the work." (Id.). As to quality of work, Forrey wrote that plaintiff was having issues "[e]diting reports to a level that is near publishing quality. A number of recent high profile reports [he] edited (e.g. China Property and Exposures to Europe) needed substantial additional editing to meet quality standard."[4] (Id.). For an action plan, Forrey wrote that "[a]ll edited draft reports will be sent to the Research MD when [he] forward[s] them on for team leader/senior management approval, in order to demonstrate that [he is] providing high quality and near publishing ready materials." (Id.). As to "teamwork/commitment", Forrey noted that plaintiff had issues with "[b]eing an engaged, team participant in the Asia CFG

---

[3] The expected-performance standards for the area of productivity state that a research writer is to "[p]rovide timely edits and drafts as requested by Analysts. Turnaround time for short reports (several pages)/comments should be within 24 hours or less. Turnaround time for longer reports should be within 48 hours." (Id.).

[4] The expected-performance standards for the area of "quality of work" state that "[a]ll edited reports forwarded for review are at a near publishing quality (i.e. they have clear opinions upfront, being well supported, have good structure, being concise and free of any typos or formatting issues)." (Id.).

research process."[5] The action plan states that the "[r]esearch MD will seek regular feedback from the Asia CFG analytical team on [his] level of engagement and willingness to help in the research effort." (Id.). On July 31, 2012, Forrey posted an interim PIP on plaintiff's shared calendar, which plaintiff asserts was also libelous. (Id. at ¶ 81). According to plaintiff, the interim PIP enumerated his failings in productivity and teamwork, and stated that colleagues were avoiding working with him. (Id.). Defendants then extended plaintiff's PIP through and including October 16, 2012. (See Nuccio Decl. Ex. F).

In June 2012, Jeannie-Marie Noyce, the younger employee based in Australia, was transferred to work in the Hong Kong office, and was again provided with a standing desk. (Am. Compl. ¶ 118). Plaintiff repeated his request for a standing desk, and Moody's complied, delivering the equipment in September 2012, just a few days before plaintiff's suspension. (Id.).

On June 15, July 15, and August 3, 2012, plaintiff mailed complaints of alleged securities violations by Moody's to the

---

[5] The expected-performance standards for the area of "teamwork/commitment" are described as "[b]eing supportive of other team members and accountable to own responsibility in publishing high quality research products." (Id.).

SEC. (Id. at ¶ 46). Also on June 15, 2012, plaintiff mailed complaints of retaliation for making these securities-violation complaints to OSHA, and mailed complaints of ongoing age discrimination, harassment, and retaliation to the EEOC. (Id.).

Beginning in June 2012, plaintiff asserts, analysts at Moody's repeatedly tried to get him to work on reports containing material non-public information ("MNPI"), which was a change from plaintiff's previous job duties. (Id. at ¶¶ 48, 50, 51). On July 9, 2012, Moody's instigated a global change to its employees' securities trading policy, requiring employees with routine access to MNPI to sell all of their identified individual securities by October 1, 2012. (Id. at ¶ 49). Plaintiff argues that this policy had a disproportionate and discriminatory impact on him compared to other employees, but when he requested a waiver from the new policy, he was denied. (Id. at ¶¶ 49, 56). Instead, he was granted a one-month reprieve until November 1, 2012. (Id. at ¶ 52).

In July 2012, Moody's began posting advertisements for the position of research-writer, using phrases such as "strong attention to detail" and "work using own initiative and without

close supervision". (Id. at ¶ 119). Plaintiff alleges that this language was implicitly targeting younger candidates. (Id.).

On August 29, 2012, plaintiff declined a work assignment involving MNPI. (Id. at ¶ 53). The next day, Forrey sent plaintiff an email telling him not to turn down work involving MNPI without prior authorization. (Id.). On September 12, 2012, Moody's suspended plaintiff without pay while investigating the claim made by Forrey that plaintiff had refused a work assignment. (Id.). According to plaintiff, defendants packed up the contents of his desk into sealed boxes, causing colleagues walking past his office, as well as those attempting to email him and receiving no response, to assume that he had been fired. (Id. at ¶ 86).

At the conclusion of this suspension, on September 27, 2012, Dan O'Connell, the manager of Moody's Hong Kong office, presented plaintiff with a return-to-work agreement. (Id. at ¶ 66; see also Nuccio Decl. Ex. H). This agreement stated that by signing, plaintiff acknowledges that "performance of the required job duties of a Financial Writer involves and requires access to material non-public information (MNPI) and that he "will not refuse work that contains MNPI." (Id. Ex. H at ¶ 2).

It also stated that by signing, plaintiff acknowledges that he was prohibited from "spending excessive amounts of work time on personal e-mailing, web surfing, and/or review of media articles". (Id. Ex. H at ¶ 3). Lastly, the return-to-work agreement stated that by signing, plaintiff "acknowledges that he can be terminated or resign at any time with or without cause (subject, to the extent applicable, to the notice requirements set forth in his January 28, 2008 offer letter)" and that plaintiff "acknowledges and agrees that this Agreement does not constitute a guarantee of employment for any length of time." (Id. Ex. H at ¶ 5). Plaintiff contends that, despite language in the document stating that it was a "voluntary" agreement, he signed it under duress so that he could to return to work. (Am. Compl. ¶ 67).

Plaintiff claims that, despite his disagreement with the contents of the PIP and refusal to sign it or any extensions, he adhered to its action plan by providing weekly updates listing everything that he had worked on and sending copies of all edited drafts to Forrey. (Id. at ¶ 80). Plaintiff asserts that Forrey provided virtually no feedback on these weekly reports. (Id.). On October 24, 2012, Forrey notified plaintiff that Moody's had terminated his employment. (Id. at ¶ 68). Forrey

cited the PIP, and stated that plaintiff's performance "had not improved to a satisfactory level." (Id.). Plaintiff was terminated without a severance payment, and later, in February 2013, learned that Moody's had cut its accrued voluntary contribution to his retirement fund by "nearly two thirds". (Id. at ¶ 70). According to plaintiff, his termination was retaliation for making an age-discrimination complaint. (Id. at ¶ 119).

Plaintiff asserts that he never couched his complaints regarding his treatment as "age discrimination", because he knew that Hong Kong has no laws prohibiting age discrimination. (Id. at ¶ 123). However, once he found out that his claims, as he asserts, were covered under ADEA, he filed his lawsuit. (Id. at ¶ 124).

## II.  Procedural History

Plaintiff filed his original complaint on December 26, 2012. Defendants filed a motion to dismiss on April 1, 2013 (Dkt. No. 18), which was deemed withdrawn as moot based on plaintiff's representations that he would be filing an amended complaint. (See Endorsed Order, dated April 12, 2013 (Dkt. No.

24)). Plaintiff filed his amended complaint on April 22, 2013, and defendants again moved to dismiss on May 9, 2013.

## ANALYSIS

## I. Legal Standard for Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim, we bear in mind that "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 415 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. See, e.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). A complaint is subject to dismissal unless its factual allegations, if credited, make the claim "plausible". See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 560-70 (2007). While detailed factual allegations are not necessary, the pleading must be supported by more than mere "'labels and conclusions' or '[]formulaic recitation[s] of the

16

elements of a cause of action.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

When addressing a Rule 12(b)(6) motion, the court may not consider evidence proffered by either side. Rather, it is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. See, e.g., ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Leonard F. v. Israel Disc. Bank, 199 F.3d 99, 107 (2d Cir. 1999). "To be incorporated by reference, the [pleading] must make a clear, definite and substantial reference to the documents . . . [and] [t]o be integral to the [pleading], the [claimant] must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the [pleading]." Bill Diodato Photography LLC v. Avon Products, Inc., 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (citing DeLuca v. AccessIT Group, Inc., 695 F. Supp.2d 54, 60 (S.D.N.Y. 2010)).

In view of plaintiff's status as a pro se litigant, we read his complaint liberally and derive from it the most reasonable claims and arguments that it may be read to imply. See, e.g., Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006) (per curium). However, the "plausibility" standard articulated in Twombly and Iqbal applies to the pleadings of pro se plaintiffs as well as to those of represented litigants. See, e.g., Carvel v. Cuomo, 357 Fed. App'x 382, 383-84 (2d Cir. 2009); Sheehy v. Brown, 335 Fed. App'x 102, 104 (2d Cir. 2009).

## II.   Analysis of Plaintiff's Claims

### A.   Whistleblower Protection Under Sarbanes-Oxley and Dodd-Frank

Plaintiff claims that he faced retaliation by defendants for engaging in the protected activity of complaining about alleged securities violations, in contravention of both Sarbanes-Oxley ("SOX") and Dodd-Frank. (Am. Compl. ¶ 3). According to plaintiff, the retaliatory events underlying this claim began in mid-2011 and culminated in his termination on October 24, 2012. (Id. at ¶ B.i).

In moving to dismiss, defendants contend that plaintiff's whistleblower retaliation claims under SOX and Dodd-Frank fail because neither Act's retaliation provisions have extraterritorial application. (Defs.' Mem. in Supp. of Mot. to Dismiss, dated May 9, 2013 (Dkt. No. 28) ("Defs.' Mem.") at 2, 7-9). In the alternative, defendants argue that many of plaintiff's whistleblower claims are either time-barred or fail to allege an "adverse employment action" sufficient to make out a claim under either statute. (Id. at 2, 9-12).

In opposition, plaintiff argues that both statutes can be applied extraterritorially, and he attempts to distinguish this case from precedent holding that neither statute has extraterritorial effect. In particular, he asserts that the enactment of Dodd-Frank "overturned the implications" of the leading case on the subject, Morrison v. National Australia Bank, Ltd., 561 U.S. 247, 130 S.Ct. 2869 (2010). (Pl.'s Mem. of L. in Opp'n to Defs.' Mot. to Dismiss, dated May 17, 2013 (Dkt. No. 30) ("Pl.'s Opp'n") at 4-5). In that case, the Supreme Court held that, absent a clearly expressed Congressional intention to apply a regulatory statute internationally, no such extraterritorial reach may be inferred. In place of this holding, plaintiff argues that this court should use the

"conduct" and "effects" tests, endorsed by pre-Morrison cases in this Circuit, to determine whether the statutes should apply. (Id. at 6-7). In further support of his argument that SOX and Dodd-Frank should apply, he cites the fact that Hong Kong does not have laws protecting whistleblowers from retaliation, and he suggests that basic fairness conceptions dictate that he should be able to assert his claims here. (Id. at 7-8). He further urges this court to use its "supplemental jurisdiction" to hear his claims. (Id. at 8).

In reply, defendants assert that the "conduct" and "effects" tests, and the cases cited by plaintiff that relied upon them, are no longer good law after the Morrison decision. (Defs.' Reply Mem. of Law in Supp. of Mot. to Dismiss, dated May 28, 2013 (Dkt. No. 32) ("Defs.' Reply") at 2). They further contend that plaintiff's assertions that he is a United States citizen and that Forrey and West were based in New York cannot overcome the fact that plaintiff's whistleblower claims are based on events that occurred in Hong Kong. (Id. at 2-3).

1. **The Extraterritorial Effect of SOX and Dodd-Frank**

In Morrison v. Nat'l Australia Bank Ltd., the Supreme Court held that "[u]nless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic concerns. . . . When a statute gives no clear indication of an extraterritorial application, it has none." 130 S.Ct. at 2877-78 (internal citations omitted). Because the retaliation provisions of both SOX and Dodd-Frank are silent as to extraterritorial application, we find that they cannot be applied outside of the United States. Though caselaw on this particular subject is limited, our determination is in accordance with a recent ruling from this court holding that the anti-retaliation provision of Dodd-Frank has no extraterritorial effect, even if a plaintiff meets the definition of a "whistleblower" from 17 C.F.R. § 240.21F-8(c)(2). See Liu v. Siemens A.G., 2013 WL 5692504, at *3 (S.D.N.Y. Oct. 21, 2013). That same case also affirmed that section 806 of SOX does not apply extraterritorially. Id. at *4.

That the Dodd-Frank Anti-Retaliation Provision does not apply outside of the United States is underscored by the fact

that Dodd-Frank does contain explicit extraterritorial-application language elsewhere in the statute, when it addresses suits by the SEC and the United States. See Dodd-Frank § 929P(b), 124 Stat. at 1864-65.[6] In short, if Congress had intended to authorize the anti-retaliation provision to apply abroad in the context of private litigation, it would have explicitly done so. See Liu, 2013 WL 5692504, at *3 (citing § 929P(b) of Dodd-Frank); see also Asadi v. G.E. Energy (USA), LLC, 2012 WL 2522599, at *4 (S.D. Tex. June 28, 2013), aff'd on other grounds, 720 F.3d 620 (5th Cir. 2013). "[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." Morrison, 130 S.Ct. at 2883.

