UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9/30/2014_
```

------------------------------------------------------X
                  :

PAUL C. ULRICH,            :

                  :

            Plaintiff,   :            No. 13-CV-00008 (VSB)

                  :

        - against -      :           **MEMORANDUM & ORDER**

                  :

MOODY'S CORPORATION, et al.,  :

                  :

          Defendants.  :

                  :

------------------------------------------------------X

Appearances:

Paul C. Ulrich
Hong Kong
*Plaintiff Pro Se*

Joseph Alan Nuccio
Rene M. Johnson
Morgan, Lewis & Bockius LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Paul C. Ulrich, proceeding *pro se*, brings this action against Defendants

Moody's Corporation and Moody's Investors Service, Inc. (together, "Moody's"), asserting a

myriad of claims under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(b)(1)(A) (the "SOX Act");

the Dodd-Frank Act, Public Law 111-231, 124 Stat. 1376 ("Dodd-Frank"); the Age

Discrimination in Employment Act, 29 U.S.C ¶¶ 621-34 (the "ADEA"); New York State Human

Rights Law § 296; and the Sherman Antitrust Act, 15 U.S.C. § 1 (the "Sherman Act"); as well as

tort claims for defamation and false light, and breach of contract claims.  Before me are

Plaintiff's Objections to the Report and Recommendation issued by Magistrate Judge Michael H.

Dolinger, recommending that I grant in part and deny in part Defendants' Motion to Dismiss the

Amended and Verified Complaint, (Doc. 26) (the "Amended Complaint" or "Am. Compl.").  For the reasons that follow, Plaintiff's Objections are overruled in part and sustained in part, the Report is adopted as modified, and Defendant's Motion to Dismiss is:  (1) granted as to Plaintiff's SOX Act and Dodd-Frank claims; (2) granted as to Plaintiff's defamation and false light claims; (3) granted as to Plaintiff's age discrimination claims under the ADEA, except denied to the extent the Amended Complaint alleges pay discrepancy; (4) granted as to Plaintiff's claims of retaliation under the ADEA, except denied with respect to Plaintiff's employment suspension and termination; (5) granted as to Plaintiff's claims of breach of contract and breach of the covenant of good faith and fair dealing; and (6) granted as to Plaintiff's claims under the Sherman Act.

## I.      __Background__[1]

On or about January 28, 2008, Plaintiff and a representative of Moody's Investors Service Hong Kong Ltd. ("MIS") signed an employment offer letter that contained various terms related to Plaintiff's employment.  (Am. Compl. ¶ 127; Nuccio Decl. Ex. B.)[2]  Plaintiff began working at MIS, a subsidiary of Moody's on February 11, 2008.  (Am. Compl. ¶ 3; Nuccio Decl. Ex. B at 1.)  At the time his employment began, Plaintiff was 45 years old.  (Am. Compl. ¶ 89.)  Plaintiff worked as a research writer, or "Financial Writer".  (Am. Compl. at 2; Nuccio Decl. Ex. B at 1.)   In October 2010, Plaintiff received a promotion to assistant vice president ("AVP").  (Am. Compl. ¶ 98.)

Plaintiff is a U.S. citizen, but his employment with Moody's was based in Hong Kong, where he performed the majority of his work, which related to the Asia-Pacific region.  (*See* Am.

---

[1] Where indicated the following facts taken from the Amended Complaint are assumed to be true; however, I do not credit the legal conclusions or conclusory allegations contained therein.

[2] "Nuccio Decl." refers to the Declaration of Joseph A. Nuccio, Esq., filed on April 1, 2013.  (Doc. 20.)

Compl. at 2, ¶¶ 44, 100).  During his tenure at MIS, Plaintiff's first immediate supervisor was Brian Cahill, a corporate finance managing director based in Sydney, Australia.  (*Id.* ¶ 3.)  John Forrey, a corporate finance managing director based in New York, became Plaintiff's immediate supervisor in November 2010, (*id.*), although Cahill continued to exercise discretion over Plaintiff's employment, (*see id.* ¶¶ 9, 14, 28-30, 120-24).  Both Cahill and Forrey reported to Michael West, a corporate finance senior managing director based in New York.  (*Id.* ¶ 3.)

When Plaintiff began working at MIS he received about half the total compensation of colleagues in similar positions in New York and London.  (*Id.* ¶ 89.)  When Plaintiff addressed the salary discrepancy in July 2009 with Cahill and other supervisors, he was told that his pay was in line with Hong Kong salaries.  (*Id.* ¶ 92; *see also id.* ¶ 124.)  Plaintiff, however, believes that the true rationale for the pay discrepancy was age discrimination.  (*Id.*)  In response to Plaintiff's further inquiries about the issue in August and October 2009, Cahill stated that Plaintiff lacked teamwork skills and that other managers had given negative feedback about Plaintiff.  (*Id.* ¶ 93.)

Jean-Francois Tremblay, who was younger than Plaintiff, was also hired as a research writer several months after Plaintiff was hired in Hong Kong, but at a higher rank.  (*Id.* ¶ 101.) Tremblay was hired to work in New York for the Financial Institutions Group.  (*Id.*)  Tremblay, like Plaintiff, had a graduate economics degree and had worked as a government economist. (*Id.*)  Tremblay was hired as a vice president, several grades above Plaintiff, and subsequently received a promotion to assistant managing director in late 2011.  (*Id.*)  Almost from the beginning of his employment, Tremblay was allowed to make presentations to external audiences and received credit for research as a senior analyst and author, while Plaintiff was prevented from doing so by Cahill.  (*Id.* ¶ 102.)  Plaintiff received a promotion, and evidently a

pay raise, in October 2010.  (*Id.* ¶¶ 98-99.)

More generally, Cahill "created a hostile work environment that interfered with [Plaintiff]'s work and repeatedly sabotaged [his] career at Moody's . . . ."  (*Id.* ¶ 97.)  Among other things, Cahill "subjected [Plaintiff]'s work to far more scrutiny than required of [his] eight peers in other regions."  (*Id.*)  Cahill did not offer Plaintiff any plan for advancement.  (*Id.* ¶ 103.)  When Plaintiff asked why Cahill did not fill out a development plan for Plaintiff's annual performance evaluation, Cahill said that those plans were only for analysts.  (*Id.* ¶ 105.)  Cahill's evaluations also failed to provide Plaintiff with specific business objectives to meet.  (*Id.*)  In addition, Plaintiff was denied access to certain career-development activities, including his requests for time to participate in advanced Mandarin language sessions.  (*Id.* ¶ 106.)

In early 2011, Moody's hired Tania Hall to be a research writer in its London office.  (*Id.* ¶ 60.)  Hall's job description included spending half her time working remotely to assist Plaintiff on assignments for the Asia-Pacific region.  (*Id.*)  In September 2011, in reviewing a draft of an article, Plaintiff discovered an instance where Hall had lifted word for word text from a prominent newspaper article.  (*Id.* ¶¶ 63-65.)  Plaintiff alerted editors about the plagiarism, but believes Hall was never reprimanded over the incident.  (*Id.*)

In June 2011, Plaintiff submitted a doctor's note diagnosing him with osteoporosis and a back issue, and requested a standing desk.  (*Id.* ¶ 117.)  The request was denied.  (*Id.* ¶ 118.)  Plaintiff later learned that a younger colleague in Sydney had been given a standing desk to accommodate her back problems, and she was then allowed to bring the standing desk with her when she transferred to the Hong Kong office in May 2012.  (*Id.*)  Plaintiff thereafter renewed his request and received a standing desk in September 2012.  (*Id.*)

In July 2011, Plaintiff cooperated with an internal MIS investigation into a research

report concerning Chinese issuers of internationally rated bonds.  (*Id.* ¶ 4.)  The report contained factual errors due to faulty data or analysis by Moody's analysts, and its publication attracted inquiries from the Securities and Futures Commission of Hong Kong.  (*Id.*)  Plaintiff thought that the report contained possible securities violations and that Moody's Asian operations under Cahill's leadership had failed to follow Moody's public guidelines for investigating those violations.  (*Id.* ¶ 5.)  Cahill retaliated against Plaintiff based in part on his involvement in this investigation, including by preventing Plaintiff from attending an annual training session.  (*Id.* ¶ 6.)