Plaintiff argues that we should use the "conduct" and "effects" tests enumerated in the past by the Second Circuit in order to find that the anti-retaliation provisions in both Dodd-Frank and SOX can be extraterritorially applied here. (Pl.'s

---

[6] Section 929P(b), entitled "Extraterritorial Jurisdiction of the Antifraud Provisions of the Federal Securities Laws", states, in pertinent part, "The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of the antifraud provisions of this title involving . . . (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States." Id.

Opp'n 6-7). However, this argument ignores the fact that the Supreme Court in Morrison explicitly repudiated the "conduct" and "effects" tests, reiterating the importance of the presumption against extraterritorial application of United States statutes to guard against unnecessarily confusing statutory interpretation. See Morrison, 460 S.Ct. at 2879-81.

Plaintiff's argument that the enactment of Dodd-Frank abrogates the holding of Morrison is also unavailing. This court has recently suggested that Section 929P(b) of Dodd-Frank "may have restored" the "conduct" and "effects" tests previously used by the Second Circuit, but only as to actions brought by the SEC or the Department of Justice. SEC v. Gruss, 859 F. Supp.2d 653, 664 n.4 (S.D.N.Y. 2012); see also Cornwall v. Credit Suisse Group, 729 F. Supp.2d 620, 626 n.3 (S.D.N.Y. 2010).[7] Because plaintiff is bringing a private action against defendants for violations of SOX and Dodd-Frank, he cannot avoid the presumption against extraterritoriality.

Similarly, plaintiff's vague arguments that his claims actually originate in the United States do not allow him to

---

[7] See also n.6, supra.

avoid the presumption. That plaintiff is a United States citizen and has hazy plans to return here at an unknown date in the future does not transform his retaliation claims, the factual bases of which all originate in Hong Kong, into domestic claims. Indeed, the Supreme Court in Morrison explicitly noted that "it is a rare case . . . that lacks all contact with the territory of the United States [and] the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." Morrison, 130 S.Ct. at 2884 (emphasis in original). Plaintiff's American citizenship and even his allegations that the retaliation he was subjected to was orchestrated by "managers in New York" (Am. Compl. ¶ 3) do not afford him the ability to utilize these statutes abroad. See Liu, 2013 WL 5692504, at *3 ("The issue is not whether persons located abroad can be 'whistleblowers' and thus eligible for whistleblower awards, but whether the Anti-Retaliation Provision's protections extend to overseas whistleblowers. The fact that a person outside the United States may be a 'whistleblower' under Dodd-Frank does not compel the conclusion that he is protected by the Retaliation Provision.") (citing 17 C.F.R. § 240.21F-2(b)(1)(iii)). We can find no caselaw applying the anti-retaliation provisions of SOX or Dodd-Frank to a foreign resident working at a foreign subsidiary of an American

corporation and alleging retaliation for protected activity occurring abroad, even if the alleged retaliation did originate in the United States. See Asadi, 2012 WL 2522599, at *5 (Jordan-based employee of American corporation could not invoke the anti-retaliation provision of Dodd-Frank even though he was terminated in the United States, because the majority of events giving rise to the suit occurred in a foreign country). In this case, all protected activity and all of the retaliation that plaintiff allegedly experienced occurred in Hong Kong, and therefore he cannot utilize the anti-retaliation protection of these statutes.

## 2. **Timeliness of Claims**

Even if we ignored the extraterritorial nature of plaintiff's Dodd-Frank and SOX claims, they would be limited by the pertinent limitations provisions. By plaintiff's own admission, he did not report any alleged securities violations until May 15, 2012, when he contacted the Moody's integrity hotline to complain about the overheard teleconference. Thus, any claims that encompass events occurring prior to that date are not cognizable, because in order to state a claim for whistleblower retaliation, a plaintiff must have actually "blown

the whistle." This bar applies to plaintiff's claims regarding his allegedly low starting salary (he was hired on February 18, 2008), the failure to promote (he was promoted in October of 2010 (see Am. Compl. ¶ 98)), the failure to timely provide him with a standing desk (he first requested a standing desk in June of 2011 (see id. at ¶¶ 117-18)) or to allow him to telecommute (id. at ¶ 28), and the reduction of his work responsibilities, which began in October of 2011. (See id. at ¶¶ 9, 14). In that same vein, plaintiff cites the fact that he was forced to share an office, an event precipitating -- and, one could argue, causing -- the overheard phone conference, as evidence of retaliation. (Id. at ¶¶ 23-24). Again however, defendants could not possibly have retaliated against plaintiff, in violation of either statute, until plaintiff engaged in protected activity and defendants were made aware of that activity.[8]

Under Section 1514(A) of SOX, a whistleblower action must "be commenced not later than 180 days after the date on which the violation occurs." 18 U.S.C. § 1514A(b)(2)(D). Plaintiff

---

[8] On that note, plaintiff's argument that he is entitled to tolling of the SOX statute of limitations because of defendants' alleged "concealment" is unavailing. (See Pl.'s Opp'n 11). The SOX statute of limitations cannot be tolled back to a time predating the protected activity engaged in by a plaintiff. Again, any alleged retaliatory conducted by defendants occurring before May 15, 2012, when plaintiff reported to the internal hotline, is not cognizable under SOX or Dodd-Frank.

filed a complaint with the integrity hotline on May 15, 2012, and therefore his claims that involve action taken by defendants after plaintiff engaged in this protected activity, namely, his suspension, which occurred on September 12, 2012, and his termination, which occurred October 24, 2012, are timely. Dodd-Frank's six-year statute of limitations would similarly encompass plaintiff's claims that his suspension and termination were retaliation for whistleblowing. Indeed, defendants do not dispute that plaintiff's Dodd-Frank claims are timely. (See Def.'s Reply 5 n.3).

### 3. Conclusion -- SOX and Dodd-Frank Claims

In sum, we find that the anti-retaliation provisions of both SOX and Dodd-Frank do not apply extraterritorially to plaintiff's case, and we recommend that his whistleblower claims be dismissed.[9]

---

[9] Because these claims are barred by their extraterritorial nature, we need not address defendants' argument that the complaint fails in other respects to plead cognizable claims under the cited statutes.

**B. Defamation and False Light**

Plaintiff next claims that defendants defamed him and subjected him to false-light publicity when Cahill posted plaintiff's Performance Improvement Plans ("PIPs") on a shared work calendar, where they were ostensibly visible to other employees. (Am. Compl. ¶ 73). According to plaintiff, the published PIPs falsely state that his job performance was faulty due to, inter alia, his lack of teamwork and poor writing abilities. (Id. at ¶¶ 74, 75, 82; see also Nuccio Decl. Ex. E). These actions, plaintiff states, caused other Moody's employees to avoid working with him, and gave others a false impression of plaintiff's work ethic and skills. (Am. Compl. ¶ 81). Further, plaintiff argues that the "repeated, unprivileged publication of private information, the provable falsity of the published attacks o[n] [his] professional ability and character, and the demonstrated harm from their publication to his reputation show actual malice." (Id. at ¶ 83).

As a threshold matter, defendants argue that New York does not recognize a claim for false-light publicity. (Def.'s Mem. 12). They go on to assert that plaintiff's defamation claim should be dismissed because 1) the PIPs at issue are non-

28

defamatory on their face; 2) any statements made in the PIPs are non-actionable opinion; 3) to the extent that they contain verifiable facts, the statements made are substantially true; and 4) the PIPs are covered by the common-interest privilege, requiring plaintiff to plead actual malice, which defendants contend he has failed to do. (Id. at 2, 12-20).

In opposition, plaintiff contends that the falsity of the statements made in the PIPs can be proven, and argues that his refusals to work on specific projects and criticisms of defendants' research methodologies were based upon adherence to securities regulations. (Pl.'s Opp'n 12). He also argues that because the "gists" of the statements in the PIPs were false, they cannot be considered substantially true. Plaintiff claims that the PIPs caused him shame and disgrace among his coworkers. (Id. at 13). Lastly, he contends that defendants are not protected by qualified privilege for employers, because the "dozens of employees" who shared plaintiff's calendar did not have a need to know about the information communicated in the PIPs. (Id.).

In reply, defendants argue that a defendant asserting truth as a defense in a libel action is not required to justify every

word, and that it is sufficient that the gist of the matter is true. (Defs.' Reply 7-8 (citing Gomba v. McLaughlin, 504 P.2d 337, 339 (Colo. 1972)). Further, defendants repeat that the common-interest privilege should apply, because plaintiff cannot show that the PIP statements were made for the sole purpose of defaming him, and they were not made with reckless disregard for the truth. (Id. at 8).

## 1. Choice of Law

At the outset, it should be noted that in their initial briefing, neither side explicitly addressed whether New York law or Hong Kong law should apply to plaintiff's common-law claims.[10] Defendants rely almost exclusively on New York law in their brief and reply, and plaintiff in his opposition cites cases interpreting New York law. (See, e.g., Pl.'s Opp'n 14). Usually when this is the case, we would assume that both parties were advocating the use of New York law. See, e.g., Vacold LLC v. Cerami, 545 F.3d 114, 122-23 (2d Cir. 2008) (citing Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999) (finding the choice-of-law issue waived when the defendant "fail[ed] to bring

---

[10] Defendants do state, in a footnote, that there is no conflict between Hong Kong and New York law relating to at-will contracts (Defs.' Mem. 26 n.20), but this falls short of advocating the use of New York law for all of plaintiff's common-law claims.

to the attention of the district court the potential applicability of [another jurisdiction's] law")); Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) ("Here, the parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law"). But on October 5, 2013, plaintiff sent a letter to the court arguing that Hong Kong law should apply to his common-law tort and contract claims. (See Oct. 5, 2013 letter to the Court from Paul C. Ulrich (Dkt. No. 34) ("Ulrich letter") at 1). We noted that briefing was complete on May 29, 2013, and therefore deemed this letter to be an extremely tardy sur-reply that sought to raise an issue of foreign law under Fed. R. Civ. P. 44.1, and allowed defendants to respond. (See Order, dated Nov. 13, 2013 (Dkt. No. 35)). In response, defendants assert that the question of which jurisdiction's law to apply has been resolved through the briefing, and that plaintiff has waived his argument to use Hong Kong law by failing to assert it in his opposition. (See Dec. 6, 2013 letter to the Court from Joseph A. Nuccio, Esq. (Dkt. No. 37) ("Nuccio Letter") at 2).

"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules in the forum state." Access 4 All Inc. v.

*Trump Int'l Hotel & Tower Condominium*, 2007 WL 633951, at *3 (S.D.N.Y. Feb. 26, 2007) (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989)). Here we are exercising our diversity or supplemental jurisdiction to adjudicate plaintiff's common-law tort and contract claims,[11] and therefore we apply New York's choice-of-law rules. "In New York . . . the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws. It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis." *Access 4 All*, 2007 WL 633951, at *3 (quoting *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001)).

---

[11] Plaintiff mistakenly asserts in his amended complaint that we are hearing this case under both federal question and diversity jurisdiction (*see* Am. Compl. ¶ II.A), but complete diversity is at least open to question as defendants are corporations headquartered in New York and plaintiff affirms that he was a resident of New York before moving to Hong Kong, owns a home in New York, and intends to return there. (*Id.* at ¶ II.C.i.). Diversity hinges on where each party is domiciled, and that inquiry looks at (1) the party's physical presence in the state; and (2) the intent to remain in that state indefinitely. *See, e.g.*, *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). The second element does not require that the person have an affirmative intent to remain permanently in the state, merely that he has no present intent to move to another state. *Nat'l Artists Mgmt. Co., Inc. v. Weaving*, 769 F. Supp. 1224, 1227 (S.D.N.Y. 1991). "One can reside in one place but be domiciled in another." *Mississippi Band*, 490 U.S. at 48 (quoting *District of Columbia v. Murphy*, 314 U.S. 441 (1941)).

It can certainly be argued, as defendants do in their response to plaintiff's letter, that there is no substantial conflict between New York and Hong Kong defamation law. (See Nuccio Letter 1). If we find that to be the case, we would use New York law to evaluate plaintiff's defamation claim, and we perform that analysis below.