In early 2012, Plaintiff played a role in preventing the publication of a report concerning issuers of Indonesian corporate bonds, (*id.* ¶¶ 10-12), and Cahill "stripped [him] of research functions" as a result, (*id.* ¶ 14).  In March 2012, at around the time that an "orchestrated retaliation" against him began, (*see id.* ¶ 18), Plaintiff criticized Moody's handling of its credit ratings of Korean government-related bond issuers, (*id.* ¶ 20).

Following that criticism, Plaintiff was, among other things, required to begin sharing an office with an analyst, (*id.* ¶ 24), an arrangement that Plaintiff found disruptive, (*id.* ¶¶ 26-27), and that prompted him to request permission from Forrey to work from home, (*id.* ¶ 28).  The request was denied by Cahill, even though Forrey could have authorized it.  (*Id.*)  Forrey notified Plaintiff of the denial by telephone on May 9, 2012.  (*Id.*)  On the call, Plaintiff informed Forrey about "Cahill's long-standing discrimination toward [Plaintiff]," (*id.* ¶ 29), and Forrey told Plaintiff that, according to Cahill, Plaintiff had refused to do work and had poorly edited certain publications, (*id.* ¶¶ 30-32).

On May 15, 2012, Plaintiff's officemate participated in a ratings call from their shared office rather than from a secure conference room.  (*Id.* ¶ 40.)  Plaintiff, unaware at the time that

his officemate was participating in a ratings call, made two external phone calls to individuals at the Hong Kong tax bureau.  (*Id.*)  When he realized what had occurred, Plaintiff believed that it was possible that the ratings committee call was overheard on his external calls, which may have been a securities law violation.  (*Id.*)  On May 15, 2012, Plaintiff reported his concern about "his forced overhearing of a confidential ratings committee without prior clearance and lodged complaints of long-standing age discrimination and harassment" through Moody's U.S.-based "integrity hotline".  (*Id.* ¶¶ 40-41.)

On May 31, 2012, Forrey issued Plaintiff a two-month Performance Improvement Plan ("PIP") outlining areas in which Plaintiff needed to raise his performance in order to meet expectations.  (*Id.* ¶ 42; Nuccio Decl. Ex. C.)  The PIP was posted on Plaintiff's Microsoft Outlook calendar, which Plaintiff shared with dozens of global colleagues, a fact known to Forrey before he posted the PIP.  (Am. Compl. ¶ 73.)  On June 15, 2012, Plaintiff mailed complaints of:  securities violations to the U.S. Securities Exchange Commission (the "SEC"); retaliation for complaints about securities violations to the United States Occupational Safety and Health Administration ("OSHA"); and age discrimination, harassment, and retaliation to the United States Equal Employment Opportunity Commission (the "EEOC").  (*Id.* ¶ 46.)  He also voiced concern to Cahill and others at Moody's about a potential securities violation by Moody's related to disclosures regarding Asian steel companies.  (*Id.* ¶ 47.)  Forrey and Cahill ignored Plaintiff's concerns and reprimanded him for raising issues with regard to the disclosures.  (*Id.*)

Beginning on June 8, 2012, certain MIS analysts began requesting Plaintiff to work on reports containing material, non-public information.  (*Id.* ¶ 48.)  Plaintiff had not previously been asked to work on such reports, and considered the requests further retaliation against him.  (*Id.*)  Plaintiff also alleges that the traditional types of work he was assigned were no longer being

assigned to him, in favor of publications based on material, non-public information.  (*Id.* ¶ 56.)
On July 9, 2012, Moody's implemented a new policy requiring employees with routine access to
material, non-public information to sell certain securities.  (*Id.* ¶ 49.)  Plaintiff requested but was
refused a waiver from the policy, and instead he was granted an extension until November 1,
2012.  (*Id.* ¶¶ 49, 52, 56.)

On August 17, 2012, Forrey extended the PIP through October 16, 2012, (*id.* ¶ 43;
Nuccio Decl. Ex. F), and on September 12, 2012, Plaintiff was suspended without pay for 14
days, based on allegations that Plaintiff had refused certain work, particularly work involving
material, non-public information, and had been insubordinate, (Am. Compl. ¶¶ 53, 55).  At the
conclusion of his suspension, Plaintiff signed a "Return to Work Agreement" dated September
27, 2012, in which he acknowledged that he would be required to work on publications based on
material, non-public information and that he could be terminated at any time with or without
cause.  (*Id.* ¶¶ 66-67; Nuccio Decl. Ex. H.)  Plaintiff was fired from MIS on October 24, 2012.
(Am. Compl. 2.)

## II.    Procedural History

Plaintiff filed his initial Complaint on December 26, 2012. (Doc. 1.)  The case was
originally assigned to the docket of Judge Lewis A. Kaplan,[3] who referred the matter to
Magistrate Judge Dolinger for general pretrial purposes and for reports and recommendations on
dispositive motions, (Doc. 4).  On April 1, 2013, Defendants filed a motion to dismiss the
Complaint.  (Doc. 18.)  Defendants withdrew that motion following Plaintiff's representation
that he would be filing an amended complaint.  (Docs. 21, 24.)  On April 22, 2013, Plaintiff filed
the Amended Complaint.  (Doc. 26.)  Plaintiff alleged the following claims:  (1) that he was

---

[3] The case was reassigned to me on February 3, 2014.

retaliated against for his whistleblower activities regarding potential securities law violations, in violation of the SOX Act and Dodd-Frank, (Am. Compl. ¶¶ 2-71); (2) that the posting of the PIPs constituted defamation or false light, (*id*. ¶¶ 72-87); (3) that he was subject to age discrimination and was retaliated against for complaining about age discrimination, (*id*. ¶¶ 88-124); (4) that his termination and forced divestiture of securities violated his employment contract and that the general working conditions he was subjected to violated the covenant of good faith and fair dealing, (*id*. ¶¶ 125-137); and (5) that Moody's and its main competitor, Standard & Poor's, violated the Sherman Act by agreeing not to recruit or hire each other's analytical staff and by agreeing to suppress the wages each paid to analysts, (*id*. ¶¶ 137-163).

On May 9, 2013, Defendants filed a Motion to Dismiss the Amended Complaint, (Doc. 27), Plaintiff filed his Opposition on May 17, 2013, (Doc. 30), and Defendants filed their Reply on May 28, 2013, (Doc. 32).  Almost five months after the completion of briefing on the motion, Plaintiff submitted a letter dated October 5, 2013, seeking to raise a choice-of-law issue regarding his tort and contract claims.  (Doc. 34.)  Magistrate Dolinger requested a response from Defendants (Docs. 35, 36), and Defendants responded on December 6, 2013, (Doc. 37).  On December 9, 2013, Plaintiff submitted a letter replying to Defendants' December 6 letter, (Doc. 38), which Magistrate Judge Dolinger declined to rely on as unauthorized and untimely, (Doc. 39).