In the alternative, if we were to find that there is a substantial conflict between Hong Kong and New York defamation law, we are to apply New York's "interest analysis" to this tort choice-of-law problem. See Connaughton v. Nat'l R.R. Passenger Corp., 809 F. Supp. 1, 2 (E.D.N.Y. 1992) (citing Arochem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992)). In that analysis, "the law of the jurisdiction having the greatest interest in the litigation will be applied." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 n.5 (2d Cir. 1997) (quoting Schultz v. Boy Scouts, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95 (1985)). Factors to be considered are the domiciles of the parties, the place where the tortious conduct occurred and where the injury was suffered, and the policies behind the substantive laws of the respective jurisdictions. Bing v. Halstead, 495 F. Supp. 517, 520 (S.D.N.Y. 1980). When the interest analysis does not point clearly to the law of any

jurisdiction, the law of the place where the tort occurred prevails. Id. (citing Neumeier v. Kuehner, 31 N.Y.2d 121, 128-29, 335 N.Y.S. 2d 64, 69-70 (1972)).

In applying this analysis, we note that the alleged defamatory action by defendants occurred in Hong Kong -- albeit using a computer calendar program accessible worldwide to post the content -- and plaintiff's injury was primarily suffered in Hong Kong, as exemplified by plaintiff's contention that the allegedly defamatory PIPs caused his colleagues to avoid working with him on projects. (See, e.g., Am. Compl. ¶ 81). Because it can be argued that both New York and Hong Kong law could apply to plaintiff's defamation claim, we undertake both analyses below. Under either jurisdiction's laws, however, plaintiff has failed to state a claim upon which relief can be granted.

### a. **Applying New York Law to Plaintiff's Defamation Claim**

In New York, a claim for defamation arises from a false statement that tends to "expose plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of

34

their friendly intercourse in society." <u>Baraliu v. Vinya Capital, L.P.</u>, 2009 WL 959578, at *10 (S.D.N.Y. Mar. 31, 2009) (quoting <u>Dillon v. City of New York</u>, 261 A.D.2d 34, 37-38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)). To plead such a claim, a plaintiff must allege facts that prove "(1) [a] defamatory statement of fact concerning the plaintiff; (2) falsity; (3) publication to a third party; (4) fault of the defendant; (5) special damages or <u>per se</u> actionability." <u>Arias-Zeballos v. Tan</u>, 2008 WL 833225, at *9 (S.D.N.Y. Mar. 28, 2008); <u>see also Peters v. Baldwin Union Free Sch. Dist.</u>, 320 F.3d 164, 169 (2d Cir. 2003).

As to the first element, "whether particular words are defamatory presents a legal question to be resolved by the court in the first instance . . . and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." <u>Golub v. Enquirer/Star Group, Inc.</u>, 89 N.Y.2d 1074, 1076, 659 N.Y.S.2d 836, 837 (1997). When determining whether a statement or publication is defamatory, courts "must give the disputed language a fair reading in the context of the publication as a whole." <u>Celle v. Filipino Reporter Enterprises, Inc.</u>, 209 F.3d 163, 176 (2d Cir. 2000) (citing <u>Armstrong v. Simon & Schuster</u>,

Inc., 85 N.Y.2d 373, 380, 625 N.Y.S. 2d 477, 481 (1995)). Courts are not to "strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous." Id. (citing November v. Time, Inc., 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 311 (1963)). Finally, "the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." Id. at 177-78.

The New York Constitution provides for absolute protection of opinions, and it is up to the court to decide as a matter of law whether the challenged statement is fact or opinion. See Celle, 209 F.3d at 178 (citing Rinaldi v. Holt, Rinehart & Winston, 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943, 950 (1977)). The court's "essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were . . . written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." Id. (quoting Steinhilber v. Alphonse, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 904 (1986)). If the statement reasonably would be understood as such, it is not protected opinion under New York law. Id.

However, the burden rests with plaintiff to establish that the disputed statement is not protected opinion. Id. at 179.

Under New York law, words that tend to "disparage a person in the way of his office, profession or trade" are defamatory per se. Davis v. Ross, 754 F.2d 80, 82 (2d Cir. 1985); see also Jewell v. NYP Holdings, Inc., 23 F. Supp.2d 348, 400 (S.D.N.Y. 1998). However, the evaluation of an employee's performance, even an unsatisfactory evaluation, is a matter of opinion that cannot be objectively categorized as true or false and cannot be actionable. Brattis v. Rainbow Advertising Holdings, L.L.C., 2000 WL 702921, at *3 (S.D.N.Y. May 31, 2000) (citing McDowell v. Dart, 201 A.D.2d 895, 895, 607 N.Y.S.2d 755, 755 (4th Dep't 1994)). Statements criticizing an employee's performance and comparing him unfavorably to other employees have been held to be nonactionable expressions of opinion, id. (citing cases), as these types of statements or evaluations often have no precise meaning and are merely a general reflection of the speaker's viewpoint. Wait v. Beck's North America, Inc., 241 F. Supp.2d 172, 184 (N.D.N.Y. 2003).

In order to sufficiently plead the third element of publication, a plaintiff must allege that the defamatory material, "through some act or the carelessness of the defendant, is read by or otherwise communicated to someone other than the person defamed and who understood its meaning and knew to whom it referred." Hochberg v. Nissen, 180 A.D. 2d 435, 435-36, 580 N.Y.S.2d 12, 12 (1st Dep't 1992) (quoting Weidman v. Ketcham, 278 N.Y. 129, 131, 15 N.E.2d 426 (1938)).

For the reasons that follow, plaintiff has failed to allege facts that could state a defamation claim under New York law.

Plaintiff claims that the PIPs were defamatory because they contain untrue statements about his work product and work ethic. According to plaintiff, he was a much better writer than his colleagues at Moody's, as evidenced by the fact that Moody's and MIS had a low standard for writing ability and he had far surpassed it, and he states that he was obviously a team player because he would not have been able to work so effectively otherwise. (Am. Compl. ¶ 96). But even if plaintiff believes that the statements contained in the PIPs were untrue, they constitute non-actionable opinion as a matter of law. See, e.g., Albert v. Locksen, 239 F.3d 256, 268 (2d Cir. 2001) ("No

workplace, we think, can operate effectively unless the employers and employees who work there have the ability to speak freely in evaluating the actions of their employees and co-employees."); Brattis, 2000 WL 702901, at *4 (negative performance reviews of plaintiff citing poor performance and distributed to other employees held to be nonactionable opinion); Tasso v. Platinum Guild Int'l, 1998 WL 841489, at *5-6 (S.D.N.Y. Dec. 3, 1998) (finding statements that plaintiff was "unethical, untrustworthy and unprofessional" and "incompetent" to be nonactionable opinion); see also id. at *5 (citing cases); Ott v. Automatic Connector, Inc., 193 A.D.2d 657, 658, 598 N.Y.S.2d 10, 11 (2d Dep't 1993) ("[A] defamation cause of action does not lie based on the allegations in the plaintiff's papers, as the unfavorable assessment of his work performance in the letter amounted to a nonactionable expression of opinion. An employer has the right to assess an employee's performance on the job without judicial interference.").[12]

---

[12] It should be noted that plaintiff has sufficiently pleaded publication. Under New York law, a statement is published as soon as it is read by anyone else, and "this rule applies even to statements made by one employee to another." Albert, 239 F.3d at 269. Plaintiff alleges that the PIPs were posted to his shared calendar (Am. Compl. ¶¶ 73, 81), that this calendar was shared with colleagues stationed all over the world (id. at ¶ 73 & n.27), and that "the news" of the PIPs "spread" to a London colleague named Hall. (Id. at ¶ 83). Making all inferences in favor of plaintiff, this is sufficient to plead publication. See Pirre v. Printing Developments, Inc., 468 F. Supp. 1028, 1041 (S.D.N.Y. 1979) aff'd, 614 F.2d 1290 (2d Cir. 1979) (citing

In sum, plaintiff has failed to state a claim of defamation under New York law.

### b. **Applying Hong Kong Law to Plaintiff's Defamation Claim**

Even if we were to apply Hong Kong law to plaintiff's defamation claim, it would still fail. Hong Kong's statutory defamation law is found in the Defamation Ordinance, Laws of Hong Kong Ch. 21 (1986). Defamation is defined as the "publication of a [false] statement which exposes a [person] to hatred, ridicule or contempt or causes him to be shunned or avoided by right-thinking members of society generally." Valerie A. Penlington, Law in Hong Kong: An Introduction 178 (1986) (citing the British case Sim v. Stretch, 2 A.E.R. 1237 (1936)). If a statement is communicated to another, it is considered "published" within the meaning of the statute. See Melissa K. Bauman, Defamation in Hong Kong and the People's Republic of China: Potential Perils of Two Standards of Free Speech, 15 Hastings Int'l & Comp. L. Rev. 671, 678 n.53 (1992). To analyze a claim of defamation, courts use a two-part test: (1) the court

Kennedy v. Butler, Inc., 245 N.Y. 204, 156 N.E. 666 (1927));
Loughry v. Lincoln First Bank, N.A., 67 N.Y.2d 369, 377, 502
N.Y.S. 2d 965, 969 (1986).

must determine if "all or any of the publications . . . can in any way be referable to [the plaintiff]", Lok Kwai-fu v. Y.C. Chan, H.K.L.R. 225, 228 (1978), and if so, (2) whether "taken individually or as a whole" the publication is libelous. Id.


On the ground of public policy, Hong Kong also has the available defense of qualified privilege, which "affords protection on certain occasions to a person acting in good faith and without any improper motive who makes a statement about another person even when that statement is in fact untrue and defamatory." Halsbury's Laws of Hong Kong, 2d Ed., § 380.586 (2010). The defendant must prove that the publication was subject to a qualified privilege, and to defeat that defense, the plaintiff must then prove that the defendant's motivation in the publication was malicious, or in other words that the defendant used the publication for a "sole or dominant indirect motive or improper purpose not connected with the privilege". Id. at § 380.587. "Statements made by employers as to employees' character, even if untrue, are protected by qualified privilege." Id. at § 380.591. The statement can be one made to a fellow employee, another employer thinking of hiring the employee, a current employer, or a previous employer to qualify as privileged. Id. This privilege even covers statements about

the nature of an employee's termination and the reasons underlying such. Id.

As plaintiff's employers communicating information relating to plaintiff's work performance to other employees, defendants are undoubtedly protected by this qualified privilege. Thus, under Hong Kong law plaintiff's defamation claim should be dismissed.

## 2. **False Light**

New York does not recognize an independent cause of action for the common-law "false light" tort. See Colandrea v. Town of Orangetown, 490 F. Supp.2d 342, 351 (S.D.N.Y. 2007); Amadsau v. Bronx Lebanon Hosp. Ctr., 2005 WL 121746, at *pincite (S.D.N.Y. Jan. 21, 2005) report and recommendation adopted sub nom. Amadasu v. Rosenberg, 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005) aff'd, 225 F. App'x 32 (2d Cir. 2007) (citing cases); Geary v. Goldstein, 831 F Supp. 269, 277 (S.D.N.Y. 1993) (citing Howell v. New York Post, 81 N.Y. 2d 115, 123, 596 N.Y.S.2d 350, 354, (1993)). Thus, under New York law, plaintiff's false-light claim is not cognizable.

As discussed above, plaintiff attempts to have us apply Hong Kong law to his common-law claims, including false light. However, similar to New York, Hong Kong does not have a false-light cause of action. See, e.g., The Law Reform Commission of Hong Kong, Executive Summary, Report: Civil Liability for Invasion of Privacy, Dec. 9, 2004, available at http://www.hkreform.gov.hk/en/publications/rprivacy.htm (last visited Dec. 31, 2013) ("We conclude that it is unnecessary to create a tort of giving publicity to a matter concerning an individual that places him before the public in a false light.").[13]

Because neither New York nor Hong Kong recognizes false light as a cause of action, plaintiff's claim fails. Thus, we recommend that defendants' motion to dismiss plaintiff's false-light claim be granted.

---

[13] Plaintiff's alternative argument, that we can exercise supplemental jurisdiction over his false-light claim because the tort of false light "is cognizable in at least some of the other six national jurisdictions in Asia Pacific and Europe where colleagues would have . . . received the defamatory PIPs", is plainly meritless. (Pl.'s Opp'n 13).

C. **Age Discrimination and Retaliation Claims Under ADEA and NYSHRL**

Plaintiff next claims that defendants discriminated against him because of his age, and later retaliated against him after he reported the discrimination. (Am. Compl. ¶¶ 118, 119). According to plaintiff, the discrimination came in the forms of a starting salary lower than that of his younger colleagues (id. at ¶ 91) and a denial of requested seating accommodations, namely a standing desk, even though a younger Australia-based employee at Moody's was provided with one. (Id. at ¶¶ 117-18). He also claims that he suffered discrimination from Cahill, who created a "hostile environment" and "sabotaged" his career with "malicious rumors" starting in 2008, and that he suffered retaliatory conduct following a complaint that he made to Forrey on May 9, 2012. (Id. at ¶ 97).