On March 31, 2014, Magistrate Judge Dolinger issued his Report and Recommendation on Defendants' Motion to Dismiss (the "Report").  (Doc. 41.)  Plaintiff timely submitted his Objections to the Report on April 14, 2014, (Doc. 47), and Defendants filed their response on May 1, 2014, (Doc. 49).

### III.    **The Report**

Judge Dolinger's 105-page Report meticulously and thoroughly addressed each claim of

the Amended Complaint.  The following summarizes the dispositions recommended by Judge

Dolinger:

1. Plaintiff's whistleblower claims under both the SOX Act and Dodd-Frank should be dismissed because the anti-retaliation provisions of those statutes do not apply extraterritorially.  (Report 27.)

2. Plaintiff's defamation claims should be dismissed as facially insufficient under New York and Hong Kong law.  (*Id.* at 40, 42.)

3. Plaintiff's false light claims should be dismissed as no such cause of action exists under New York and Hong Kong law.  (*Id.* at 42-43.)

4. Plaintiff's age-discrimination claim under the ADEA should be dismissed because the Amended Complaint does not allege sufficient facts to suggest that age discrimination factored in Plaintiff's suspension or termination, (*id.* at 55), but his retaliation claim under the ADEA should survive the motion to dismiss, (*id.* at 69).

5. Any age-discrimination claim under the NYSHRL that might be read into the Amended Complaint should be dismissed because Plaintiff failed to allege that the discriminatory behavior had a connection to New York.  (*Id.* at 56-57.)

6. Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims should be dismissed under New York law because Plaintiff was an at-will employee.  (*Id.* at 76, 79-80.)

7. Plaintiff's Sherman Act claims should be dismissed because Plaintiff lacks standing to bring such claims, (*id.* at 88), and because the Amended Complaint fails to state a valid antitrust claim, (*id.* at 98-99).

### IV.    **Standard of Review**

A district court reviewing a magistrate judge's report and recommendation "may accept,

reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

judge."  28 U.S.C. § 636(b)(1).  Parties may raise objections to the magistrate judge's report and

recommendation, but they must be "specific[,] written," and submitted within 14 days after being

served with a copy of the recommended disposition, Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §

636(b)(1), or within 17 days if the parties are served by mail, *see* Fed. R. Civ. P. 6(d).

When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a *de novo* standard of review.   28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3).   Where no timely objection is made to a portion of a recommended ruling, the district court reviews that portion of the recommended ruling for clear error.   *See Wilds v. UPS, Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   This standard demands "more than a sheer possibility that a defendant has acted unlawfully."   *Id.*   "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."   *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.   *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).   A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."   *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).   Finally, although all allegations contained in the complaint are

assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

Even after *Twombly* and *Iqbal*, a "document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (internal quotation marks omitted).  Further, pleadings of a *pro se* party should be read "to raise the strongest arguments that they suggest." *Kevilly v. New York*, 410 F. App'x 371, 374 (2d Cir. 2010) (summary order) (internal quotation marks omitted).  Nevertheless, dismissal of a *pro se* complaint is appropriate where a plaintiff fails to state a plausible claim supported by more than conclusory factual allegations. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).  In other words, the "duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (alteration and internal quotation marks omitted).

### V.   **Plaintiff's Objections**

#### A.   *SOX Act and Dodd-Frank Claims*

Plaintiff first argues that the Report did not consider rules of the SEC providing that where a complaint is first made internally within a company, and then within 120 days it is submitted to the SEC, the complaint will be treated as if it had been made to the SEC when the complaint was first made.  (Objections 5.)[4]  Plaintiff contends that his SOX Act and Dodd-Frank retaliation claims therefore cover any retaliation related to his complaints about the March 2012 report concerning Korean bond issuers and about the methodology of rating Asian steel companies.[5]  However, the rule Plaintiff relies on for this objection, 17 C.F.R. § 240.21F-4(b)(7),

---

[4] "Objections" refers to Plaintiff's Objections to Magistrate Judge's Report and Recommendation.  (Doc. 47.)

[5] Plaintiff later objects that his July 2011 cooperation with an investigation should also serve as a trigger for retaliation.  (Objections 7.)  Despite recognizing the timeliness issues with his complaints made in early 2012, he fails to explain why a July 2011 event would not be straightforwardly barred by the 180-day limitations period for

applies to awards given to whistleblowers and not to the anti-retaliation provisions of the SOX

Act and Dodd-Frank.  As an initial matter, there is no basis for the argument that a rule that

applies to awards given to whistleblowers should be imported to apply to the anti-retaliation

provisions.  *See Liu v. Siemens A.G.*, __ F.3d __, 2014 WL 3953672, at *6-7 (2d Cir. Aug. 14,

2014) (rejecting argument that SEC's interpretation of whistleblower award provision in Dodd-

Frank as applying extraterritorially compels same interpretation of anti-retaliation provision).  In

addition, backdating the time of his complaints would make no difference here, as his claims that

his suspension and termination were retaliatory—the only two claims of retaliation done after

Plaintiff "blew the whistle"—would have been timely anyway.[6]  (*See* Report 26-27.)

Plaintiff next argues that the Report misconstrues his retaliation claim for his termination

as limited to age discrimination and not also to whistleblowing activities.  (Objections 5.)  The

Report does no such thing; as noted above, it expressly addresses a retaliation claim for

termination under the SOX Act and Dodd-Frank.  (Report 26-27.)

Finally, Plaintiff objects to the Report's conclusion that the anti-retaliation provisions of

the SOX Act or Dodd-Frank do not apply extraterritorially.  (Objections 8-11.)  Following the

Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, a court deciding whether

a statute applies extraterritorially first determines whether "there is [an] affirmative intention of

the Congress clearly expressed to give [the] statute extraterritorial effect . . . ."  561 U.S. 247,

255 (2010) (internal quotation marks omitted).  "When a statute gives no clear indication of an

extraterritorial application, it has none."  *Id.*  There is no clear indication of extraterritorial

such a claim, *see* 18 U.S.C. § 1514A(b)(2)(D).  There is no dispute that the July 2011 cooperation occurred more than 120 days before his June 15, 2012 complaint to the SEC and more than 180 days before he brought this lawsuit.

[6] In any event, as discussed below, the Report correctly recommends that Plaintiff's retaliation claims under the SOX Act and Dodd-Frank be dismissed because neither statute applies extraterritorially.

application in either the anti-retaliation provision of the SOX Act, *see* 18 U.S.C. § 1514A(a);

*Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 10 (1st Cir. 2006), or the anti-retaliation

provision of Dodd-Frank, *see* 15 U.S.C. § 78u-6(h)(1)(a); *Liu*, 2014 WL 3953672, at *4-7; *Asadi*

*v. G.E. Energy (USA), LLC*, No. 12-CV-345, 2012 WL 2522599, at *4 (S.D. Tex. June 28,

2012), *aff'd on other grounds*, 720 F.3d 620 (5th Cir. 2013).  Plaintiff's primary argument to the

contrary is that the extraterritorial application of the whistleblower awards in those statutes

compels extraterritorial application of the anti-retaliation provisions.  (Objections 8-9.)