Defendants assert that plaintiff's age-discrimination and retaliation claims fail because he is unable to plead a prima facie case that his treatment and termination were due to his age. (Def.'s Mem. 2-3, 20-26). Defendants point out that plaintiff was hired by the same manager (Cahill) he now accuses of harboring age bias, only a few years before his termination.

44

Defendants also note, as an aside, that plaintiff does not explicitly allege that his suspension or termination were the result of age discrimination. (Id. at 21 n.14). Lastly, defendants argue that any ADEA claims based on events prior to August 26, 2011 are time-barred by the statute of limitations. (Id. at 20).


In opposition, plaintiff argues that he is entitled to use the statute of limitations under the Lilly Ledbetter Fair Pay Act, Pub. L. 111-2, 123 Stat. 5 (2009), to extend the time period covered by his pay-disparity claim. (Pl.'s Opp'n 15-16). In the alternative, plaintiff argues that the three-year statute of limitations under the New York State Human Rights Law § 296 covers his discrimination claim (id. at 16), or that the statute of limitations should be tolled because of defendants' concealment and plaintiff's ignorance of the law. (Id.). He further argues that he was similarly situated to other younger employees at Moody's who did not suffer the same kind of alleged harassment, discrimination, and denial of benefits. (Id. at 17-18).


In reply, defendants argue that plaintiff cannot take advantage of the Lilly Ledbetter Fair Pay Act because any

alleged pay disparity was resolved by August 2011. (Defs.' Reply 9). They further contend that plaintiff did not allege any cause of action under the NYSHRL, and therefore cannot take advantage of its statute of limitations now. (Id.). Additionally, defendants argue that plaintiff's ignorance of age-discrimination law does not warrant equitable tolling. (Id.). They repeat their arguments that plaintiff has not sufficiently pled that he was similarly situated to any of his alleged comparators at Moody's, and that a causal connection cannot be established between plaintiff's conduct and his alleged retaliatory termination. (Id. at 10).

## 1. **The Age-Discrimination Claim**

The ADEA prohibits employment discrimination on the basis of age against persons aged 40 or older. 29 U.S.C. §§ 623(a)(1), 631(a). To establish a prima facie case for age discrimination under ADEA, a plaintiff must show that (1) he was within the protected age group, (2) that he was qualified for the position, (3) that he experienced an adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Gorzynski v. JetBlue Airways

Corp., 596 F.3d 93, 106 (2d Cir. 2010); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).

Defendants argue that plaintiff has failed to put forward specific facts sufficient to plead a prima facie case, but they slightly misstate the standard we must employ at the motion-to-dismiss stage. In 2002, the Supreme Court held that an ADEA complaint may pass muster without detailed pleading of facts that would support a prima facie case, and that the required level of detail was controlled by Rule 8(a), which mandates a simple and short statement of the claim. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002). That said, the Supreme Court in its 2006 decision in Twombly and 2008 decision in Iqbal imposed a plausibility standard on Rule 12(b)(6) analysis. See Twombly, 550 U.S. at 560-70; Iqbal, 556 U.S. at 678. The net result is that a complaint must contain sufficient factual matter to "permit the court to infer more than the mere possibility of misconduct"; rather, the court must be able "to draw a reasonable inference that the defendant is liable for the misconduct alleged", Turkmen v. Ashcroft, 589 F.3d 542, 546 (2d Cir. 2009), and in doing so it must conduct its evaluation through a "'context specific' inquiry." Kajoshaj v. New York City Dep't of Educ., 2013 WL 5614113, at *3 (2d Cir. Oct. 15,

2013) (quoting Iqbal, 556 U.S. at 679). To permit the court to draw the required reasonable inference, "'a plaintiff must allege facts that allow the court in substance to infer elements of a prima facie case.'" Mohawk v. William Floyd School Dist., 2014 WL 838162, at *2 (E.D.N.Y. Mar. 3, 2014) (quoting King v. U.S. Sec. Assocs., 2012 WL 4122025, at *5 (S.D.N.Y. Aug. 22, 2012)).

Plaintiff was 45 years old when he was hired by defendants (Am. Compl. ¶ 89), and therefore meets the age-group requirement for protection under ADEA. There is also no real dispute that he was qualified for his position, as all plaintiff need establish is that he "possesse[d] the basic skills necessary for performance of the job". Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991). This is hardly an issue in this case, because "by hiring the employee, the employer itself has already expressed a belief that []he is minimally qualified." Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001). Thus, we need only examine whether plaintiff has sufficiently alleged that he suffered an adverse employment action giving rise to an inference of discrimination.

Termination and suspension are undoubtedly adverse employment actions, as is a failure to promote, all of which plaintiff does explicitly plead. (Am. Compl. ¶¶ 91, 119). However, plaintiff's failure-to-promote claim cannot survive a motion to dismiss because of the simple fact that plaintiff actually received a promotion to assistant vice president in October of 2010. (Id. at ¶ 98). Even if he had phrased his complaint to assert a discriminatory delay in receiving a promotion, that still would not be enough to qualify as an adverse employment action. See, e.g., Jeffrey v. Montefiore Med. Ctr., 2013 WL 5434635, at *20 (S.D.N.Y. Sept. 27, 2013) ("[I]t is a failure to promote, not a failure to quickly promote that makes an employment action materially adverse.") (emphasis in original); Davis v. City Univ. of New York, 1996 WL 243256, at *9 (S.D.N.Y. May 9, 1996) ("The eventual grant of tenure and a promotion to [plaintiff], even if after a delay, and even if that delay were due to discrimination or retaliation, contradicts her claim that she suffered a materially adverse change.").

Plaintiff's other allegations of discriminatory conduct -- that his work was subjected to a higher level of scrutiny than that of other employees (Am. Compl. ¶ 97), that he was

prohibited from voting during ratings committees despite his expertise (id. at ¶ 98), and that Cahill and others at Moody's failed to acknowledge or give due credit and praise for his work (id. at ¶ 129) -- do not rise to the level of adverse employment actions, even when considered together. See, e.g., Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 640 (2d Cir. 2000) ("To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."). Plaintiff did not suffer a demotion, a reduction of wages, or a loss of benefits, and though his work responsibilities may have been altered and he may have been subjected to increased scrutiny, from his complaint we can discern no loss of material work responsibilities. See Hill v. Rayboy-Brauestein, 467 F. Supp.2d 336, 352 (S.D.N.Y. 2006) ("[A] change in job responsibilities is not necessarily an adverse employment action. . . . Neither is underutilization of a Plaintiff's skills.") (internal citations omitted); see also Pimentel v. City of New York, 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) ("A materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity. While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.").

Similarly, plaintiff's claim that he was discriminated against because he was denied a standing desk is not cognizable under ADEA. First, it must be noted that plaintiff's request for a standing desk was not denied, but delayed until September 2012, when the equipment was delivered to him a few days before his suspension. (Am. Compl. ¶ 118). Second, even if his request had been denied outright, it would not qualify as a materially adverse employment action. If plaintiff were claiming that he suffered from a disability that required the use of a standing desk, and that defendants unreasonably denied him that accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), it is possible that this action would qualify as an impermissible denial of a necessary accommodation. However, plaintiff does not allege that he suffered from a disability within the meaning of the ADA; rather, he is alleging that the delay or denial of a standing desk qualifies as age discrimination, and therefore we must use the standard under ADEA, under which the delay in providing a standing desk does not qualify as an adverse employment action.[14]

---

[14] To state a claim under the ADA, plaintiff would have had to, at the very least, allege that the standing desk was an accommodation necessary for him to perform the essential functions of his job. See, e.g., McMillan v. City of New York, 711 F.3d 120, 125-26 (2d Cir. 2013). He has not claimed that this is the case, only that the denial evidences age discrimination against him.

Plaintiff also fails to plead any facts that would allow an inference that age discrimination had anything to do with his treatment by defendants. Showing disparate treatment of similarly situated individuals is one way to create an inference of age-based employment discrimination. See Andretta v. Napolitano, 922 F. Supp.2d 411, 418 (E.D.N.Y. 2013). In seeking to do so, Ulrich alleges that a younger MIS employee, Jeannie-Marie Noyce, promptly received a requested standing desk and that this evidences age discrimination, but he does not allege that they were similarly situated in any respect that could invite legitimate comparison of their respective treatment, stating only that she was a younger colleague employed in Sydney, Australia. (See Am. Compl. ¶ 118).[15]

Plaintiff's vague comparisons to other colleagues are also insufficient to show discrimination. Plaintiff compares his treatment with that of Simon Wong, who plaintiff claims was hired as a research writer at Moody's for a higher salary, was

---

[15] Indeed, because Ms. Noyce was employed in Sydney, it is not plausible that the decision regarding the standing desk was comparably similar for both employees -- that is, involving the same supervisors or criteria for providing the desk -- and plaintiff does not so allege.

allowed to vote in ratings committee meetings,[16] and was allowed to publish research under his own name. (Am. Compl. ¶ 100). We are unable to analyze whether plaintiff and Mr. Wong are similarly situated, however, because plaintiff neglects to include Mr. Wong's age. He also fails to plead any other specifics about this individual that would suggest that a salary or job difference was based on age animus. See, e.g., Crenshaw v. Hartman, 681 F. Supp.2d 412, 415 (W.D.N.Y. 2010) (citing Tejada v. Mance, 2008 WL 4384460, at *6 (N.D.N.Y. Sept. 22, 2008) (dismissing discrimination claim because plaintiff failed to allege facts plausibly suggesting that defendant's actions were motivated by discriminatory animus)).

Plaintiff also compares his treatment to that of a younger research writer named Jean-Francois Tremblay, who plaintiff states shared a similar educational background and qualifications, but was hired in New York at the vice-president level and quickly promoted. (Id. at ¶ 101). Because Tremblay was hired in New York and was based there, it is unclear whether Tremblay shared supervisors with plaintiff and therefore whether their respective treatments are subject to meaningful

---

[16] It appears that plaintiff was allowed to vote in ratings committee meetings once he was promoted to an assistant vice president. (See Am. Compl. ¶ 98). See n.2, supra.

comparison, and plaintiff fails to allege any other facts to support a plausible inference of age animus based on the alleged history of Mr. Tremblay. Similarly, plaintiff compares his treatment to GA Donovan, whom he describes as his "younger predecessor" and who allegedly told plaintiff that he was offered advancement opportunities and was allowed to attend rating committees, despite the fact that Donovan had only a liberal-arts background. However, plaintiff admits elsewhere in his complaint that he was allowed to attend and vote in rating committees beginning in October 2010. (Id. at ¶ 98). From plaintiff's submissions, it seems that the company-wide policy at Moody's was not to allow research writers to vote in these committees, and that plaintiff was allowed to vote once he was promoted to assistant vice president. (See id.). The fact that this policy applied to all research writers undercuts plaintiff's assertion that his treatment was based on his age.


Plaintiff has not alleged any additional facts that would tend to permit a plausible inference of age discrimination in his suspension and termination. He has not, for example, claimed that he was subjected to, or even overheard, disparaging comments about older employees. He contends that defendants used language "targeting younger, less-experienced candidates" but

the language he cites -- "strong attention to detail" and "work using own initiative and without close supervision" (id. at ¶ 119) -- does not suggest age concerns. Indeed, it even could be argued that these comments show that defendants were actually seeking older and more experienced candidates, who would need little supervision.

In sum, plaintiff has sufficiently alleged that he suffered several adverse employment actions, namely that he was suspended and subsequently terminated. However, he has failed to plead any facts from which we could plausibly infer that age discrimination was a contributing -- let alone motivating -- factor in either of these events. Because plaintiff's complaint does not include factual allegations sufficient "to raise a right to relief above the speculative level", Twombly, 550 U.S. at 555, we recommend that his claim for age discrimination under ADEA be dismissed.

Because plaintiff is pro se, we read his complaint liberally, and we assume that he intended to also bring an age discrimination claim under New York State Human Rights Law

("NYSHRL"). See Triestman, 470 F.3d at 476.[17] NYSHRL has an explicit provision regarding its extraterritorial application, stating that it applies "to an act committed outside this state against a resident of this state or against a corporation organized under the laws of this state or authorized to do business in this state, if such act would constitute an unlawful discriminatory practice if committed in this state." N.Y. Exec. L. § 298-a(1). Courts have interpreted this provision to apply to an act of discrimination committed outside of the state against a state resident. Torrico v. Int'l Business Machine Corp., 213 F. Supp.2d 390, 407 (S.D.N.Y. 2002). However, the New York Court of Appeals has underscored that the NYSHRL does not apply to non-residents, "who are unable to demonstrate that the impact of the discriminatory act was felt inside the state." Hoffman v. Parade Publications, 15 N.Y.3d 285, 291-92, 907 N.Y.S.2d 145, 149 (2010).