Plaintiff's argument was recently and unequivocally rejected by the Second Circuit.[7]  *See Liu*,

2014 WL 3953672, at *6-7.  Specifically, the Second Circuit held that "there is no explicit

statutory evidence that Congress meant for the antiretaliation provision to apply extraterritorially,

and none of the tangential indications of extraterritorial application elsewhere in Dodd–Frank to

which [plaintiff] points are sufficiently germane or cogent to overcome the presumption against

extraterritoriality." *Id.* at *7.  Plaintiff attempts to justify the extraterritorial application by

raising his unsupported fear that "[e]ach year hundreds of tips" will otherwise go unreported.

(Objections 9.)  This is not a legal basis to justify the extraterritorial application, and, in any

event, policy arguments such as these are more appropriately addressed to Congress.

     The only question that remains is whether Plaintiff's claims are domestic or

extraterritorial.  The Report correctly concludes that they are extraterritorial.  (Report 23-25.)  By

his own admission, despite being a U.S. citizen, Plaintiff has had little if any connection to the

United States as part of his employment.  "[A]t all times during Plaintiff's entire employment

with Defendants, as well as subsequently, he has been a resident of Hong Kong, and during the

---

[7] Plaintiff's argument is also contrary to ordinary statutory interpretation, which provides that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks and alteration omitted).

past four years his legal status in Hong Kong has been that of a Hong Kong permanent resident."
(Objections 11-12.)  In addition, Plaintiff was hired and worked for a Hong Kong company
(MIS), and his alleged whistleblowing activities concerned, among other things, non-public
information disclosed in Hong Kong, and articles written for publication that concerned the
ratings methodology applied to Indonesian corporate bond issuers, Korean government-related
bond issuers, and Asian steel companies.  Plaintiff's suspension and termination both occurred in
Hong Kong.  In contrast to these concrete foreign connections, Plaintiff's claim that "managers
in New York orchestrated the retaliation" against him, (Am. Compl. ¶ 3), is a conclusory and
entirely speculative statement, and one at odds with his characterization of Australia-based
Cahill as his "Javert" even after New York-based Forrey became Plaintiff's direct supervisor,
(*see id.* ¶¶ 9, 14, 28-30).  In any event, on its own, the allegation that managers in New York
orchestrated the retaliation against him is insufficient to make the conduct domestic.  *See*
*Morrison*, 561 U.S. at 266 (that allegedly deceptive conduct occurred in the U.S. did not make
claim domestic); *Asadi*, 2012 WL 2522599, at *5 (that plaintiff held U.S. citizenship, was
terminated at-will under applicable U.S. law, and received termination email as sent from U.S.
did not make claim domestic).  "In short, simply alleging that some domestic conduct occurred
cannot support a claim of domestic application because it is a rare case of prohibited
extraterritorial application that lacks *all* contact with the territory of the United States."  *Liu*,
2014 WL 3953672, at *4 (internal quotation marks and alterations omitted; emphasis in
original).

      The authority Plaintiff cites to suggest the domestic origins of his claim is unpersuasive.
(Objections 9-10.)  On similar facts before it, the Administrative Review Board Panel in
*Villanueva v. Core Laboratories NV*, ARB Case No. 09-108, 2011 WL 7021145, at *8-10 (Dep't

of Labor Dec. 22, 2011), concluded that the anti-retaliation provision of the SOX Act did not apply extraterritorially and that the complaint did not allege a domestic claim.  There, a resident of Colombia, working for a Colombian company, complained of an allegedly improper transaction between that company and a company in the Dutch Antilles, which the whistleblower believed resulted in a violation of Colombian tax law.  *Id.* at *10.  The panel determined that the conduct was extraterritorial despite the whistleblower's insistence that "the allegedly fraudulent scheme he disclosed and the retaliatory termination of his employment were perpetrated by American executives of [the company] within the United States."[8]  *See id.* at *3, *10.  Meanwhile, Plaintiff's reference to *Dos Santos v. Delta Airlines, Inc.*, No. 2012-AIR-00020, 2013 WL 1282257 (Dep't of Labor Jan. 11, 2013), is misplaced since that decision exclusively concerned the anti-retaliation provision of a different and unrelated statute, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121.

Plaintiff's objections to the Report's recommended dismissal of his retaliation claims under the SOX Act and Dodd-Frank are overruled.

**B.    *Defamation Claims***

Plaintiff objects to what he perceives to be the Report's refusal to consider his arguments in favor of applying Hong Kong law to his defamation claim, (Objections 2, 5-6), as well as the Report's conclusion that New York and Hong Kong defamation law are substantially the same and would both bar Plaintiff's defamation claim,[9] (*id.* at 11-13).  First, the latter objection disproves the former, as Judge Dolinger considered Hong Kong defamation law.  (*See* Report 40

---

[8] The Fifth Circuit affirmed the panel's decision on the alternate ground that the whistleblower's activity was not covered by the anti-retaliation provision because the complaint concerned violations of foreign and not U.S. law. 743 F.3d 103, 109-110 (5th Cir. 2014).

[9] The fact that Hong Kong law is based on British law or that it might have data privacy and human resource code laws, (Opposition 12), is irrelevant.  The issue is whether or not the laws with regard to defamation are similar.

("Even if we were to apply Hong Kong law to plaintiff's defamation claim, it would still fail.").) Second, the Report is correct that Plaintiff's defamation claim fails under Hong Kong law.

Plaintiff claims defamation stemming from the PIPs being placed on his Microsoft Outlook calendar and thereby made accessible to his colleagues.  Under Hong Kong law, a defamatory statement is one that "tend[s] to injure the reputation of another person," including by "imput[ing] lack of qualification, knowledge, skill, capacity, judgment or efficiency in the conduct of his trade, business or professional activity."  Halsbury's Laws of Hong Kong ("Halsbury's") § 380.533 (2d ed. 2010).

A court reviewing allegedly defamatory statements "must first consider what meaning the words would convey to the ordinary person" and must then determine whether a "reasonable person would be likely to understand them in a defamatory sense."  *Id.* § 380.534. However, "[s]tatements made by employers as to employees' character, even if untrue, are protected by qualified privilege."  *Id.* § 380.591; *see Cheng v. Tse Wai Chun*, [2000] 3 H.K.C.F.A.R. 339, 355 (C.F.A.) ("The rationale of the defence of qualified privilege is the law's recognition that there are circumstances when there is a need, in the public interest, for a particular recipient to receive frank and uninhibited communication of particular information from a particular source.").  The qualified privilege extends to statements made under circumstances in which "the employer and the person to whom [the statements] were made had a common interest in the subject matter of the statements," including when statements are made to fellow employees.  Halsbury's § 380.591.  To overcome qualified privilege, "the plaintiff is required to . . . establish, on a balance of probabilities, that there was malice on the part of [the defendant]."  *Winmost Enters. Ltd. v. Chinlink Int'l Holdings Ltd.*, [2014] H.K.E.C. 564, ¶ 32 (C.F.I.); *accord* Halbury's § 380.591.  To demonstrate malice, a plaintiff must show that the

statements were intended to injure him, or that the speaker lacked an honest belief in the truth of the statement.  *Leung Kwai Ling v. Carmel Chow*, [2012] H.K.E.C. 1582, ¶ 19 (C.F.I.); *see also Winmost*, 2014 H.K.C.U. 826, ¶ 33 ("'[T]o destroy the privilege the desire to injure must be the dominant motive for the defamatory publication; knowledge that it will have that effect is not enough if the defendant is nevertheless acting in accordance with a sense of duty or in bona fide protection of his own legitimate interests.'") (quoting *Horrocks v. Lowe* [1975] AC 135).  A plaintiff's subjective disagreement with the performance evaluation of his supervisors or colleagues is insufficient to demonstrate malice.  *Leung Kwai Ling*, [2012] H.K.E.C. 1582, ¶ 21.