Because plaintiff is not a resident of New York, his factual allegations must additionally support a reasonable inference that defendants' alleged discrimination had an actual

---

[17] That plaintiff meant to state a claim under the NYSHRL is supported by his assertion in his opposition brief that the NYSHRL statute of limitations applies to his claims. (Pl.'s Opp'n 16).

impact in New York. <u>Doner-Hendrick v. New York Institute of Technology</u>, 2011 WL 2652460, at *8 (S.D.N.Y. July 6, 2011). At most, he has pleaded that the alleged discriminatory behavior had a "tangential connection" to New York -- claiming that his New York managers were responsible for his purported pay disparity (Am. Compl. ¶¶ 92, 99), that Michael West in New York was "behind" the policy to no longer allow research writers to vote in ratings committees (<u>id.</u> at ¶ 99), and that New York-based managers knew of Cahill's discriminatory treatment towards him but did nothing to stop it (<u>id.</u> at ¶ 113). These allegations do not allow Ulrich to claim protection under the NYSHRL, since the purported retaliation did not have an impact here. <u>See</u>, <u>e.g.</u>, <u>Hoffman</u>, 15 N.Y.3d at 288, 907 N.Y.S.2d at 146 (plaintiff's assertions that he attended quarterly meetings in New York, that he was managed from New York, and that the decision to terminate him was made in New York were not sufficient to satisfy the impact requirement); <u>Doner-Hendrick</u>, 2011 WL 2652460, at *8 (the "'impact' within the state that plaintiff must plead . . . is the direct effect of a discriminatory act on a protected individual").[18]

---

[18] Even if we were to apply the NYSHRL to plaintiff's claim, age discrimination suits brought under NYSHRL are subject to the same burden-shifting analysis, and are analyzed using the same standard, as claims brought under the ADEA. <u>See</u> <u>Tomassi v. Insignia Financial Group, Inc.</u>, 478 F.3d 111, 115 (2d Cir. 2007) (citing <u>Abdu-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 466

## 2. **The Retaliation Claim**

To state a claim for retaliation in violation of the ADEA, a plaintiff must allege (1) that he participated in a so-called protected activity, (2) that his participation was known to the employer, (3) that the employer undertook an action that was materially adverse to the plaintiff, and (4) that there was a causal connection between the adverse action and the protected activity. See, e.g., Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 70 (2006) (discussing Title VII's anti-retaliation provision); Kessler v. Westchester Count Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006) (applying Burlington to an ADEA claim because the court found its anti-retaliation provision to be "nearly identical" to that of Title VII). It bears emphasis that the adverse action need not be a step that alters the terms, conditions or status of plaintiff's employment. As the Supreme Court noted in Burlington, "[t]he scope of the anti[-]retaliation provision extends beyond workplace-related or employment-related retaliatory acts or harm." 548 U.S. at 67. Whatever the nature of the adverse conduct by the defendant, "[the] plaintiff must show that a

---

(2d Cir. 2001)); Delville v. Firmenich Inc., 920 F. Supp.2d 446, 458 (S.D.N.Y. 2013). Since plaintiff's pleading of an ADEA discrimination claim fails as a matter of law, so too would his claim for age discrimination under NYSHRL.

reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. at 67-68 (internal quotations omitted). The Court went on to emphasize that "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Id. at 69.

As with his age-discrimination claim, plaintiff is not required to plead facts sufficient to establish a prima facie case of retaliation in order to survive a motion to dismiss. See Williams v. New York City Housing Auth., 458 F.3d 67, 72 (2d Cir. 2006) ("The Swierkiewicz holding applies with equal force to any claim, including retaliation claims . . ., that the McDonnell Douglas framework covers."). Nonetheless, we use the prima facie standard as a guidepost when determining whether plaintiff has pled sufficient facts.

"[T]o establish participation in a protected activity, a plaintiff is required to show not an actual violation of the act, but only that he was acting under a good faith, reasonable belief that such a violation existed." Mabry v. Neighborhood

Defender Serv., 769 F. Supp.2d 381, 397 (S.D.N.Y. 2011) (quoting Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989)). Thus, the merits of a plaintiff's underlying discrimination claim are not dispositive of whether plaintiff's activity is protected under the ADEA. Id.

In this case, plaintiff claims that he was engaged in protected activity when he reported his claim of age discrimination to the EEOC on June 15, 2012 (Am. Compl. ¶¶ 2(f), 46, 81), and also when he made an oral complaint on May 9, 2012 to Forrey, and that he later suffered retaliation. According to plaintiff, the retaliatory conduct by defendants included the posting of the allegedly defamatory PIPs on his shared calendar. (Id. at ¶ 119; Pl.'s Opp'n 18). Defendants argue that the retaliation claim must be dismissed for failure to adequately plead a causal connection, and because plaintiff's oral complaint to Forrey does not qualify as protected activity. (Defs.' Mem. 24-26; Defs.' Reply 10).

It is well established that the filing of an EEOC complaint is a protected activity. Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 73 (2001). The EEOC is required by statute to promptly

notify all persons named in a charge as prospective defendants upon receiving such a charge, see 29 U.S.C. § 626(d)(2), and therefore we can infer that defendants were notified of plaintiff's complaint.[19] Thus, the first two prongs are satisfied insofar as plaintiff invokes his EEOC complaint as protected activity.

In contrast, plaintiff has not adequately pled a retaliation claim relating to his May 9, 2012 phone call to Forrey, because he has failed to plead facts that would allow us to reasonably infer that he engaged in protected activity known to defendants. According to plaintiff's complaint, during the phone call he complained of "Cahill's longstanding discrimination" toward him. (Am. Compl. ¶ 29). He also complained of "ongoing aural harassment" from his officemate, the denial of his request to telecommute, and perceived retaliation from Cahill for pointing out problems with past research. (Id. at ¶¶ 29, 30). They discussed two instances of plaintiff declining work assignments (id. at ¶ 31) and Forrey's assessment that plaintiff had poorly edited some publications. (Id. at ¶ 32).

---

[19] Indeed, defendants in their memorandum of law state that they were notified by the EEOC of plaintiff's charge on June 28, 2012. (Defs.' Mem. 20 n.12).

Nowhere in plaintiff's complaint does he allege that he informed Forrey during the May 2012 phone call that he believed that he was being discriminated against because of his age. In fact, plaintiff explicitly states elsewhere in the complaint that he intentionally omitted any mention of age discrimination in this conversation. (Id. at ¶ 123). Because this discussion did not serve to make Forrey aware that plaintiff was complaining of age discrimination, his oral complaint is not sufficient to constitute protected activity under the retaliation provision of ADEA. See 29 U.S.C. § 623(d); see also, e.g., Melie v. EVCI/TCI College Admin., 374 Fed. App'x 150, 153 n.* (2d Cir. 2010) ("Grievances are not generally considered protected activity when they fail to mention discrimination."); Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 123 (2d Cir. 2008) (plaintiff must show that he engaged in protected activity known to the defendant); Montanez v. City of New York, 2012 WL 2374205, at *5 (E.D.N.Y. June 22, 2012) (complaints made to supervisors were not protected activity where they were of a "general nature").

As for plaintiff's complaint to the EEOC, he must allege facts that could plausibly show that he suffered a materially adverse action and that the action was causally connected to his

protected activity. Plaintiff claims that the entire performance review process, including the publishing of the PIPs, was retaliatory in nature and was punishment for his complaints of age discrimination. (Pl.'s Opp'n 18). However, plaintiff has failed to explain how the posting of the PIPs could be construed as a materially adverse action. The ADEA "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington, 548 U.S. at 67. By contrast, "[a]ctions that are trivial harms -- i.e., those petty slights or minor annoyances that often take place at work and that all employees experience -- are not materially adverse." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011). Plaintiff's allegation that his work was criticized by way of a performance evaluation falls generally under the rubric of standard disciplinary measures and typical workplace procedures. See Sesay-Harrell v. NYC Dep't of Homeless Servs., 2013 WL 6244158, at *15 (S.D.N.Y. Dec. 2, 2013); see also, e.g., Valentine v. Standard & Poor's, 50 F. Supp.2d 262, 284 (S.D.N.Y. 1999) ("[N]egative reviews did not lead to any immediate tangible harm or consequences [and therefore] do not constitute adverse actions").

In his complaint, plaintiff lists multiple other instances that he claims constitute retaliation by defendants, some explained more clearly than others. For example, he claims that he was retaliated against for complaining about his low salary, but he does not explain in what manner. (Am. Compl. ¶¶ 92-93). He asserts that defendants provided him with no advancement path and denied him many training and development opportunities as part of a pattern of ostracism and retaliation by Forrey and Cahill. (Id. at ¶¶ 103, 106). He additionally claims that he was excluded from events and social gatherings. (Id. at ¶ 120). Finally, he claims that he suffered increasing retaliation from Cahill and Forrey following the May 9, 2012 phone conversation with Forrey, and the subsequent complaint to Moody's internal integrity hotline. (Id. at ¶ 122).

These claims regarding an increasingly hostile work environment, taken together, could plausibly be found to be materially adverse actions pursuant to ADEA's retaliation provision, as a reasonable employee might feel that these actions would dissuade them from making or supporting a discrimination charge. See Burlington, 548 U.S. at 69 (noting, inter alia, that while not inviting an employee to lunch may, in some circumstances, by trivial, exclusion from training lunches

that might contribute significantly to the employee's advancement could dissuade some from pressing a complaint). Plaintiff's suspension and subsequent termination are also undoubtedly materially adverse actions under the statute.

As to the required causal link, "a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (alteration in original) (citations omitted). Alternatively, plaintiff may establish causation by proffering evidence "that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990) (citation omitted).

Plaintiff's suspension and termination could be construed as retaliation for filing a complaint of age discrimination -- as they are undoubtedly materially adverse actions taken against him -- but only if he can allege facts that, if credited, could

lead to a plausible inference of a causal connection between defendants' actions and his protected activity. He seems to rely on a temporal proximity argument, suggesting that the three-month gap between his EEOC complaint and his suspension shows a causal connection. Courts in this Circuit "have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action", allowing a court to "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013) (quoting Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)).

Because we are at the motion-to-dismiss stage, and plaintiff is not required to plead a prima facie case of retaliation, we find that he has provided enough information in his complaint to draw a plausible inference that a causal connection exists between his June 15, 2012 EEOC complaint and his August and September 2012 suspension and termination. See, e.g., Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("five months is not too long to find" a causal connection"); Loksen v. Columbia Univ., 2013 WL 5549780, at *11

(S.D.N.Y. Oct. 4, 2013) (possible nine-month gap between adverse employment action and protected activity enough to show causal connection); Conklin v. County of Suffolk, 859 F. Supp.2d 415, 432 (E.D.N.Y. 2012) (almost six-month gap sufficient to show causation). Thus, we find his ADEA retaliation claim relating to his suspension and termination to be cognizable.

As to the other potentially materially adverse actions plaintiff describes -- for example, that his promotion and his requested seating accommodation were delayed, that his request to telecommute was denied, that his work was subject to increased scrutiny, and that he was denied due credit for his work -- he has failed to show a causal connection between them and his protected activity. Plaintiff's complaints of diminished job responsibility, hostility, and being denied his own office and the ability to telecommute all predated his EEOC complaint (see Am. Compl. ¶¶ 89, 92-93, 97, 103, 106), and therefore a causal connection between his protected activity and the alleged retaliation cannot be drawn. See, e.g., Sesay-Harrell, 2013 WL 6244158, at *20 (defendants cannot have retaliated against protected conduct that had yet to occur).

Thus, plaintiff has sufficiently pled an ADEA retaliation claim only with respect to his suspension and subsequent termination.[20]

### 3. **Statute of Limitations: ADEA Retaliation**

"Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). Discrete acts of discrimination or retaliation are deemed to have "occurred" on the day when they "happened." Id. at 110. If a plaintiff alleges multiple discriminatory acts, each individual act triggers "a new clock for filing charges alleging that act" id. at 113, and the term "practice" does not convert such related discrete acts into a single unlawful practice for the purpose of timely filing. Id. at 111. A claimant must file a charge within 300 days of the date of the act or lose the ability to recover for it. Id. at 110, see also 29 U.S.C. § 626(d)(1)(B).

---

[20] Again, we assume that plaintiff also meant to bring a retaliation claim under NYSHRL § 296. As with his discrimination claim, because he is not a New York resident and has failed to plead that there is anything more than a tangential connection between the alleged retaliatory conduct and the State of New York, he cannot utilize the NYSHRL. See pp. 55-57, supra.