The statements in the PIPs are the type of subjective, constructive criticism that fall precisely within the scope and purpose of the qualified privilege.  *See Dr. Alice Li Miu Ling v. Hong Kong Polytechnic Univ.*, [2012] H.K.E.C. 1494, ¶ 147 (D.C.) (evaluative comments made in paperwork recommending dismissal of employee were subject to privilege).  None of the allegations in the Amended Complaint, or in the PIPs themselves, (*see* Nuccio Decl. Exs. D, E, F)[10], suggest in any way that the statements were made with malice; rather, they appear to be motivated by a desire to change Plaintiff's performance of his work responsibilities.  Nor does the context in which the statements in the PIPs were made—on internal software that may have been accessible by Plaintiff's other supervisors and colleagues, but not by a larger audience—suggest that they were intended to injure Plaintiff.  *Cf. Blakeney-Williams v. Cathay Pac. Airways Ltd.*, [2012] 15 H.K.C.F.A.R. 261, ¶ 81 (C.F.A.) (public statements questioning the fitness of pilots choosing to strike were actionable, but private termination letters were not, on grounds of qualified privilege); *Cheng*, 3 H.K.C.F.A.R. at 356 ("For instance, if a former

---

[10] The PIPs are properly considered on this motion because they were relied on and referenced in the Amended Complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

employer includes defamatory statements in an employment reference with the dominant purpose of injuring the former employee, the former employer is misusing the privileged occasion and this will vitiate his defence of qualified privilege."). Plaintiff's insistence that he informed Forrey of the falsity of the statements in the PIPs does not change that conclusion, but merely reflects Plaintiff's subjective disagreement with the statements. *See Leung Kwai Ling*, [2012] H.K.E.C. 1582, ¶ 21.

Accordingly, Plaintiff's objections to the Report's recommended dismissal of his defamation claims are overruled.

### C.   *ADEA Claims*

#### 1.   **Age Discrimination**

Plaintiff argues that the Report improperly concluded that the Amended Complaint did not raise an inference of age discrimination.  (Objections 13.)  In objecting, Plaintiff contends that the Report misread the record and failed to properly credit the examples of age discrimination described in the Amended Complaint.  Plaintiff believes the Report puts too much emphasis on certain facts and not enough on others.  The Report correctly recommends dismissal of most of Plaintiff's age discrimination claims, but the claim regarding pay disparity should be allowed to go forward.

To establish a prima facie case of age discrimination, a plaintiff must show:  (1) that he was aged 40 or older, (2) that he was qualified for the position, (3) that he experienced an adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012).  A plaintiff may satisfy the fourth element, an inference of discrimination, by showing among other

things that he was treated less favorably than similarly situated employees who were not members of his protected group.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).  However, "[a]t the pleading stage, a plaintiff need not establish a prima facie case satisfying the required elements of disparate treatment, but only sufficient facts to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 211 (2d Cir. 2010) (summary order) (quoting *Boykin*, 521 F.3d at 214) (alteration omitted).

As the Report notes, the first and second elements of an age discrimination claim are undisputed here.  The issues are whether certain actions amounted to adverse employment actions and whether the Amended Complaint raises an inference of discrimination.

The Amended Complaint relies heavily on allegations of disparate treatment in attempting to create an inference of discrimination.  As Plaintiff recounts in his Objections, the Amended Complaint alleges that Plaintiff was paid less and appointed to a lesser position than other research writers; that he was subject to a hostile work environment created by Cahill; that he received stricter discipline than Hall, a younger colleague in London, as well as other young editors did; and that he was not given a standing desk even though a younger colleague in Australia received one.  I agree with the recommendations in the Report with regard to the dismissal of all but one of Plaintiff's age discrimination claims.  Although it is an extremely close call, I find Plaintiff's allegations with respect to pay disparity sufficient to survive the Motion to Dismiss.

Pay disparity is a materially adverse employment action for purposes of a discrimination claim.  *See Humphries v. City Univ. of N.Y.*, No. 13-CV-2641, 2013 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013).  Here, Plaintiff identifies the disparity as discriminatory by alleging

that: (1) he was, at 45 years old, a member of a protected class; (2) he was similarly qualified to colleagues who were doing the same work as he was doing; and (3) he was paid significantly less than those colleagues and told that the disparity was driven by his being located in Hong Kong, when in reality it was the result of age discrimination. (*See* Am. Compl. ¶¶ 89, 91-93.) Plaintiff further provides a specific example of such a colleague by describing Jean-Francois Tremblay, a research writer whom Plaintiff claims was hired in New York a few months after Plaintiff, "who was younger than [Plaintiff] and . . . [who] had the closest qualifications to [Plaintiff]." (*Id.* ¶ 101.) While it is true that Plaintiff has not specifically alleged that all of these colleagues were not only younger than he but also outside the protected group, i.e., that each was less than 40 years old, that is a reasonable inference to draw from the Amended Complaint. Likewise, although Plaintiff describes his job as being billed by Moody's as "minimal work for minimal pay," (*see id.* ¶ 126), he does state that he was paid less than "colleagues in similar positions in New York and London," (*id.* ¶ 89), and that Cahill reviewed his work as well as the work of these colleagues, (*id.* ¶ 97). On a motion to dismiss, I will infer that these colleagues were in fact similarly situated despite potential distinctions raised by the Amended Complaint. Accordingly, Plaintiff's allegations were "sufficient to give [Moody's] fair notice of [Plaintiff's] claim and the grounds upon which it rests."[11] *See Boykin*, 521 F.3d at 214.

However, Plaintiff's failure to promote claim cannot survive. As the Report correctly notes, that claim is defeated by the fact that Plaintiff was in fact promoted in October 2010. (Report 49 (citing *Jeffrey v. Montefiore Med. Center*, No. 11-CV-6400, 2013 WL 5434635, at

---

[11] I cannot determine that the claim is barred by the statute of limitations, as Defendants suggest by stating in their motion papers that Plaintiff fails to allege that he continued to be paid less than his colleagues as of August 2011 (when the statute began to run against any ADEA claims) and after his promotion in October 2010, (Doc. 28 at 20 n.13). To the contrary, the Amended Complaint states that whatever raise Plaintiff received as part of his promotion only partially offset the pay disparity. (Am. Compl. ¶ 99.)

*20 (S.D.N.Y. Sept. 27, 2013); *Davis. v. City Univ. of N.Y.*, No. 94-CV-7277, 1996 WL 243256, at *9 (May 9, 1996).)  Plaintiff's subjective belief that the promotion "did not, to Plaintiff's mind, constitute a promotion in the sense of one based on merit but was rather just closing a disparity in rank and partially narrowing a pay gap," (Objections 13), has no merit and cannot save the claim.

The Amended Complaint also fails to set out a claim for hostile work environment. Under the ADEA, a hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment." *Kassner*, 496 F.3d at 240 (internal quotation marks omitted).  An ADEA plaintiff must also demonstrate that he was "subjected to the hostility because of [his] membership in a protected class." *Id.* at 241 (internal quotation marks omitted). Here, however, the allegations in the Amended Complaint only establish that Plaintiff received what he considered to be poor treatment from Cahill, and not that the treatment had anything to do with his age.  For example, the Amended Complaint states that Cahill did not give Plaintiff enough guidance on his career, (*see* Am. Compl. ¶ 105); did not reach out to Plaintiff promptly after Plaintiff was hired, (*see id.* ¶109); did not call Plaintiff frequently enough for Plaintiff's liking, (*see id.* ¶ 110); did not schedule meetings with Plaintiff in the manner Plaintiff preferred, (*see id.* ¶ 111); and was generally not as nice as Forrey, Plaintiff's other direct supervisor, (*see id.* ¶ 114).  None of these allegations, or any others concerning Cahill directly, appears in any way related to animus based on Plaintiff's age.  There is no allegation regarding even a single directly discriminatory comment made by Cahill.