According to plaintiff, events underlying his claim of retaliation began in "early February 2008 when [plaintiff] started working for [defendants] and continued through the date of unlawful termination." (Am. Compl. ¶ B.iv). As we have discussed, plaintiff filed his first charge with the EEOC on June 15, 2012 (id. at ¶ 46), and therefore only actions that occurred within 300 days prior to that date will be actionable.

Plaintiff's claims that his suspension and termination were a result of his age-discrimination complaint (id. at ¶ 122) are not time-barred and are cognizable, as they occurred on September 12, 2012 and October 24, 2012, respectively, only months after plaintiff's June 15, 2012 EEOC filing and well within the 300-day statute of limitations.[21]

---

[21] In his opposition, plaintiff makes the argument that the Lilly Ledbetter Fair Pay Act can be applied to his claim, ostensibly extending the statute of limitations of ADEA back in time to cover his myriad allegations. (Pl.'s Opp'n 15-16). He also seems to argue that the statute of limitations should be tolled due to concealment of plaintiff's rights by defendants. (Id. at 17). Putting to one side the merits of these arguments, we note again that the only adverse employment actions that plaintiff has sufficiently pled are his suspension and termination. Therefore, even if we were to extend the statute of limitations all the way back to February 2008, when he was hired, that would not save his insufficiently-pled allegations of poor treatment by defendants.

### 4. <u>Conclusion -- Retaliation Claims</u>

We recommend that defendants' motion, insofar as it relates to plaintiff's ADEA retaliation claim regarding his suspension and termination, be denied.

### D. <u>Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing Claims</u>

According to plaintiff, instead of the "minimal work for minimal pay" and "relaxed work environment" that he claims he was promised when joining Moody's, he was forced to "spend his full workdays drafting and redrafting repeated versions of research reports due to a harassing pattern of micromanagement, delays, and obstruction from Cahill." (<u>Id.</u> at ¶ 126). This, he argues, reflects bad faith by defendants in negotiation. (<u>Id.</u>). He claims that the Moody's recruiter, familiar as she was with Cahill's reportedly poor management skills, should not have represented to him that Moody's was a "relaxed work environment". (<u>Id.</u>).[22] Further, plaintiff claims that his

---

[22] Plaintiff also seems to imply that Moody's informed him that his supervisor was to be Gary Lau, but subsequently switched him to Cahill soon after he started work, redrafting and backdating

termination was a breach of his employment agreement with defendants (id. at ¶ 127), as was defendants' change in securities trading policy, which threatened the forced divestiture of his securities. (Id. at ¶ 172).

He also contends that Cahill's creation of a hostile work environment -- in the form of, in plaintiff's words, "harassment, ostracism, disparagement, and other behavior that constituted bullying" -- constituted a breach of an implied covenant of good faith and fair dealing. (Id. at ¶ 128). Based on a high turnover rate of research writers working under Cahill, plaintiff contends that others were probably subject to the same harassment, and that Moody's had a duty to investigate. (See, e.g., id. at ¶ 134).

In moving to dismiss these claims, defendants contend that plaintiff's January 28, 2008 job offer letter was not an employment contract, as it does not guarantee employment for any specific term. (Defs.' Mem. 26). Defendants assert that under New York law, absent an agreement establishing a fixed duration, the employment relationship is presumed to be at will, terminable at any time by either party. (Id.). Additionally,

---

a new offer letter that included Cahill's name. (Id. at ¶ 128 n.40).

defendants contend that Moody's decision to adopt a more stringent conflict-of-interest policy during the course of plaintiff's employment does not violate any portion of his offer letter. (Id. at 27). Lastly, defendants state that New York does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing when a breach-of-contract claim based upon the same facts is also pled. (Id. at 28).

In opposition, plaintiff argues that defendants' written job offer to him, signed by both parties, was an employment contract, and contained no mention of "at will" status. (Pl.'s Opp'n 22). He then attempts to marry his breach-of-contract claim with his ADEA and Dodd-Frank claims, arguing that because his termination occurred for discriminatory reasons, this constituted a contract breach. (Id.). He repeats his argument that defendants' change in company policy regarding the divestment of securities to which employees have access to MNPI was also a breach. (Id. at 23). He further contends that his claim for breach of good faith and fair dealing is based on separate arguments and a broader set of facts than his contract claim. (Id. at 23-24).

### 1. **Choice of Law**

Unlike plaintiff's common-law defamation and false-light claims, there is no actual dispute over whether to apply New York law or Hong Kong law to his contract claims. Defendants rely exclusively on New York contract law in their briefs, and plaintiff in his opposition does not argue that Hong Kong law should apply. In fact, plaintiff cites to New York case law in his opposition and states that "Defendants admit that this Court has jurisdiction over this cause of action by arguing that New York law governs the Defendants' contract of 28 January 2008 employing Plaintiff." (Pl.'s Opp'n 22). Plaintiff knew defendants were relying on New York law and did not dispute it, in fact using defendants' reliance on New York law as an argument to bolster his case, and this is enough for us to infer that New York law should be applied. See, e.g., Mason Tenders Dist. Council of Greater New York v. Concore Equip., Inc., 2011 WL 5548912, at *9 n.2 (S.D.N.Y. Nov. 10, 2011) (applying New York law where contract did not contain choice-of-law provision, defendant invoked New York law in briefing, and plaintiff did not dispute choice of law in its opposition).[23]

---

[23] In any event, there is no significant conflict between the laws of the two jurisdictions. Laws. Under Hong Kong law, either party to a contract of employment may at any time

## 2. **The Contract Claim**

The employment agreement between MIS and plaintiff enumerates a start date, starting salary, and target bonuses, and also describes a three-month probationary period and a twenty-day vacation leave. (Nuccio Decl. Ex. B at ¶¶ 1-5).[24] It contains a confidentiality clause stating that plaintiff's "obligations on disclosure and divulgence of information, and on securities purchases or sales are subject to applicable statutory regulations and our code of Ethics." (Id. Ex. B at ¶ 6). It also states that plaintiff "shall not undertake or have any interest in any activity or business which conflicts with the interest of [MIS] or with the performance of [his] duties at

---

terminate the contract without notice by agreeing to remit to the other party one month's pay. See Hong Kong Ordinances Cap 57 § 7(1A). This is substantially similar to the law in New York -- discussed in greater detail below -- which makes an employment agreement terminable at will unless otherwise specified. See Reid v. Ernst & Young Global Ltd., 831 N.Y.S.2d 362, 2006 WL 3455359, at *4 (Sup. Ct. N.Y. Cty. 2006) ("[T]he court discerns no actual conflict between Hong Kong law and New York law as they apply to a claim for breach of contract."). Where there is no conflict between the laws of two jurisdictions, no choice-of-law problem arises, and we would therefore apply New York law in any event. See, e.g., Employers Ins. Of Wausau v. Duplan Corp., 899 F. Supp. 1112, 1118 (S.D.N.Y. 1995).

[24] We refer to the terms of the contract, which defendants proffer, since it is referred to by plaintiff in his complaint and is integral to his contract claims.

[MIS]." (Id. at ¶ 7). The employment agreement does not define a fixed term of employment.

From what we can gather from the complaint, plaintiff is first alleging that defendants breached their employment agreement with him when they subjected him to a work environment that was more stressful than what he had anticipated. Plaintiff's crushed expectations of a leisurely work environment would not qualify as a breach, as there is nothing in the plain language of the employment agreement to suggest that this would be included in the terms. In fact, the only mention of "employment conditions" in the employment agreement relates to plaintiff's eligibility for fringe benefits after a probationary period. (See id. Ex. B at ¶ 8).

Plaintiff then argues that his termination breached his employment contract. (Am. Compl. ¶ 127). However, the employment agreement signed by plaintiff and defendants' representative does not specify any duration, making plaintiff an at-will employee of Moody's subject to termination at any time. Under New York law, "[a]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." Chimarev v. TD

Waterhouse Investor Servs., Inc., 280 F. Supp.2d 208, 216 (S.D.N.Y. 2003), aff'd, 99 F. App'x 259 (2d Cir. 2004) (citing De Petris v. Union Settlement Assoc., Inc., 86 N.Y.2d 406, 410, 633 N.Y.S.2d 274, 276 (1995)); see also Wright v. Cayan, 817 F.2d 999, 1002 (2d Cir. 1987) (holding that the law is well settled in New York that employment is at will and can be terminated at any time by either party, unless the duration of an employment contract is explicitly set forth). Thus at-will employees cannot maintain actions for breach of contract based on their termination, as they are not party to a contractual relationship. See Smalley v. Dreyfus Corp., 10 N.Y.3d 55, 58, 853 N.Y.S.2d 270, 272 (2008). Plaintiff argues that because his employment agreement did not use the term "at will", he was not an at-will employee (Pl.'s Opp'n 22), but under New York law, if an agreement is silent as to duration, at-will employment is assumed. See Sabetay v. Sterling Drug Inc., 69 N.Y.2d 329, 333, 514 N.Y.S. 2d 209, 211 (1987). Plaintiff therefore cannot assert a cause of action for a breach relating to his termination.

Plaintiff's second angle to his breach-of-contract claim -- that defendants' threat of forced divestiture of his securities violated a clause in his employment contract -- is also not cognizable. The employment agreement explicitly states that

plaintiff "shall not undertake or have any interest in any activity or business which conflicts with the interest of [MIS] or with the performance of your duties at Moody's Investors Service Hong Kong Limited". (Nuccio Decl. Ex. B at ¶ 7). Section 6 of the agreement states that plaintiff's "obligations on disclosures and divulgence of information, and on securities purchases or sales are subject to applicable statutory regulations and our code of Ethics." (Id. at ¶ 6). Thus, plaintiff signed an agreement to follow the rules made by defendants regarding conflicts of interests, disclosure of information, and securities purchases. Simply because defendants amended a company policy during plaintiff's tenure does not mean the contract was breached. It also must be noted that plaintiff was never actually forced to divest any of his securities, because he was granted an extension of the implementation of the policy until November 2012. (Am. Compl. ¶¶ 52, 68). The mere "threat" of this divestment caused him no harm, and in any event, does not constitute a breach.

### 3. **Claimed Breach of Covenant of Good Faith and Fair Dealing**

The argument underlying plaintiff's claim that defendants breached a covenant of good faith and fair dealing is somewhat

unclear. From what we can gather, plaintiff seems to be claiming that defendants' bad-faith negotiation of his employment contract and the hostile environment created by Cahill constituted a breach of the covenant. (Am. Compl. ¶ 128). In plaintiff's complaint, he details many instances of perceived harassment and poor treatment by Cahill directed at plaintiff and other staff members at MIS, intimating that defendants breached the covenant because they knew or should have known about Cahill's behavior and did not disclose it prior to the signing of the employment contract. (See, e.g., id. at ¶¶ 126-36).

Under New York law, the duty of good faith is an implied contractual term and "breach of that duty is merely a breach of the underlying contract." Jordan v. Verizon Corp., 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008) (quoting Fasolino Foods Co., Inc. v. Vanca Nazionale Del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)). Because raising both claims in a single complaint is redundant, courts regularly dismiss any freestanding claim for breach of the covenant of fair dealing. Id. at *7. Plaintiff argues that he meant for his claim for breach of good faith to be folded into his underlying breach-of-contract claim, and that therefore they are not separate causes of action. He also

contends that his good-faith claim encompasses many more facts than his breach-of-contract claim, including the allegation that defendants negotiated in bad faith. (Pl.'s Opp'n 23-24). However, plaintiff's good-faith claim refers specifically to the negotiation and formation of the contract that he claims was breached (Am. Compl. ¶ 128), and hence any breach of the duty of good faith would be a breach of the underlying contract. Accordingly, this claim should be dismissed.