Further, the Amended Complaint does not make out a case for disparate treatment on these grounds.  The only allegations regarding disparate treatment are that Cahill edited

Plaintiff's work more heavily than that of Plaintiff's peers, (*see id.* ¶ 97); that Plaintiff was not permitted to write under his own name, as two other colleagues were, (*see id.* ¶¶ 100, 102); that he was subjected to harsher discipline than colleagues, and in particular Hall, (*see id.* ¶ 65); and that he was denied permission to use a standing desk while a younger colleague was granted permission,[12] (*see id.* ¶¶ 117-18).  None of these is an instance of intimidation, ridicule, or insult, and even taken together they are too sporadic to qualify as pervasive.  *See Trachtenberg v. Dep't of Educ.*, 937 F. Supp. 2d 460, 473 (S.D.N.Y. 2013) (collecting cases).  Nor are any of these allegations alone sufficient to constitute materially adverse employment actions.  *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (internal quotation marks omitted).

The only reasonable inference to be drawn from all these allegations is that Plaintiff did not get along with Cahill.  The fact that Plaintiff was between 45 and 50 years old when he was interacting with Cahill does not transform their apparent conflict into age discrimination.  *See Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 396 (S.D.N.Y. 2011) (allegations evidencing "personality conflict" did not allege age discrimination).

Plaintiff's objections to the Report's recommended dismissal of his age discrimination claims under the ADEA are overruled, except that his age discrimination claim based on pay-disparity is sustained.  The Report will be modified accordingly.

### 2.     Retaliation

Plaintiff objects to the Report's recommendation limiting his retaliation claims for his

---

[12] Plaintiff received a standing desk in September 2012, so his claim for disparate treatment merely stems from the delay.

June 2012 EEOC complaint to his suspension in September 2012 and the termination of his

employment in October 2012.  Specifically, Plaintiff asserts (1) that he complained about

discrimination before June 2012, and (2) that the PIPs are actionable adverse employment

actions.  (Objections 15-18.)

      To establish a prima facie case of retaliation, Plaintiff must show (1) that he participated

in a protected activity, (2) that he suffered an adverse employment action, and (3) that there was

a causal connection between his engaging in the protected activity and the adverse employment

action.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).  In order to show

that he engaged in protected activity prior to June 2012, Plaintiff proposes in his Objections that

he be permitted to further amend his complaint to add allegations that he complained of age

discrimination during certain conversations with supervisors in May 2010 and May 2012.

(Objections 16.)  The addition of such allegations would be futile because Plaintiff cannot show

any additional materially adverse employment actions following May 2010 or May 2012 that

would be causally connected to protected activity.

      First, the PIPs do not qualify as adverse employment actions.  Constructive criticism and

evaluation plans are generally not adverse actions for purposes of a discrimination or retaliation.

*See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[I]n the

context of the issuance of a counseling memo . . . criticism of an employee (which is part of

training and necessary to allow employees to develop, improve and avoid discipline) is not an

adverse employment action.") (internal quotation marks omitted); *Waters v. Gen. Bd. of Global

Ministries*, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) ("[T]he issuance of a performance plan

and the recommendation that [plaintiff] attend [Employee Assistance Program] counseling

sessions do not constitute adverse employment actions.").  Although the PIPs and similar

criticism could qualify as adverse actions where they materially impact the terms and conditions

of the plaintiff's employment, *see Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 283-84, 288

(S.D.N.Y. 2008) (denying summary judgment because jury could have found performance plan

impacted terms of employment where, among other things, it laid out revised, objective

performance targets for plaintiff to meet, or risk termination), Plaintiff fails to allege sufficient

facts that demonstrate that the PIPs materially impacted the terms and conditions of his

employment.  Instead, Plaintiff repeats his claim that the critiques in the PIPs were based on false

information, but fails to describe how that affected his employment.  The change in Plaintiff's

working conditions occurred when he was suspended, which the Report already recommends is

properly the subject of a retaliation claim.

Second, assuming for purposes of this analysis that Plaintiff's May 9, 2012 call with

Forrey and his May 15, 2012 complaint to Moody's hotline were protected activities, the only

alleged adverse employment actions that occurred after those calls and could be causally

connected to those calls are Plaintiff's suspension and the termination of his employment.  *See*

*Graves v. Deutsche Bank Secs., Inc.*, 548 F. App'x 654, 656 (2d Cir. 2013) (summary order) (no

causal connection for retaliation claim where plaintiff's "termination *preceded* his complaints of

discrimination") (emphasis in original).  The Report already recommends that both incidents are

properly the subject of a retaliation claim.

Third, the Amended Complaint does not contain any allegations of discrete adverse

employment actions that occurred between the calls in May 2010 and May 2012.  While Plaintiff

claims that he was paid less than other, younger employees, he cannot claim that the disparity

was retaliation for protected activity because his claims of pay disparity relate back to the first

day of his employment with MIS.  *See id.*  The same is true of his claim that he was assigned a

lesser rank than other, younger employees.  *See id.*  The balance of Plaintiff's allegations of discrimination describe in only general terms, without reference to specific dates, discrepancies in the way his younger colleagues were treated.  The two exceptions are Plaintiff's allegation that he did not receive a standing desk pursuant to a June 2011 request even though a younger colleague was given one, (Am. Compl. ¶ 118), and that a younger colleague was not sufficiently disciplined in September 2011 for plagiarism related to a draft article, (*id.* ¶ 65).  Even assuming that those allegations constitute adverse employment actions against Plaintiff, both are too far removed temporally to raise any inference that they are causally connected to the May 2010 call. *See Rivera v. Orange Cnty.*, No. 10-CV-9134, 2013 WL 812016, at *11 (S.D.N.Y. 2013) ("courts in this district have generally inferred causation when fewer than six months elapsed between the two events"); *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 617 (S.D.N.Y. 2008) ("While the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, the weight of authority supports the view that ten or twelve months is too long.") (internal quotation marks omitted). And there is nothing else in the Amended Complaint to suggest that these actions were retaliatory.

Plaintiff's objections to the Report's recommended partial dismissal of his ADEA retaliation claims are overruled.

### D.      *Breach of Contract and Breach of Good Faith and Fair Dealing Claims*

Plaintiff does not object to the Report's recommendation that his breach of contract and breach of the implied covenant of good faith and fair dealing claims be dismissed under New York law because Plaintiff was an at-will employee.  The Report also refused to apply Hong Kong law to the breach of contract claims because Plaintiff did not raise the issue in opposing

the Motion to Dismiss, or at any point before then.  (Report 73.)  Plaintiff objects and argues that

Judge Dolinger should have applied Hong Kong law, which he believes would result in the

Amended Complaint stating viable breach of contract claims.  (Objections 18-20.)

As an initial matter, Plaintiff's October 5, 2013 letter—filed over four months after the

completion of briefing on the Motion to Dismiss the Amended Complaint—did not give

sufficient notice of his intention to raise a choice-of-law issue regarding foreign law.  *See* Fed. R.