As for plaintiff's termination, New York law does not impose a duty of good faith and fair dealing with respect to termination of an at-will employment agreement. Mirabella v. Turner Broad. Sys., Inc., 2003 WL 21146657, at *1 (S.D.N.Y. May 19, 2003) (citing Nunez v. A-T Financial Info., Inc., 957 F. Supp. 438, 443 (S.D.N.Y. 1997)).[25] The basis for this rule is that an obligation to abide by an implied covenant of good faith and fair dealing in this respect would be inconsistent with the employer's unfettered right to terminate an at-will employee. Nunez, 957 F. Supp. at 443 (citing cases). Thus, plaintiff has

---

[25] The Second Circuit has enumerated one exception: an at-will employee can recover for a breach of the covenant of good faith and fair dealing if the employee could demonstrate that his employment was terminated so that the employer could avoid paying him earned commissions on completed sales. Wakefield v. N. Telecom, Inc., 769 F.2d 109, 114 (2d Cir. 1985). Plaintiff does not allege that this occurred, nor would this be at all applicable to the facts of this case.

no claim under New York law for breach of an implied covenant of good faith and fair dealing, and defendants' motion to dismiss this claim should be granted.[26]

Alternatively, in recognition of plaintiff's pro se status, we note that his claim could be analogized to a fraud-in-the-inducement claim. (See Pl.'s Opp'n 23-24 (alleging that defendants negotiated in bad faith)). However, to state a claim for fraud in the inducement, a plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). More specifically, Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). Here, plaintiff has failed to satisfy the requirements of Rule 9(b). His amended complaint and opposition do not identify a single allegedly fraudulent statement, nor does he identify any speakers who allegedly made fraudulent statements or state where and when fraudulent statements were

---

[26] As an aside, plaintiff's breach-of-good-faith claim would also fail under Hong Kong law, as "there is no general principle of 'good faith and fair dealing' in contract law in the performance of a contract." Dawn Jade Ltd. v. Himanshu Girdhar Dua, HKEC 1957 (2013).

made. See Jalee Consulting Grp., Inc. v. XenoOne, Inc., 908 F. Supp.2d 387, 394 (S.D.N.Y. 2012). The only statement he references is the one allegedly made by Edith Mok -- that he could "spend half his time at work writing another novel" (Am. Compl. ¶ 126) -- and plaintiff does not explain why this vague statement can be plausibly read as both fraudulent and sufficient to induce him to sign the contract with defendants. Thus, it is not sufficient to meet the heightened standard of Rule 9(b) or common-law fraud pleading standards. See generally Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488, 836 N.Y.S.2d 509, 515 (2007).


### E. **The Sherman Act Claim**


For his last claim, plaintiff alleges that Moody's had an "informal agreement" with Standard & Poor's ("S&P") not to hire or poach each other's analytical staff, and that this constituted an illegal restraint of trade and commerce in violation of the Sherman Act. (Am. Compl. ¶¶ 139-40). He contends that since 2009, the U.S. Department of Justice has viewed such agreements, which plaintiff characterizes as a "duopsony", as per se illegal, regardless of proof of market impact. (Id. at ¶¶ 139, 159). According to plaintiff, this

agreement with S&P was directed from New York but gradually expanded to other Moody's subsidiaries. (Id. at ¶ 140). Plaintiff asserts that, in refraining from hiring and poaching from each other, each ratings firm has been acting against its own self-interest, evidencing a "collusive scheme to restrict free trade, commerce, and employees' rights of employment at a competitively determined salary". (Id. at ¶ 145). He contends that this alleged collusion lowered average compensation for affected employees by 15 to 20%, and presented obstacles to employees' ability to access better job opportunities at the competitor firm. (Id. at ¶ 146).


   Plaintiff asserts that he has standing to bring this cause of action because he is still an analytical employee of Moody's, entitled to back pay and damages since termination, and the alleged collusion has hurt his job mobility and limited his opportunities for higher compensation. (Id. at ¶¶ 156, 157). He argues that his antitrust injury is not a purely foreign one because he applied and interviewed for, or asked about, analytical jobs with S&P in New York as well as Hong Kong, and as a United States citizen with New York relatives, he is likely to eventually return here. Once he does, he contends, this

alleged collusion will bar him from obtaining a job at S&P's New York office. (Id. at ¶ 158).


In defendants' motion to dismiss, they assert that plaintiff's theory is implausible, as the agreement he alleges would be against both firms' economic self-interest, especially since he alleges that other ratings firms -- including Fitch and A.M. Best -- were not cooperating in the alleged conspiracy. Further, defendants argue that plaintiff's complaint lacks the basic level of detail necessary to demonstrate that such an illegal agreement exists, as it does not include any facts suggesting the requisite meeting of the minds between Moody's and S&P. (Def.'s Mem. 30).


Defendants also contend that plaintiff has not pled a basis to infer that he suffered an antitrust injury or that he has standing to bring a claim under the Sherman Act. (Id. at 32). Defendants note that plaintiff is alleging a conspiracy involving analysts, while plaintiff himself is a financial writer, and therefore would not have been affected by any alleged agreement. (Id.). Defendants also argue that any injury to plaintiff -- a Hong Kong resident employed by Moody's' Hong Kong subsidiary -- as a result of this alleged conspiracy would

be independent of any alleged effect on United States commerce, and that therefore he lacks standing to bring this claim. (Id. at 33).

Further, defendants argue that plaintiff has failed to allege essential elements of a Sherman Act claim, namely, a viable relevant market and market power. (Id.). Lastly, defendants contend that plaintiff's Sherman Act claim should be dismissed because it is barred by the applicable statute of limitations. (Id. at 34-35).

In opposition, plaintiff argues that the conduct of Moody's and S&P constitutes a violation of the Sherman Act under any analysis, but that it should be evaluated using the "per se" analysis. (Pl.'s Opp'n 31-32). He repeats that he has standing because he is a United States citizen injured by a conspiracy directed by an American company, with adverse consequence for commerce both in the United States and abroad. (Id. at 33).

In reply, defendants reiterate that plaintiff has failed to allege facts that would show any of the essential elements necessary to establish a conspiracy under the Sherman Act. (Def.'s Reply 16). Defendants note that plaintiff in his

opposition did not identify the relevant market power underlying his claim, and also failed to address the fact that he was a financial writer, not an analyst, and thus could not even qualify as a participant in the market that he claims was constrained by the alleged collusion. (Id. at 17-18). Defendants further repeat that plaintiff lacks standing to bring this claim and that the claim is time-barred since plaintiff is not protected by the "continuing conspiracy doctrine". (Id. at 18).

### 1. **Antitrust Standing**

While private citizens can sue under the Sherman Act, they must demonstrate antitrust standing. See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 (1986). Standing to bring an antitrust claim is analyzed using two metrics: first a plaintiff must demonstrate "antitrust injury, which is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" In re Digital Music Antitrust Litig., 812 F. Supp.2d 390, 400 (S.D.N.Y. 2011) (quoting In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009) (internal citations omitted)). Second, a plaintiff must show that he is a proper plaintiff in light of the factors discussed in Associated General Contractors v. California State Council of Carpenters,

459 U.S. 519, 540-45 (1983). These include: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. Id.; see also In re DDAVP, 585 F.3d at 688. Ultimately, antitrust standing analysis asks "which persons have sustained injuries too remote [from an antitrust violation] to give them standing to sue." Blue Shield of Virginia v. McCready, 457 U.S. 465, 476 (1982) (alteration in original).

Plaintiff alleges that he suffered an antitrust injury when he was denied the ability to transfer between firms and was unable to receive what he felt was adequate compensation for his work. According to him, this agreement "interfered with his financial prospects" relating to an October 2010 job application to S&P. (Am. Compl. ¶ 157). In his opposition, plaintiff states that he twice interviewed for positions at S&P (Pl.'s Opp'n 30) and was apparently not offered a position, but this assertion is not contained in his amended complaint.

Plaintiff's vague assertion that he was barred from potential job opportunities at S&P, and his forward-looking fear that this alleged agreement "will affect him" when he tries to apply to S&P in the future betray the unripe and speculative nature of his claim. Also, plaintiff has failed to put forward any provable facts that he was paid substantially less than other financial writers (presumably at places other than Moody's), or that this purported pay disparity was a result of the alleged agreement. Thus, he has not asserted that he has suffered an antitrust injury sufficient to confer standing.

As for the second standing inquiry, plaintiff refers to "analysts" (Am. Compl. ¶ 143), "credit analysts" (id. at ¶ 146), "ratings analysts" (id. at ¶ 147), "analytical staff" (id. at ¶ 145), "credit specialists" (id. at ¶ 143), and supervisors of credit or ratings analysts (id. at ¶ 147) throughout his complaint, seemingly claiming that these are the populations injured by the alleged agreement. Plaintiff himself, however, worked as a research writer and assistant vice president at MIS, not as a member of the analytical staff. (See id. at ¶ C.i.). He admits as much in his complaint, stating that "[a]lthough [plaintiff] was not a credit-rating analyst or manager supervising analysts at MIS, [plaintiff] has Article III

standing to bring this cause of action because . . . he is still an analytical employee of MIS, entitled to back pay and damages since termination". (See id. at ¶ 156). By plaintiff's own description, he is not representative of the category of persons negatively affected by this alleged conspiracy, though he contends that he was also personally affected. Plaintiff's conclusory assertion that he suffered an injury in addition to the injuries suffered by analytical staff is not enough to show that he is a proper plaintiff to bring this claim. Even if he had sufficiently pled a viable antitrust claim -- and we find below that he has not -- he clearly lacks standing.

In short, the complaint fails to allege a basis for standing to bring this Sherman Act claim.

### 2. **The Antitrust Claim**

Apart from plaintiff's lack of standing, he fails to plead the required elements of a Sherman Act claim. To survive a motion to dismiss, "it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to

engage in anticompetitive conduct] was made.'" In re Elevator
Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (alteration in
original) (quoting Twombly, 550 U.S. at 556). The complaint must
contain enough factual matter "to raise a reasonable expectation
that discovery will reveal evidence of illegal agreement." Hinds
County, Miss., v. Wachovia Bank N.A., 620 F. Supp.2d 499, 512
(S.D.N.Y. 2009) (quoting Twombly, 550 U.S. at 556). "Thus, an
allegation of parallel conduct coupled with only a bare
assertion of conspiracy is not sufficient to state a [Sherman
Act] claim." In re Digital Music, 812 F. Supp.2d at 398-99
(quoting Starr, 592 F.3d at 322). "Twombly requires that a
plaintiff provide 'specific time(s), place(s), or person(s)
involved in the alleged conspiracies'", Bel Canto Design, Ltd.
v. MSS Hifi, Inc., 2012 WL 2376466, at *7 (S.D.N.Y. June 20,
2012) (quoting American Medical Ass'n v. United Healthcare
Corp., 588 F. Supp.2d 432, 446 (S.D.N.Y. 2008)), and it is well
established that "[s]olely pleading opportunities to conspire is
not sufficient to support a claim of actual conspiracy." Id. at
*7 (citing Capital Imaging Assoc., P.C. v. Mohawk Valley Med.
Assocs., Inc., 996 F.2d 537, 545 (2d Cir. 1993)).

Plaintiff's assertion that an illegal agreement between
Moody's and S&P exists is based in part on an informal
investigation performed by plaintiff that searched online job

advertisements -- for analytical positions -- from Moody's and S&P. (Am. Compl. ¶ 141). As purported support for his allegation, plaintiff cites the facts that none of the job listings mentioned prior work experience at a rating agency as a desired qualification, and that Moody's re-hired employees who had left the company, only to rejoin it later. (Id.). Plaintiff also cites hearsay from unnamed "senior, former MIS executives from New York" and "an external recruiter from Hong Kong" in an attempt to bolster his argument that an illegal agreement exists. (Id. at ¶ 149).

To determine whether a plaintiff has alleged an unreasonable restraint of trade prohibited by the Sherman Act, a court may employ one of two tests: the rule of reason or the per se rule. Deciding which of these tests to apply is a question of law. Apex Oil Co. v. DiMauro, 713 F. Supp. 587, 595 (S.D.N.Y. 1989) (citing inter alia Gregoris Motors v. Nissan Motor Corp. in USA, 630 F. Supp. 902, 906 (E.D.N.Y. 1986)). The rule of reason is the approach typically used to judge acts allegedly in violation of the Sherman Act, and it requires a court to decide whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. Continental T.V., Inc. v. GTE Sylvania, Inc., 444 U.S. 36, 49 (1977). The plaintiff

must first demonstrate -- or at the motion-to-dismiss stage, allege -- that the assertedly improper behavior has an anticompetitive effect on the relevant market. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977). If the plaintiff does not sufficiently allege an anticompetitive effect, the complaint fails as a matter of law to state a cause of action under the antitrust laws. United States Football League v. National Football League, 842 F.2d 1335, 1360 (2d Cir. 1988).