Civ. P. 44.1 ("A party who intends to raise an issue concerning the law of a foreign country shall

give notice by pleadings or other writing.").  The cases Plaintiff cites to suggest otherwise all

involved parties who gave reasonable notice in their pleadings or earlier, *see Rationis Enters.*

*Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 584, 586 (2d Cir. 2005)

(defendant gave reasonable notice by stating in its answer that "substantive law of a foreign

country governs"); *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05-CV-4837, 2006 WL

399396, at *8 (S.D.N.Y. Feb. 21, 2006) (plaintiff gave reasonable notice where complaint

indicated "that [foreign] law governs (i) the duties [defendants] owed [plaintiff] as its investment

adviser and administrator; (ii) the applicable standard of care; and (iii) the right to

indemnification") (citations omitted); *cf. Torah Soft Ltd. v. Drosnin*, 224 F. Supp. 2d 704, 718-19

(S.D.N.Y. 2002) (applicability of foreign law determined by state court prior to removal to

federal court), whereas Plaintiff here cited only U.S. laws in his initial complaint and in his

Amended Complaint, and relied exclusively on New York law in briefing the contract claims for

purposes of this motion.  Even if Plaintiff's October 5, 2013 letter were treated as a sur-reply, it

would not have timely raised the issue.  *See Local 875 I.B.T. Pension Fund v.* Pollack, 992 F.

Supp. 545, 559 (E.D.N.Y. 1998) (noticing issue of foreign law in reply papers was "not

sufficient notice under Rule 44.1").  Simply put, nothing in Plaintiff's pleadings or his briefing

was "sufficient to alert the defendants that [Hong Kong] law is relevant to [the contract] claims.
*See Phoenix Four*, 2006 WL 399396, at *8.

Plaintiff is mistaken in his belief that his *pro se* status alone somehow excuses his failure
to make any reference to the choice-of-law issue in his pleadings or during briefing of the motion
to dismiss.  Rather, courts have generally applied the law discussed in briefing where a *pro se*
party failed to object.  See *Robert Smalls Inc. v. Hamilton*, No. 09-CV-7171, 2010 WL 3238955,
at *4 n.6 (S.D.N.Y. July 19, 2010) (*pro se* defendants waived argument that law other than New
York's applied, where they failed to raise the issue in briefing motion to dismiss); *PSG Poker,
LLC v. DeRosa-Grund*, No. 06-CV-1104, 2007 WL 1837135, at *3 n.6 (S.D.N.Y. June 27, 2007)
(summary judgment motion decided under New York law where plaintiff briefed New York law
and *pro se* defendant did not object); *cf. Elliott v. Nestle Waters N. Am. Inc.*, No. 13-CV-6331,
2014 WL 1795297, at *9 (S.D.N.Y. May 6, 2014) (entertaining choice-of-law issue because *pro
se* plaintiff's "opposition suggest[ed] an argument as to the applicability" of different state's
law).  For example, in *Nakano v. Jamie Sadock, Inc.*, the *pro se* plaintiff attempted to raise an
issue of Japanese law regarding a contract claim that had been dismissed on a motion for partial
summary judgment.  No. 98-CV-515, 2000 WL 680365, *3-4 (S.D.N.Y. May 25, 2000).  The
court held that the plaintiff's letter purporting to notice the issue was untimely, where plaintiff
had not indicated the applicability of Japanese law in her Amended Complaint, or in briefing
summary judgment.  *Id.*  The court made this ruling over plaintiff's argument that she was an
inexperienced litigant, noting among other things that the contract that allegedly called for
Japanese law was sued upon by plaintiff and was neither overly long nor highly technical.  *See
id.*  Here, Defendants briefed their initial, withdrawn Motion to Dismiss under New York law,
(*see* Doc. 19 at 24-26), and even referenced in a footnote the lack of conflict between New York

and Hong Kong law, (*see id.* at 24 n.12).  Yet Plaintiff subsequently amended his original complaint, and opposed the instant Motion to Dismiss the Amended Complaint, without giving any hint that he believed Hong Kong law should apply to the claim.  Given that Defendants noted the potential issue, and that Plaintiff lived and worked in Hong Kong (a fact that should have suggested to him the potential applicability of Hong Kong law), Plaintiff's failure to raise the issue in a timely way cannot be excused.  The Report was correct in deciding the claims under New York law.

Plaintiff's objections to the Report's recommended dismissal of his breach of contract claims are overruled.

### E.     *Sherman Act Claims*

Plaintiff objects to, among others, the Report's conclusions that he lacks standing to pursue an antitrust claim, (Objections 21-22), and that he fails to state a valid claim under the Sherman Act, (*id.* at 22-24).  Because these recommendations are correct, the Sherman Act claims must be dismissed.

#### 1.     Antitrust Standing

Plaintiff argues that the Report improperly applied the standing test used in class actions and that the Report was too heavily influenced by Defendants' arguments.  (Objections 21-22.) Neither argument has merit.

"Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534, (1983) (internal quotation marks omitted).  Accordingly, in addition to Article III standing, a plaintiff in a Sherman Act case must demonstrate "antitrust standing."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585

F.3d 677, 688 (2d Cir. 2009).  A Sherman Act plaintiff must show (1) that he suffered an antitrust injury, and (2) that he is an efficient enforcer of the antitrust laws.  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76-77 (2d Cir. 2013).  Assuming that Plaintiff meets the first requirement, the second inquiry focuses on the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Id.* at 78 (internal quotation marks omitted).  Here, it is plain that Plaintiff could not be a victim of the conspiracy contained in the Amended Complaint and is not an efficient enforcer of the antitrust laws.

The allegations in the Amended Complaint themselves demonstrate that Plaintiff lacks standing to bring the Sherman Act claims.  A central flaw in Plaintiff's claim for antitrust standing is that he describes the alleged conspiracy as affecting "analytical positions" at Moody's and its main competitor, Standard & Poor's ("S&P").  (*See* Am. Compl. ¶ 141; *see also id.* ¶¶ 146-48.)  However, Plaintiff, by his own admission, "was not a credit-rating analyst or [a] manager supervising analysts".  (*Id.* ¶ 156.)  Plaintiff was a "research writer," (*id.* at 2), and was not treated as an analyst, (*cf. id.* ¶¶ 99-100, 102 (describing differences in treatment between research writers and analysts).  In short, Plaintiff cannot be considered a victim of the conspiracy he has alleged.  However, after essentially excluding his position from the scope of the conspiracy, the Amended Complaint goes on to suggest in conclusory fashion that Plaintiff ought to be considered an analytical employee anyway, and purports to apportion Plaintiff's suppressed wages between the age discrimination he allegedly suffered and the effects of the antitrust conspiracy.  (*Id.* ¶ 156.)  I find that these conclusory allegations are insufficient to justify

Plaintiff's inclusion as a victim in the alleged conspiracy.

Even if this were not the case, the first three factors regarding an efficient enforcer weigh against Plaintiff. Specifically, the injury Plaintiff alleges is too indirect, in that whatever pay discrepancy he suffered as a result of the conspiracy was intended not for his position but for the analysts, and too speculative, for the same reason. In other words, whatever wage suppression Plaintiff may have suffered in his position of research writer was collateral to the conspiracy's alleged purpose of suppressing the wages of analysts. Further, based upon the allegations in the Amended Complaint, there is an identifiable class of persons far better situated to bring this antitrust claim: analytical staffers at Moody's or S&P.

Accordingly, Plaintiff's objections to the Report's recommendation that he be denied antitrust standing are overruled.