"No-hire" or "no-switching" agreements, like the one to which plaintiff alludes in his complaint, are viewed as a subset of covenants not to compete, and for such allegations courts have used the rule of reason rather than the per se rule to determine whether or not a plaintiff has sufficiently alleged a cause of action under section 1 of the Sherman Act. See, e.g., Eichorn v. AT&T Corp., 248 F.3d 131, 144 (3d Cir. 2001), (analyzing a no-hire agreement under the rule of reason and denying per se treatment); Bogan v. Hodgkins, 166 F.3d 509, 515 (2d Cir. 1999) ("We have previously identified interagency no-switching agreements as 'distinguishable from those boycotts that have been held illegal per se.' . . . Although such agreements fall within the ambit of antitrust law, we have

nonetheless denied them per se treatment because 'a harmful effect upon competition [was] not clearly apparent.'") (internal citations omitted) (alteration in original); Union Circulation Co. v. Fed. Trade Commission, 241 F.2d 652, 657 (2d Cir. 1957) ("The restraints here under consideration, the 'no-switching' agreements, are dissimilar in several significant respects to the group boycotts that have been held illegal per se by the Supreme Court. The 'no-switching' agreements are directed at the regulation of hiring practices and the supervision of employee conduct, not at the control of manufacturing or merchandising practices. . . . Because a harmful effect upon competition is not clearly apparent from the terms of these agreements, we believe them to be distinguishable from those boycotts that have been held illegal per se."). See also Amerisource Corp. v. RX USA Int'l, Inc., 2007 WL 2816193, at *4 (E.D.N.Y. Sept. 26, 2007) ("Per se treatment is not appropriate in circumstances where anticompetitive effects on the market are not readily obvious or clearly apparent."); Aventis Environmental Science USA LP v. Scotts Co., 383 F. Supp.2d 288, 502 (S.D.N.Y. 2005) ("'[T]here is a presumption in favor of a rule-of-reason standard'") (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 725 (1988)); Dresses for Less, Inc. v. CIT Grp./Commercial Servs., Inc., 2002 WL 31164482, at *6 (S.D.N.Y. Sept. 30, 2002) ("Only conduct that is 'manifestly

anticompetitive' is designated as per se illegal. Most cases do not fall within the per se category.") (quoting Bogan, 166 F.3d at 514).


For a Sherman Act claim to survive a motion to dismiss, "an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes -- analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." Chapman v. New York State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008) (citing Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)). See also United States v. Grinnel Corp., 384 U.S. 563, 570-71 (1966) ("Definition of the relevant product and geographic markets is an element of plaintiffs' cause of action which must be pled and proved."); Hunter Douglas, Inc. v. Comfortex Corp., 44 F. Supp.2d 145, 151 n.9 (N.D.N.Y. 1999) ("The relevant market must be defined according to both geography and the product or service at issue."). "Market definition is a deeply fact-intensive inquiry [and] courts [therefore] hesitate to grant motions to dismiss for failure to plead a relevant product market." Id. at 238 (quoting Todd, 275 F.3d at 199-200). However, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule

of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Id. (citing Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)).

Application of the rule-of-reason analysis demonstrates that plaintiff has failed to allege a relevant market that has suffered an adverse effect on competition due to the purported agreement between defendants and S&P. Though the complaint alleges that this agreement had an anticompetitive effect on the wages and job prospects of credit rating analysts (Am. Compl. ¶ 159) -- which we assume to be the market that plaintiff is alleging was harmed -- it does not identify a geographic boundary to limit the market in any way. The closest plaintiff comes to enumerating a geographic market is in his opposition brief, when he states that "MIS and S&P did not limit their collusion by geography or time period, so a court can infer that the highest corporate levels approved and perpetuated such illegal wide-ranging, company-wide, and worldwide policies." (Pl.'s Opp'n 32).

Even if we are to assume all facts in plaintiff's favor --
that Moody's and S&P entered into an agreement not to poach each
other's analytical staff, making it impossible for credit rating
analysts to switch from one company to the other -- this
relevant market fails to encompass all interchangeable
substitute products; specifically it does not include employment
at other comparable ratings agencies such as Fitch and A.M.
Best.  See, e.g., Chapman, 546 F.3d at 238. The relevant market
must be broad enough to encompass all ratings agencies that are
reasonably interchangeable with Moody's and S&P, and plaintiff's
complaint explicitly leaves out other ratings agencies.
Plaintiff is only concerned with analysts being able to transfer
between, and receive comparative salaries from, Moody's and S&P,
but credit analysts -- of which plaintiff is not even one -- are
apparently able to transfer from Moody's or S&P to other
agencies without restriction.


Even if it could be found that plaintiff sufficiently
alleged a relevant market, he has not alleged a factual basis
for inferring that defendants' conduct has had an "actual
adverse effect on competition as a whole in the relevant market;
to prove it has been harmed as an individual competitor will not
suffice." Integrated Systems & Power, Inc. v. Honeywell Int'l,

Inc., 713 F. Supp.2d 286, 299 (S.D.N.Y. 2010) (citing Tops
Markets Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir.
1998) (emphasis in original)). Plaintiff states that this
alleged agreement has harmed competition for analyst jobs and
wages generally, but fails to back up this assertion with any
facts. He uses his contention that he was not properly
compensated, as well as his own ad-hoc investigations from
searching LinkedIn and cold-calling current employees of both
firms, to attempt to show that this alleged agreement has harmed
competition, but plaintiff's vague suspicions and limited
anecdotal evidence are not enough to plausibly show that this
agreement, if it exists, has had an actual negative effect on
analyst compensation and mobility. Like the relevant market
definition, the adverse effect on competition is a requirement
that must be alleged at the pleading stage, and thus plaintiff's
failure to plausibly allege an adverse effect on competition
dooms his Sherman Act claim. See, e.g., Twombly, at 556-57
("Without more, . . . a conclusory allegation of agreement at
some unidentified point does not supply facts adequate to show
illegality."); see also Mayor & City Council of Baltimore, Md.
v. Citigroup, Inc., 709 F.3d 129, 137 (2d Cir. 2013) ("If we
permit antitrust plaintiffs to overcome a motion to dismiss
simply by alleging parallel conduct, we risk propelling
defendants into expensive antitrust discovery on the basis of

acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy.").

Further, even if we were to conclude that plaintiff's circumstantial evidence constitutes "plus factors" that add to his allegation of parallel conduct, these alleged facts "must still lead to an inference of conspiracy." Id. at 136 (quoting Starr, 592 F.3d at 322). The circumstantial evidence put forward by plaintiff could lead to an equally plausible inference of either independent or interdependent behavior, falling well short of a tacit agreement. See Apex Oil Co. v. DiMauro, 822 F.2d 246, 254 (2d Cir. 1987).

Plaintiff argues that this case is analogous to In re High-Tech Employee Antitrust Litigation, 856 F. Supp.2d 1103 (N.D. Cal. 2012), where the court held that plaintiffs had adequately pled a section 1 Sherman Act claim based upon their allegations that six tech companies had engaged in agreements not to poach, or "cold-call," each other's employees. (See Pl.'s Opp'n 32). Not only is that case not controlling, it is readily distinguishable. In that case, the court found that plaintiffs had sufficiently enumerated the "who, what, to whom, where and

when" of the alleged overarching conspiracy, based upon the complaint's specific examples of various ways in which these "no cold-call" agreements could significantly impact employee compensation. High-Tech, 856 F. Supp.2d at 1115-18. There, the plaintiffs had included enough plausible facts to show that even one such agreement between any of the named defendant tech companies would have a ripple effect throughout the industry, depressing employee compensation and mobility. (Id. at 1121). In contrast, plaintiff has not adduced any evidence that would show that an agreement between MIS and S&P not to poach each other's analysts would have a ripple effect on analysts working in the industry, who were, as plaintiff admits, free to move to other ratings agencies, just not between MIS and S&P.


Plaintiff has utterly failed to state a cause of action under section 1 of the Sherman Act. He provides only general assertions of conspiracy, and pleads no facts to show -- or even raise the possibility that discovery will reveal -- that any agreement was made between Moody's and S&P, or that any such agreement would have adversely affected competition in a plausibly defined market. Because plaintiff has not plausibly pled a relevant market or an antitrust injury, he has failed to

state a cause of action, and we recommend that this claim be dismissed.

### 3. **Statute of Limitations: Sherman Act**

Since plaintiff fails to plead a viable Sherman Act claim, the parties' dispute as to the effect of the statute of limitations is moot. Nonetheless, we briefly address this issue in the interest of completeness.

Under the Sherman Act's statute of limitations, damages are recoverable if a plaintiff files suit within four years after a claim accrues. 15 U.S.C. § 15(b). An antitrust cause of action generally "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." Rite Aid Corp. v. American Express Travel Relateed Servs. Co., Inc., 708 F. Supp.2d 257, 263-64 (E.D.N.Y. 2010) (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971)). A plaintiff who timely files suit is entitled to recover damages that he has suffered, as of the filing date, that flow from the defendant's harmful act and all such damages that the plaintiff will predictably suffer in the future. Id. at 264 (citing Zenith, 401 U.S. at 339).

99

If, however, an antitrust violation consists of a series of acts that repeatedly invade a plaintiff's interests and continue over time, a cause of action may accrue each time the plaintiff is injured anew. Id. at 267. When the "continuing violation exception" applies, "[a]n overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." Zenith, 401 U.S. at 338. An overt act "is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." Rite Aid Corp., 708 F. Supp.2d at 268 (citations omitted). A plaintiff cannot, however, "use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997). The continuing violation exception only allows a plaintiff to recover damages caused by overt acts committed within the limitations period. Id. at 189.

It is unclear from plaintiff's complaint exactly when he allegedly suffered injury from defendants' purported conspiracy, though he appears to be asserting that the alleged agreement between Moody's and S&P negatively affected him from his initial

hiring until the present moment -- and presumably into the future. (See Am. Compl. ¶¶ B.v., 149, 160 (claiming that Moody's was engaged in a "longstanding" antitrust conspiracy dating back "at least 25 years")). In his opposition brief, he suggests that the conspiracy began in the 1980s or 1990s. (Pl.'s Opp'n 26 ("Until the late 1990s, which was, in all likelihood, ten years, and possibly even twenty or more years, after the start of the conspiracy . . .")). Plaintiff was hired by Moody's in 2008, more than four years before he filed this lawsuit; thus his argument that his starting salary was negatively affected by this agreement is certainly barred by the statute of limitations.

Plaintiff also contends that he can take advantage of tolling of the statute of limitations by using the "continuing violation" theory, claiming that defendants "did not limit their collusion by . . . time period." (Id. at 32). In the context of a continuing conspiracy to violate the antitrust laws, the statute of limitations runs from the commission of the act that injures the plaintiff, meaning that "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

Klehr, 521 U.S. at 189 (internal quotations omitted); see also
Zenith, 401 U.S. at 338. The continuing-violation doctrine,
however, is "heavily disfavored in the Second Circuit and courts
have been loath to apply it absent a showing of compelling
circumstances." Stouter v. Smithtown Cent. School District, 687
F. Supp.2d 224, 230 (E.D.N.Y. 2010). For plaintiff to restart
the statute of limitations, he must allege an overt act which
"(1) is a new and independent act that is not merely a
reaffirmation of a previous act and (2) inflict[s] new and
accumulating injury on the plaintiff." Vitale, 1994 WL 654494,
at *5 (year).


    Plaintiff does not sufficiently allege specific overt acts
by defendants that would allow him to toll the statute of
limitations. In fact, besides the allegation that defendants
entered into an agreement with S&P, plaintiff cites no overt
acts committed by defendants that could possibly be construed as
continuing violations of the antitrust laws. Just because
plaintiff alleges that the agreement was entered into before he
was hired and continued in effect after he was terminated, that
assertion does not restart the statute of limitations. See,
e.g., In re Ciprofloxacin Hydrochloride Antitrust Litigation,
261 F. Supp.2d 188, 229 (E.D.N.Y. 2003) (actions that are the

"abatable but unabated inertial consequences of some pre-limitations action" do not satisfy the requirements for a continuing violation).

### 4. Sherman Act -- Conclusion

In sum, plaintiff does not have standing to bring his Sherman Act claim, and even if he possessed such standing, his vague assertions of an alleged agreement between Moody's and S&P fail to state a claim for antitrust injury. In addition, his claim is barred by the statute of limitations.

### CONCLUSION

Based on the foregoing, we recommend that defendants' motion to dismiss be granted as to plaintiff's whistleblower, defamation, false-light, ADEA and NYSHRL age discrimination, NYSHRL retaliation, breach-of-contract, breach-of-covenant-of-good-faith-and-fair-dealing, and Sherman Act claims. We recommend that defendants' motion to dismiss be denied as to plaintiff's claim for retaliation under ADEA.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Vernon S. Broderick, Room 415, 40 Foley Square, New York, New York, 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

**Dated: New York, New York**
**March 31, 2014**

RESPECTFULLY SUBMITTED,

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

104

Copies of the foregoing Report and Recommendation have been sent today to:

Mr. Paul C. Ulrich, PRO SE
Four Seasons Place, #2036
8 Finance Street, Central
HONG KONG
PEOPLE'S REP. OF CHINA

Joseph A. Nuccio, Esq.
Morgan, Lewis & Bockius LLP
502 Carnegie Center
Princeton, NJ 08540-6241