### 2.   Antitrust Claim

Plaintiff asserts in his objections that the Amended Complaint is sufficiently detailed regarding the alleged antitrust conspiracy to survive a motion to dismiss. (Objections 20-21.) The Report correctly concludes otherwise.

"In order to establish a conspiracy in violation of § 1 [of the Sherman Act], whether horizontal, vertical, or both, proof of joint or concerted action is required . . . ." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 183 (2d Cir. 2012). To prove the existence of this unlawful conspiracy, "'the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 184 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764 (1984)) (emphasis omitted; alteration in original). Accordingly, "[a]t the pleading stage, a complaint claiming conspiracy, to be plausible, must

plead 'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.*, it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Id.* (quoting *Twombly,* 550 U.S. at 556, 549, 557) (alteration in original). "The plausibility standard applicable is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678. A complaint that enumerates "basically every type of conspiratorial activity that one could imagine" and that lists "in entirely general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatsoever." *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50–51 (2d Cir. 2007). That is what Plaintiff has done in the Amended Complaint.

The Amended Complaint alleges in only the most conclusory terms an ongoing, global conspiracy, dating back as far as 25 years, between Moody's and S&P. Plaintiff has alleged no actual facts—direct or circumstantial—demonstrating that the two companies reached an agreement not to recruit or hire employees of the other, but only facts that are consistent with parallel conduct. The allegations that come closest to suggesting an agreement are the statement supposedly made to Plaintiff in February 2012 by a managing director of Moody's in Hong Kong that the companies had an "informal agreement not to hire or poach either other's staff", (Am. Compl. ¶ 139), and statements from two former MIS executives concerning an "unspoken rule" against hiring from S&P, (*id.* ¶ 149).[13] Proving that one manager for one of the companies made such a statement, or that two other executives sensed an "unspoken rule," fails to detail any

---

[13] In a similar vein, but farther afield, the Amended Complaint also highlights an S&P manager who heard "rumors . . . of such an agreement," (Am. Compl. ¶ 150), and two recruiters, only one of whom was affiliated with Moody's or S&P, who "referred to a 'gentlemen's agreement,'" (*id.* ¶ 149).

particular action on the part of either company, or come close to outlining the plausibility of an agreement between the two companies.  The remaining allegations in the Amended Complaint merely recite reasons why the companies would benefit from such an agreement—for example, that hiring directly from investment banks reduced the need to hire from each other, (*id.* ¶ 143), and that in light of their combined market share an agreement would have been effective in reducing compensation, (*id.* ¶¶ 146, 158-61)—and describe circumstances uncovered by Plaintiff's sleuthing that would be merely consistent with and by no means dispositive of an agreement—for example, that job listings for analytical positions at MIS and S&P did not "list[] prior work experience at a rating agency as a desired qualification," (*id.* ¶ 141), that Plaintiff read a newspaper interview with an MIS analyst stating that it would be unlikely that a team of analysts would switch between Moody's and S&P, (*id.* ¶ 144), and that Plaintiff was unable to find online profiles of analysts who worked for both companies, (*id.* ¶ 147).

These allegations fall far short of the standard necessary to survive a motion to dismiss on a claim that companies entered an anti-competitive agreement not to recruit or hire each other's employees.  By contrast, in *In re High-Tech Employee Antitrust Litigation*, a Sherman Act case alleging a series of bilateral agreements between various companies not to recruit from each other, the complaint "detail[ed] the actors, effect, victims, location, and timing of the six bilateral agreements between Defendants."  856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012).  The plaintiffs further "allege[d] that, at all relevant times, at least one of three individuals had significant influence over at least one party to each of the six bilateral agreements" and provided details of the negotiations between the CEOs of two of the six companies.  *See id.* at 1116.  Here, Plaintiff here may have described (at the highest level of generality) the victims and effect of the alleged agreement, but he fails to answer the "basic questions" of how and by whom the

agreement was reached.  *Cf. id.* at 1117 (internal quotation marks omitted).

Plaintiff has not alleged a factual basis for inferring that the two companies entered an agreement to restrain trade, but only that they engaged in parallel conduct.  The Amended Complaint even proffers a logical reason why the companies would have engaged in parallel conduct:  each had its own rating methodology and preferred to train its employees from the ground up, rather than correct habits acquired at the other.  (*See* Am. Compl. ¶ 157.)  This allegation also provides a rational explanation for why the companies would not want to hire each other's analysts, i.e., the training and work experience at one company are not readily translatable to the other company.

Accordingly, Plaintiff has failed to state a cause of action under section 1 of the Sherman Act.  Plaintiff's objection to the Report's recommended dismissal of his Sherman Act claims is overruled.[14]

### F.  *Remaining Recommendations*

I review the remaining recommendations, to which no objection was imposed, for clear error, and finding none, adopt those recommendations as well.

### G.  *Leave to Amend*

Finally, Plaintiff requests leave to amend any portions of the Amended Complaint that are dismissed.  (Objections 25.)

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R.

---

[14] Plaintiff made certain other objections to the Report's recommendation that the Sherman Act claim be dimissed.  He argues that the Report should not have applied the rule of reason standard, (Objections 22), that the Report erred in finding that he had not alleged a relevant market, (*id.* at 23), that the Report incorrectly analyzed the plus factor and whether the alleged conduct could constitute rational business behavior, (*id.* at 24), and that the Report was wrong in finding that the statute of limitations barred his antitrust claims, (*id.* at 24-25).  In light of the foregoing conclusions that Plaintiff lacks standing and failed to plausibly allege a conspiracy, it is not necessary to discuss these issues.

Civ. P. 15(a)(2).  Here, Plaintiff has already had an opportunity to amend his complaint after Defendants filed their initial motion to dismiss detailing perceived shortcomings in Plaintiff's claims.  Although *pro se* plaintiffs are generally given leave to amend a deficient complaint, *see Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795-96 (2d Cir. 1999) (per curiam), Plaintiff's failure to fix the defects with his claims, after being provided with notice of them, is sufficient ground to deny leave to amend, *see Coleman v. brokersXpress, LLC*, 375 F. App'x 136, 137 (2d Cir. 2010) (summary order) (denial of leave to amend affirmed where *pro se* plaintiff had already had opportunity to amend once and made no specific showing as to how he would remedy defects in complaint); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleadings defects"), *aff'd sub nom.*, *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007).

Accordingly, I deny Plaintiff's request for leave to amend.

**VI.**   **Conclusion**

Having reviewed the Amended Complaint and the parties' submissions related to the motion to dismiss, I ADOPT as modified above Magistrate Judge Dolinger's Report and Recommendation, (Doc. 41).  Defendants' Motion to Dismiss, (Doc. 27), is hereby GRANTED in part and DENIED in part.  Specifically:

1.  Plaintiff's claims under the SOX Act and Dodd-Frank are dismissed;

2.  Plaintiff's claims of defamation and false light are dismissed;

3.  Plaintiff's claims of age discrimination under the ADEA survive to the extent that they allege a pay discrepancy, but are otherwise dismissed;

4.  Plaintiff's claims of retaliation under the ADEA survive only as to his suspension and termination;

5.  Plaintiff's claims of breach of contract and breach of the covenant of good faith and fair dealing are dismissed; and

6.  Plaintiff's claims under the Sherman Act are dismissed.

The Clerk's Office is respectfully directed to close Doc. 27.

SO ORDERED.

Dated: September 30, 2014
       New York, New York

Vernon S. Broderick
United States District Judge