Paul C. Ulrich
Pro Se Plaintiff
Four Seasons Place, #2036
8 Finance Street, Central, Hong Kong
Paul_Ulrich@aya.yale.edu
Tel. (852) 6271-9384


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x------------------------------------------------------------
                                                       :        13-CV-00008-VSB
PAUL C. ULRICH                                         :
                          - Pro Se Plaintiff -         :        MEMORANDUM OF LAW IN
- against -                                            :        SUPPORT OF PLAINTIFF'S
                                                       :        OPPOSITION TO MOTION
MOODY'S CORPORATION AND                                :        FOR SUMMARY JUDGMENT
MOODY'S INVESTORS SERVICE, INC.                        :
                                                       :
                          - Defendants -               :        (ELECTRONICALLY FILED)
-------------------------------------------------------x------------------------------------------------------------
```


**To the Honorable Vernon S. Broderick, U.S.D.J.:**


*Pro Se* Plaintiff Paul C. Ulrich on the brief.

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ..................................................................... 1

   A. MOODY'S FICTIONAL ACCOUNT ............................................................... 2

   B. A SHORT PARABLE ................................................................................... 3

   C. BUT FOR MY AGE .................................................................................... 4

   D. BUT FOR MY PROTECTED ACTIVITY, THE COMPLAINT OF AGE DISCRIMINATION ............. 6

   E. ADDED CLAIMS FROM DISCOVERY: DEFAMATION & CONSPIRACY (*PRIMA FACIE* TORT) .... 7

II.  A SUMMARIZED STATEMENT OF FACTS ................................................. 8

III.  ARGUMENT ............................................................................................ 11

   A. STANDARD FOR SUMMARY JUDGMENT ................................................... 11

   B. SIMILARLY SITUATED: PAID LESS, FAILED TO PROMOTE, AND TREATED DIFFERENTLY ... 12

   C. *PRIMA FACIE* DISCRIMINATION .............................................................. 18

   D. RETALIATION VIA UNPAID SUSPENSION ................................................... 20

   E. MOODY'S WILLFUL VIOLATION OF ADEA .................................................. 21

   F. OTHER RETALIATION – PIP AND SWITCH TO MNPI AS HOSTILE ENVIRONMENT ............. 22

   G. PRETEXT IN DEFENDANTS' SHIFTING REASONS AND CONTRADICTED ASSERTIONS .......... 24

IV.  CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F. 3d 456  (2nd Cir. 2001) ......................................... 20

*Ash v. Tyson Foods, Inc.*, 546 US 454 (2006) ............................................................... 12

*Brown v. Coach Stores, Inc.*, 163 F. 3d 706 (2d Cir. 1998) ..................................................... 15

*Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998) .......................................... 23

*Burlington Northern v. White,* 126 S.Ct. 2405 (2006) ............................................... 22, 23

*Cruz v. Coach Stores, Inc.,* 202 F.3d 560 (2d Cir. 2000) ............................................ 22

*Danzer v. Norden Sys., Inc.*, 151 F.3d 50 (2d Cir.1998) ................................................ 11

*Dawson v. Westchester,* 373 F.3d 265 (2d Cir. 2004) .................................................. 17

*Durham Life Insurance Co., v. Evans,* 166 F.3d 139  (3rd Cir. 1999) ......................................... 16

*EEOC v. Farmer Bros.*, 31 F.3d 891 (9th Cir. 1994) .................................................... 9

*Fitzgerald v. Henderson*, 251 F.3d 345 (2d Cir. 2001) ................................................... 1

*Galayba v. New York City Bd. of Educ.*, 202 F. 3d 636 (2d Cir. 2000) ....................................... 15

*Gorman-Bakos v. Cornell Coop. Extens. of Schenectady County*, 252 F.3d 545 (2d Cir.2001) .. 25

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir.2000) ............................................ 13

*Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009) .................................... 24

*Harris v. Forklift Systems, Inc.*, 510 US 17 (1993) ...................................................... 17

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) ..................................................... 21

*Hicks v. Baines*, 593 F. 3d 159 (2d Cir. 2010) ............................................................ 22

*Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238 (6th Cir. 2004) .................................... 17

*Hollander v. American Cyanamid Co.*, 172 F.3d 192 (2d Cir.1999) ............................................ 19

*Howley v. Stratford,* 217 F.3d 141 (2d Cir. 2000) ........................................................ 18

*Humphrey v. County of Nassau,* No. 06-CV-3682 (E.D.N.Y. March 30, 2009) ......................... 17

*Humphries v. City Univ. of N.Y.,* No. 13-CV-2641, WL 6196561 (S.D.N.Y. Nov. 26, 2013)..... 18

*In re Omnicom Group, Inc. Securities Litigation,* 597 F. 3d 501 (2d Cir. 2010) ........................ 11

*Jeffrey v. Montefiore Med. Ctr.,* 2013 WL 5434635 (S.D.N.Y. Sept. 27, 2013)........................... 15

*L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419 (2d Cir. 2011)................................................ 11

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F. 3d 208 (2d Cir. 2001) ..................... 15, 20, 21

*Martinez-Santiago v. Zurich N. Amer. Insur. Co.,* No. 07-CV-8676 (S.D.N.Y. Jan. 20, 2010)... 18

*McDonnell Douglas Corp. v. Green,* 411 U. S. 792 (1973) ....................................... 12, 15, 18, 24

*Michael v. Caterpillar Financial Services Corp.,* 496 F.3d 584 (6th Cir. 2007) ........................ 22

*Mitchell v. Toledo Hosp.,* 964 F. 2d 577 (6th Cir. 1992).............................................................. 13

*Mogenhan v. Napolitano,* 613 F. 3d 1162 (D.C. Cir. 2010) ........................................................ 22

*Nakis v. Potter,* No. 01 Civ. 10047 (S.D.N.Y. 2004) ............................................................ 16, 17

*O'Connor v. Consolidated Coin Caterers Corp.,* 517 US 308 (1996)......................................... 19

*Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426 (2d Cir.1999) ................. 21, 23

*Rivera v. Rochester Genesee Reg. Transp.,* 702 F. 3d 685 (2d Cir. 2012) .................................. 11

*Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98 (2d Cir.2011)............................... 11

*Ruiz v. County of Rockland,* 609 F. 3d 486 (2d Cir. 2010).......................................................... 12

*Staub v. Proctor Hosp.,* 131 S. Ct. 1186 (2011) ......................................................................... 16

*Stratton v. Department For the Aging,* 132 F. 3d 869  (2nd Cir. 1997) ....................................... 18

*Taggart v. Time, Inc.,* 924 F.2d 43 (2d Cir. 1991)....................................................................... 14

*Tarshis v. Riese Org.,* 211 F.3d 30 (2d Cir.2000) ....................................................................... 19

*Terry v. Ashcroft,* 336 F. 3d 128 (2d Cir. 2003) ......................................................................... 18

*Villanti v. Cold Spring Harbor Cent. School Dist.*, 733 F. Supp. 2d 371 (E.D.N.Y. 2010) ......... 24

*Waltman v. International Paper Co.*, 875 F. 2d 468 (5th Cir. 1989) ................................................ 9

*Weldy v. Piedmont* 985 F. 2d 57 (2d Cir. 1993) ............................................................................ 7

*Zann Kwan v. Andalex Group LLC,* 737 F. 3d 834 (2d Cir. 2013) .................................... 7, 22, 24

*Zimmermann v. Associates First Capital Corp.*, 251 F. 3d 376 (2d Cir. 2001) ......................... 12

**STATUTES**

Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ......................................passim

As *pro se* plaintiff, I oppose the Motion for Summary Judgment ("MSJ") and the accompanying documents of defendants, Moody's Corporation and Moody's Investors Services ("Moody's"), filed on 9 July 2015 as ECFs 99-104. This Memorandum of Law in Opposition supports my Response to Moody's Statement of Facts ("Resp. SoF"), my Declaration, and my Declaration Authenticating Exhibits to oppose dismissal of the claims of pay disparity and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34.

## I. PRELIMINARY STATEMENT

Unlike Moody's SoF, my Resp. SoF comes to this Court—not from a lawyer spinning a fictionalized story of assumptions, contrivance, and conclusions—but from a participant with personal knowledge of virtually every event described and with admissible documents attesting to any that occurred outside my view. My version of what happened also remains consistent— from the first complaint to the more detailed and verified Amended Complaint, which serves as an initial affidavit to defeat summary judgment (ECF 94, at 1, n.1: *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001)), to my preliminary response to interrogatories before receipt of requested documents, to my deposition, and finally to opposing this motion. Truth is consistent, but falsehood shifts, as has Moody's story to this Court from its first motion to dismiss two years ago until now. Truth offers specificity and clarity, as does my Resp. SoF in its pinpoint citations to the record and exhibits, but falsehood is vague and unhelpful, like Moody's SoF, which tacks on irrelevant, repetitive pages of exhibits without guiding the Court to the particular facts within.

Moody's uses a figurative smokescreen to divert the Court's attention from a barrage of unfavorable facts—from the circumstances of my hiring all the way to my firing. Its Statement of "Facts" in its MSJ consists of references to "Stmt. #", which then link to its list of 64 allegedly

"material undisputed facts", none of which are undisputed and all of which are conclusory statements that gloss over or ignore key facts contradicting its inappropriate conclusions.

From the start of this action on 26 December 2012, my verified complaint has demanded a jury as the ultimate finder of the facts that are in disagreement. My Resp. SoF now disputes or objects to almost every aspect of each material fact that Moody's claims is undisputed. Similarly, Moody's has belatedly admitted only 41 of 360 or 11% of my documented Requests for Admissions ("RFAs") (ECF 88 and 89), and in my Resp. SoF, I add these additional material facts via numbered paragraphs with citations to the attached evidence. This case of age discrimination and retaliation hinges on the malefactors' state of mind, which requires circumstantial evidence to document. I have produced plenty of evidence, from which the logical inferences derive. Determining causation and credibility are issues for a jury. In addition to narrowing the scope of facts in need of proof, this Court must deny Moody's MSJ, strike its objectionable SoFs and defenses (ECF 96, at 4), and allow my claims to proceed to trial.

## A. Moody's Fictional Account

The following assessment stems from my experience as the author of a published novel and movie screenplays (Ex. 3, at D-15-16). Moody's tells a story, but even as a work of fiction, it fails. The motivations of the characters in Moody's story do not match the circumstances, the actions of the characters, or the plot, where a plot is the sequence of observed events. One must ask, "Why would someone act like that? How could someone with no bargaining power make 'demands' about pay, and why would the party with all the power accede to such demands? Why would a well-liked, talented, and conscientious employee suddenly become incapable of doing work he had done with such ease before? How could an employee with skills and experience beyond that of all his peers get paid less than any of them? Why would an employee who was

asking the EEOC and OSHA for an injunction to protect his job, and who knew that insubordination was valid grounds for dismissal, suddenly become 'insubordinate'? Why would the content and nature of this person's work shift soon after he complained of age discrimination?" Moody's has no rational or reasonable explanation for these anomalies.

## B.  A Short Parable

Moody's storyline hinges on the supposedly generous 10% annual raises that Brian Cahill bestowed on me. To put these in context, one can imagine a short parable of a merchant at a desert bazaar haggling over a perishable item with a buyer—say, a melon. Having seen similar melons in market towns outside the desert, the merchant knows that this particular melon is worth 100 dinars, but the buyer offers only 50. The merchant says, "That's ridiculous." The buyer counters with 55. The merchant says, "Look, it's unusually sweet. You've had one like this on your last trip through here." The buyer replies, "Yes, and like the other ripe one, I paid 50 the last time. I'll eat it today and be done with it." The merchant says, "But this one is much larger. Its especially fine shape, even after eating, makes the melon's gourd perfect for collecting rainwater on your trek across the desert." The buyer says, "55 is my last offer. That's more than I would pay for the small, green, unripe ones that will last a longer time on the trek."

What does the merchant do? He should wave the guy away and look for another customer because this buyer is only going from an offer of 50 to 55. It is a 10% increase, but is still nothing more than bargaining in bad faith—when they both know the true value of the melon is 100. One can then imagine there are no other customers or, if there are, they want only small, green melons that they think can last a long time across the desert and which cost only 50. Now what does the merchant do? He takes the buyer's offer of 55 because he cannot hold out for other

offers that do not come in. The melon will go to waste if unsold. In this parable, at the bizarre market of Moody's, I was the merchant, the melon was my labor, and the buyer was Cahill.

## C.  But For My Age

If I had joined Moody's as a "green" 25-year-old, as a 30-year-old, or even as a 35-year-old, Cahill would not have felt threatened by me. But precisely because I joined as a 45-year-old, I had that much more experience and potential to command respect from those in Hong Kong, who reported to Cahill as their second-level supervisor via Gary Lau, the head of Hong Kong's Corporate Finance Group ("CFG"). But for my age, Cahill would not have treated me as badly as he did. Had I been 20, 15, or 10 years younger, Cahill would probably have seen me as a useful hotshot, someone even to mentor, or show off at client events. I spoke Mandarin, had 15 years of experience on consulting projects in China, which was rapidly becoming Moody's most important market (Ex. 101, at P-297-298), and technical skills relevant to credit markets. But for my age, Cahill would not have felt insecure. Instead he ramped up the pressure, expecting and hoping that I, like my predecessor, who was also a 40-year-old China specialist, would leave.

On my resume, Cahill could read that 23 years earlier, in the mid-1980s, I was traveling to Asia, Africa, Latin America, and Europe to do cost-of-living research studies for multinational corporations (Ex. 11, at D-5), at a time when some associate analyst ("AA") colleagues were barely out of diapers and Cahill himself had only just left high school. Apart from Cahill, with a law degree from Cambridge, no one else in Asia-Pacific CFG had an Ivy League degree or the equivalent from comparable schools. I had three (Ex. 105, at D-63-65). One can see how someone of Cahill's nature might feel uncertain about me.

Like a jealous and abusive spouse, too insecure to let the partner go about life and earn a living, but needing to check on that person throughout the day, Cahill would never let me do my

job, but had to micromanage everything I produced as long as I reported to him, and even after. Just as the insecure and abusive spouse tries to control the other, Cahill tried to control me, and soon hated me for the fact that he had to behave like this. No wonder he was doing all he could to get me to quit, so that his jealous, insecure mind could rest.

Similarly, the few individual subordinates who took Cahill's bait to write negative things about me were invariably those who also felt most threatened, again because of my age, and the concomitant experience that goes with an extra decade or two of experience. These few were in Hong Kong: Lau—the head of CFG there and, as I later learned, uniformly disliked by younger team members while he conspired with Cahill to defame me; Laura Acres, the only other non-Asian in Hong Kong CFG, who was responsible for rating telecom firms but, unlike me, had no work experience in the sector (Ex. 103: my Depos. at 142:11-13); and Peter Choy, the only person older than I in CFG, who covered the China property sector—an area where I had well-developed connections.

Cahill used "groupthink" with his direct reports to pull out negative views and make them conform (Resp. ¶13). As a contrast, in a legal setting, compare the classic movie, "Twelve Angry Men". If that film's jury, instead of having a temporary foreman, all reported to the same boss running the deliberations, Henry Fonda's character would have had no chance to review the facts, ask questions, or persuade anyone. In 30 minutes, that fictional jury would have wrongfully convicted the accused teenager to death and gone out to enjoy a Yankees ballgame.

In the instant case, I have argued legal points and held my own for three years against a Harvard-educated, "Big Law" lawyer and his team (ECF 69, at 2), so one can imagine what it was like for me at Moody's to deal with colleagues in a field of development economics and finance where I was actually well-trained and experienced, unlike in law. I could write the

financial analysis with ease, and enjoyed it because one enjoys what one is good at. During our few talks as my supervisor, Cahill would invariably probe to see if I still liked the job and ask about what I found most "frustrating"—not to fix the issues but to fish for future pressure points.

Cicero once said, "When you have no basis for an argument, abuse the plaintiff." Moody's thus tries to paint me as an abrasive misanthrope, lacking teamwork skills and in need of coaching on how to interact with people. If I were so deficient, why were many of my colleagues grateful to me? Resp. ¶34, Stmt. ¶106. I made them look good on paper because their names went on the work that I wrote. I was also always prompt and able to address their needs. Your Honor has seen how I have conducted myself during the past three years on this case. I have never asked for more time to submit a document and never ranted about the system or the other side as some pro-se litigants would. Instead, if decisions and orders have gone against me, I have persevered and quietly built a record.  Just as I have conducted myself at hearings and in briefs as a courteous professional, I did the same at Moody's, and will do so at trial.

### D.  But for My Protected Activity, the Complaint of Age Discrimination

As of 9 May 2012, I was in good standing with my subsequent boss John Forrey and meeting his expectations (Stmt. ¶157, ¶159, ¶161). On this date of our pre-arranged monthly call, we intended to talk about my request for regular telecommuting. There was no other agenda. Cahill had met with Forrey the day before and said he did not support my regular telecommuting, that it would "set a bad precedent" but gave no further details (Ex. 101, at P-16). When I heard this, I was upset and complained about Cahill's long-standing age discrimination and harassment (and retaliation for my having pointed out errors and inappropriate actions in the Chinese and Indonesian Red Flags and Korean GRI reports). I said I had not received anything in writing or even verbally from Forrey or Cahill that my performance was subpar, so Moody's policy entitled

me to telecommute regularly (AC ¶30). It was then that Forrey brought up allegedly bad editing.

I assumed he was talking about an Australian report that had come out falsely listing me as the

editor. I explained that. Forrey then made a vague reference to my having turned down work. I

assumed he was talking about Takeda (AC ¶31), and I explained the compliance reasons for that.

I linked the telecommuting to the forced sharing of an office and the aural harassment that

entailed; namely, that Cahill was out to constructively dismiss me. My Decl. ¶¶19-20.

An injury like mine can have multiple "but-for" causes, each one of which can support

liability. *Zann Kwan v. Andalex Group LLC*, 737 F. 3d 834, 846, n.5 (2d Cir. 2013). Had I not

complained about Cahill, Forrey would not have started the PIP process the very next day, which

he did, as he admitted, after speaking with Cahill (Ex. 129 at D-882), the very person against

whom I had complained, the very person who had longstanding age-based animus against me,

and the very person who was in the midst of a behind-my-back, frame-and-defame campaign.

**E.  Added Claims from Discovery: Defamation & Conspiracy (*Prima Facie* Tort)**

ECF 111, at 1-2, lays out the legal standard to support the substance and timing of my

recently added claims based on discovered facts of Cahill's conspiring with his subordinate Lau

in Hong Kong to defame my professional abilities behind my back to both Forrey and my

second-level supervisor Mike West in New York. In the alternative, Cahill committed a *prima*

*facie* tort of pure malevolence. But for Cahill's defamation and conspiracy, Forrey and West

would not have put me on a Performance Improvement Plan ("PIP") with the loss of an annual

mid-year raise, suspended me without pay, and fired me. My Statement of Additional Material

Facts and authenticated exhibits present the evidence to prove these claims. I will not repeat the

legal arguments here but note only *Weldy v. Piedmont* 985 F. 2d 57, 63-65 (2d Cir. 1993) that a

preponderance of the evidence is the appropriate standard of proof in New York courts.

## II.  A SUMMARIZED STATEMENT OF FACTS

Both my Response to Statement of Material Facts and my sworn Declarations, drawing on (i) pinpoint citations from attached Exhibits ("Ex."), (ii) my sworn Amended Complaint ("AC"), (iii) my sworn Response to Interrogatories, (iv) my sworn Expert Report, and (v) my sworn Deposition present the material facts to prove my side of the story by a preponderance of the evidence. At a minimum, this mountain of material facts puts each "material fact" cited by Moody's into doubt and dispute. By contrast, Moody's Statement of Material Facts and summary in its Memo of Law spin my actual history of continued underpayment and suppression on the basis of age into a fairy tale of repeated pay raises and promotion. But this tale of Moody's lacks an internal consistency: it does not jibe with its parallel story of supposed performance problems. Likewise, Moody's tale casts a documented account of retaliation for complaining about age discrimination into a case of someone who suddenly, for no medical reason, seems to have lost the ability to write or edit and then becomes cantankerous and insubordinate.

Moody's hired me as a CFG financial writer ("writer") in Hong Kong in February 2008. The principal malefactor, Brian Cahill, did not interview me nor did he give final approval for hiring (Resp. ¶2). He had no reason to object to my hiring since he saw only favorable reports from the interviewers and my curriculum resume ("CV") with dates of first employment and college graduations—a CV that Cahill must have read since Moody's considered the position key to the success of Cahill's group (Ex. 3, at D-15).  Years later, when confronted with my charge, Cahill lied about not knowing my age (Stmt. ¶144) and his harassing treatment that began virtually the day I started (my Decl. ¶4). As soon as I accepted Moody's offer, Cahill changed my reporting line from his subordinate Lau to himself, a move by which he could better control me and my future career within the company (*id.* and ECF 59, at 2): "*Waltman v.*

*International Paper Co*., 875 F. 2d 468, 482 (5th Cir. 1989) ("harassment is about power" [emphasis in original, internal citation omitted]) and *EEOC v. Farmer Bros.,* 31 F.3d 891, 898 (9th Cir. 1994) ("harassment may be symptomatic of [ ] hostility, the employer or supervisor using [ ] harassment primarily to subordinate [the targets], to remind them of their lower status in the workplace, and to demean them". Cahill repeatedly demeaned me to Forrey (*e.g*. Stmt. ¶231) and in front of colleagues in Hong Kong, a place—as he himself admitted—where staff put inordinate emphasis on the concept of maintaining "face" or dignity (Ex. 101, at P-85).

In February 2007, Moody's hired my predecessor G.A. Donovan in Hong Kong at 25% above his requested compensation (Resp. ¶5). Three months later Donovan complained of his low pay and quit the company within one year (*id.*), at which point I joined. Donovan reported to Gary Lau in Hong Kong as supervisor (Ex. 105, at D-1911). Moody's has not produced, or did not bother to conduct, a yearend performance evaluation for Donovan even though it did so for the three CFG writers hired in mid-2007 in New York and London—Scott Stearns, Cynthia Schreiber, and Anne Colden, who were my peers when I joined, earning twice my pay, at the rank of Assistant Vice President ("AVP"). Ex. 105, at P-3405. All three previously worked together as copyeditors for Dow Jones, as had Phyllis Plitch, a VP who hired them or recommended their hiring at Moody's (Stmt. ¶71). Of the 13 CFG and Financial Institutions Group ("FIG") writers whose tenures overlapped or immediately succeeded mine, all joined Moody's at AVP or VP levels, at twice or more of my starting pay, yet none had a comparable, complete collection of skills and experience as I did, comprising writing and editing, economic research, and management consulting (my Decl. ¶¶13-14). When Moody's wrongfully terminated me, I was still the least paid writer on a global basis, even compared to recent hires. Of the writers, only Colden was older than me, and she was a VP when I left. The rest were, on

average, eight years younger, with that much less commensurate experience (Ex. 105, at P-3405).

In my fifth and final year, on 9 May 2012, I complained by phone of Cahill's age discrimination, harassment, and retaliation to Forrey. The next day, after consulting with Cahill and West, the supervisor of both, Forrey started the process of putting me onto a two-month Performance Improvement Plan ("PIP"). Stmt. ¶168. Moody's had custody of my notes from this call when it fired me on 24 October 2012, but claims the notes never existed, although documentation of my earlier complaint to Forrey appeared six days later in the transcript of my formal complaint to an external "integrity" hotline (Resp. ¶39). Moody's extended my PIP for another two months only after receiving a perfected charge of age discrimination and retaliation from the Equal Employment Opportunity Commission ("EEOC"). Resp. ¶51. The harassment that, under Cahill, had been constant but low-intensity (make-work, ostracism, denial of training or professional development, disparate treatment, interference in promotion, failure to accommodate a physical infirmity, and carping about my performance) ramped up into a covert frame-up and repeated instances of defamation behind my back to my bosses (my Decl. ¶¶23-30), changing the nature of my assignments to include Material Non-Public Information ("MNPI") as a way of getting me to quit or forcibly sell my family's securities, unpaid suspension on no grounds, and forced changing of my contract to at-will employment. After firing me, Moody's clawed back most of its contribution to my pension (Stmt. ¶223).

My Resp. SoF disproves or disputes each of Moody's claimed material facts of its memorandum of law, at 3-11. Of the five fabricated instances of alleged poor performance in Moody's brief, at 9, the first is inadmissible hearsay; the second and fifth were part of the Cahill-Lau, frame-and-defame conspiracy and proved false in Resp. ¶46, ¶49; while the third and fourth

were due to the MNPI scheme (Resp. ¶48; Stmt. ¶¶207-210), which Moody's manufactured and

then blew out of proportion for allegedly impeding workflow (Resp. ¶57; Stmt. ¶212, and ¶215).

As proof against the insubordination claim in Moody's memo, at 10-11, see Resp. ¶56, ¶58, ¶61.


## III.  ARGUMENT

### A.  Standard for Summary Judgment

In deciding a defendant's motion for summary judgment, a court "construe[s] the

evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and

resolving all ambiguities in [the plaintiff's] favor." *In re Omnicom Group, Inc. Securities*

*Litigation,* 597 F. 3d 501, 504 (2d Cir. 2010).

Neither Moody's brief nor its SoF has presented "alternative explanations so obvious that

they render [my] inferences unreasonable" *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419,

430 (2d Cir. 2011). Moreover,

> "Discrimination cases also tend to be particularly ill-suited to the assessment of a
> plaintiff's credibility at the summary judgment stage, because in such cases "the
> only direct evidence available very often centers on what the defendant allegedly
> said or did," and "the defendant will rarely admit to having said or done what is
> alleged ..." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir.1998).

Lastly, "district courts should not 'engage in searching, skeptical analyses of

parties' testimony in opposition to summary judgment,'" *Rivera v. Rochester Genesee*

*Reg. Transp*., 702 F. 3d 685, 693 (2d Cir. 2012), citing *Rojas v. Roman Catholic*

*Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011), which added, at *id.*, "'… if there

is a plausible explanation for discrepancies in a party's testimony, the court considering

a summary judgment motion should not disregard the later testimony because an earlier

account was ambiguous, confusing, or *simply incomplete*.'" [emphasis added and

internal citation omitted].

**B.  Similarly Situated: Paid Less, Failed to Promote, and Treated Differently**

Moody's repeatedly claimed that my much lower pay was in line with market norms.

Evidence in my SoF show this was not true (Resp. ¶¶19-21). As noted in *Zimmermann v.*

*Associates First Capital Corp.,* 251 F. 3d 376, 383 (2d Cir.  2001), "'[T]he trier of fact can

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up

a discriminatory purpose.'" [quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 US 133,

147 (2000). My starting pay was not only much lower—half that of my CFG writing peers and

one third of my FIG writing peers—and remained lower throughout my entire employment, but

my qualifications were far superior to those of other CFG research writers. When hired, I had (i)

university and graduate degrees from Yale, Harvard, and Stanford in Russian and East European

studies, public administration, and applied development economics; (ii) nearly 20 years of work

experience as a consultant, analyst, or writer covering Asia; (iii) proficiency in Chinese; and (iv)

work experience in 15 countries across Asia Pacific (Ex. 105, at D-476-480). My much-better-

paid peers typically had just one degree from a less-competitive university and work experience

as copyeditors, editors, or reporters (Ex. 105, Ex. 74, Ex. 77-85, at various). The U.S. Supreme

Court has said that, in proving discrimination via the framework established by *McDonnell*

*Douglas Corp. v. Green,* 411 U. S. 792 (1973), a disparity in qualifications may be probative of

pretext, but the court declined to formulate a specific standard—whether merely superior

sufficed, or—as in the instant case—whether the difference needed to be "so apparent as to

virtually jump off the page". *Ash v. Tyson Foods, Inc.,* 546 US 454 (2006).

"An employee is similarly situated to co-employees if they were (1) 'subject to the same

performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.' *Ruiz*

*v. County of Rockland,* 609 F. 3d 486, 493-494 (2d Cir. 2010), quoting *Graham v. Long Island*

*R.R.,* 230 F.3d 34, 40 (2d Cir.2000). Compare Stmt. ¶¶77-78. Moreover, Cahill's use of

underperforming and outperforming criteria for my performance evaluation in 2009 (Ex. 7, at D-

403) referred specifically to a U.S. CFG writer, Cynthia Schreiber, whom Cahill did not

supervise, but whom he implicitly used for comparison (to me) by including the description in

my personnel file. Schreiber, who was seven years younger, received much higher pay from the

start of her employment and got a promotion to Vice President, three ranks above me, while still

outside the protected class of persons aged over forty (Ex. 105, at D-7185, D-7171). Likewise,

Moody's hired Tremblay and Moerschen as writers at the level of Vice President when both

were still under forty. Ex. 105, at D-10350, D-10322 (Tremblay) and Ex. 105, at D-7020

(Moerschen).

     In the instant case, for the first two years of employment, the issue of direct supervisor is

not so important as the determining of whether employees were similarly situated in all material

respects of job function.[1] What constitutes "all material respects" varies, but the fact finder

should judge "whether the plaintiff and those he maintains were similarly situated were subject

to the same workplace standards." *Graham,* 230 F.3d 34 at 40. For this decision, "courts should

make an independent determination of the factors relevant to each case." *Id.* As evidence that

CFG financial writers were similarly situated from the start of my employment, Moody's had

them all report to the same supervisor, John Forrey, when he joined the company in November

2010. Our performance evaluations "PEs" as FIG and CFG writers and even the PIPs used the

same language and criteria for measurement (Ex. 105, at various). Only when an individual

---

[1] Even the 6th Circuit has dropped its own, now-discredited "Mitchell standard" that said,
"plaintiff must show that the 'comparables' are similarly-situated *in all respects*. [emphasis in
original] … [including] same supervisor." *Mitchell v. Toledo Hosp.,* 964 F. 2d 577, 582 (6th Cir.
1992). Cf. *Graham,* 230 F. 3d 34 at 40 ("The Sixth Circuit itself has backed away from a rigid
interpretation of *Mitchell* …)

became a manager such as "Director of Research" did the PE format change, and then it changed for both FIG and CFG in the same way, using the same measurement criteria of "Competencies". *Id.*, see, *e.g.* the 2010 PEs labeled "MIS – Manager" for Stearns of CFG and Tremblay of FIG after both had become managers (Ex. 105, at D-10282 *vs* Ex. 105, at D-10680).

Moody's memo of law, at 15, and at 17, n. 3, contradicts itself. On the one hand, Moody's says that the term "similarly situated" requires the same supervisor, same geographic location, and same local market conditions; on the other hand, it says Ling, my "successor" in Singapore was similarly situated. However, by Moody's definition, on the basis of geography, local market conditions, and same supervisor, only my replacement in Hong Kong by McNamara in February 2013 would count as "similarly situated". Compared to me, McNamara came into Hong Kong, nine years younger, with two fewer years on the job, and at nearly 20% higher pay, which rose to 50% higher by the following year (Ex. 105, at P-3405).

In mid-2008, when Rowan asked about my US-dollar salary, to which Cahill did not reply, and when Rowan suggested promoting me to AVP, Cahill answered that I was "way over qualified", that I looked "out of place", and that my hiring, in which Cahill said he did not participate, was a "mistake" (Ex. 102, at P-13054). This Circuit has found "overqualified" as pretext for an adverse action, such as pay disparity, to be "simply a code word for too old". *Taggart v. Time, Inc*., 924 F.2d 43, 44 (2d Cir. 1991). "[O]verqualified is defined as having more education, training or experience than a job calls for, *Webster's New Collegiate Dictionary* 841 (9th ed. 1983)" *Id*., at 47. Beginning in May 2008 Cahill's and Rowan's emails compared me to my CFG peers; by 2009 Lucas and then Cahill (in 2010) were comparing me to my FIG peer Tremblay (Stmt. ¶78); and after my hiring, no one ever compared my pay, treatment, or workplace standards to that of Donovan, my predecessor.

With regard to failure to promote, *Brown v. Coach Stores, Inc.,* 163 F. 3d 706, 709 (2d Cir. 1998) stated:

> In *McDonnell Douglas*, the Supreme Court provided a framework for a prima facie claim based on an alleged discriminatory failure to promote as follows [1]: plaintiff must allege that (1) she is a member of a protected class; (2) she "applied and was qualified for a job for which the employer was seeking applicants"; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

Hiring me at a lower rank than other financial writers, unwarranted delay in making me an assistant vice president, failure to promote me to vice president, denial of training opportunities, disparate impact, disparate treatment, and failure to accommodate are all issues arising from my claims of discrimination and retaliation rather than distinct claims. Compare *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F. 3d 208, 223 (2d Cir. 2001), at note 1 ("[W]e treat the failure to accommodate as an issue arising on the plaintiff's claim of discrimination for failure to promote to the position of assistant store manager, rather than as a distinct claim.")

Unlike the two cases—(1) *Jeffrey v. Montefiore Med. Ctr.*, 2013 WL 5434635, at *20 (S.D.N.Y. Sept. 27, 2013) and (2) *Davis v. City Univ. of New York,* 1996 WL 243256, at *9 (S.D.N.Y. May 9, 1996)—cited both by the R&R (ECF 41), at 49, and the M&O (ECF 50), at 20-21, Moody's waited *thirty months* to equalize (*ie* "compress") my rank with that of similarly situated financial writers, whom they hired after me, and in some cases, years after me. Moody's never equalized my pay. In *Jeffrey*, the plaintiff waited only *two* months; in *Davis*, the plaintiff hardly waited at all. By contrast, such a delay of two and half years for me had a materially adverse effect in lowering my compensation and career trajectory—precisely the harm to a career that the plaintiff in another cited case, *Galayba v. New York City Bd. of Educ.,* 202 F. 3d 636, 640 (2d Cir. 2000), failed to allege with regard to a delayed reassignment. By not becoming an assistant vice president, I was also unable to vote in rating committees and, therefore, I had no

incentive to attend them—thus missing out on potential useful experience for transferring to a job at another rating agency or at a bank's ratings advisory department.

For circumstances giving rise to a reasonable inference that Cahill prevented my promotion to vice president in December 2011, see Resp. ¶35, Stmt. ¶105, ¶124, and ¶130 to compare with those of *Durham Life Insurance Co., v. Evans,* 166 F.3d 139, 152-153 (3rd Cir. 1999)  (which holds that altering an individual's duties in a way that blocks his opportunity for promotion constitutes a tangible employment action) and *Staub v. Proctor Hosp.,* 131 S. Ct. 1186 (2011) (holding that courts may hold an employer liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision).

As for other delays that I endured, courts have found such delays actionable with regard to disparate treatment and as freestanding claims. For instance, in *Nakis v. Potter*, No. 01 Civ. 10047 (S.D.N.Y. 2004), the court held that it is up to a jury to decide whether respective delays of five and seven months from first requests for an ergonomically designed desk and orthopedic chair constituted reasonable or unreasonable accommodation under the Americans with Disabilities Act ("ADA"). By comparison, I waited 15 months from my request in June 2011 and received a standing desk only because Moody's had received my EEOC charge. The desk came just days before my suspension and a month before my termination (Stmt. ¶107). The fact that Moody's was able to acquire and deliver the desk within three months of my second request, which came after Moody's was already on initial notice for age discrimination, shows that the earlier one-year delay was unreasonable and constituted not only disparate treatment, compared to a similarly situated colleague (*id.*), but also a violation of the ADA. In fact, the first request met with refusal, not delay. Compare *Hoge v. Honda of Am. Mfg., Inc*., 384 F.3d 238, 249-50

(6th Cir. 2004)  (holding that failure to accommodate occurs once a reasonable time has expired or the employer has irrevocably refused to make the accommodation.)

Other disparate treatment that I suffered throughout my time at Moody's included having to redraft or re-edit reports up to sixty times while those of younger colleagues both in Hong Kong and elsewhere sailed through managers' review, particularly if they were credit opinions and handled by the Ratings Communications group (Resp. ¶49; Stmt. ¶242).  Courts in this circuit, such as *Nakis* and *Humphrey v. County of Nassau*, No. 06-CV-3682 (E.D.N.Y. March 30, 2009) have found that requiring employees to engage in menial "make-work" tasks constitutes adverse actions—just like deprivation of training—in harming a plaintiff's opportunities for professional growth and career advancement.

From virtually the start of my employment, Moody's either condoned a hostile work environment of make-work by Cahill or failed to take adequate remedial actions. The trier of fact must look at all circumstances to determine whether a work environment is hostile or abusive: "[These circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is … humiliating; and whether it unreasonably interferes with an employee's work performance. … *[N]o single factor is required*." [emphasis added] *Harris v. Forklift Systems, Inc.*, 510 US 17, 23 (1993). Cahill's make-work was frequent—on virtually every assignment, severe in the amount of time it drained from my workday, humiliating, and most importantly, it interfered with my work performance by hampering and delaying my advancement in the company. I could have outperformed any other of Moody's research writers in the quantity, quality, and depth of analysis and writing if Cahill had not abused me so (Stmt. ¶¶228-232, ¶¶235-236). Cases in the Second Circuit have followed the *Harris* lead: *Dawson v. Westchester*, 373 F.3d 265, 274 (2d Cir. 2004) (one must evaluate a hostile-environment claim based on the

cumulative effect of the abusive conduct); and *Howley v. Stratford,* 217 F.3d 141, 151 (2d Cir. 2000) (a judge "should not consider the record solely in piecemeal fashion" because a jury has the right to view the evidence as a whole).

## C. *Prima Facie* Discrimination

To establish a *prima facie* case of age discrimination under the ADEA, a claimant must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under "circumstances giving rise to an inference of discrimination." *Terry v. Ashcroft,* 336 F. 3d 128, 137-138 (2d Cir. 2003). Moody's does not dispute the first two elements. For the third element, Your Honor in your M&O (ECF 50), at 19, noted, "Pay disparity is a materially adverse employment action for purposes of a discrimination claim. See *Humphries v. City Univ. of N.Y.,* No. 13-CV-2641, 2013 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013)." See also *Martinez-Santiago v. Zurich North America Insurance Co.*, No. 07-CV-8676 (S.D.N.Y. January 20, 2010) (holding that a marked disparity in pay permits an inference of discriminatory intent) and *Stratton v. Department For the Aging,* 132 F. 3d 869, 880 n. 8 (2nd Cir. 1997) ("Actions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate … (fact that an employee is fired 'without good cause' may in some cases be evidence of discrimination)") [internal citations omitted]. Despite nearly four years of complaints about unequal treatment with regard to pay, Moody's never closed the gap that kept me far below my peers (Ex. 105, at P-3405). It then suspended and fired me summarily, but without cause and with no valid reason, as required by Hong Kong law (Stmt. ¶¶220-222).

Under the *McDonnell Douglas* framework, to establish a *prima facie* case of age discrimination, the U.S. Supreme Court ruled that a plaintiff does not need to show that a person

outside his protected class replaced him. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 US 308 (1996). In the *O'Connor* decision, the Supreme Court modified the fourth element in age-discrimination cases to require replacement not by a person outside the protected class, but by a significantly younger person. Kristen McNamara and Su Ann Ling, were nine and fourteen years younger than I was and replaced me in Hong Kong. In *Tarshis v. Riese O*rg., 211 F.3d 30, 38 (2d Cir. 2000), the Second Circuit found that an eight-year age difference was significant and that the replacement of an employee within the protected class by two others, one 11 years younger and the other eight *months* younger, satisfied the fourth element of a *prima facie* case under the ADEA. *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 199 (2d Cir. 1999). On a percentage age basis, at time of termination, my replacements were an average of 23% younger than I:  11.5 / 50 years; by comparison, the one in *Tarshis* was 12% younger than the plaintiff, *i.e*. 8 / 67 years; and the average in *Hollander* was 10% younger than the plaintiff, *i.e.* 6 / 58 years. Twelve of the 13 writers shown in the chart of my Decl. ¶14 were younger than I by the following numbers of years: Tremblay (7), Stearns (2), Moerschen (11), Schreiber (7), Pruzan (8), Wong (7), Porta (7), Knight (11), Hall (6), DeHaven (8), Hau (3), Ling (14)—for an average of 16%, *i.e.* 8 / 50 years (Ex. 105, at P-3405). All received higher pay and rank at hire and throughout my time at Moody's, despite, as shown in the chart, each and every one of them having a lower combination of relevant experience, applicable skills, and tenure in the job (my Decl. ¶14). Their annual compensation levels at joining Moody's as writers were higher than mine by the following percentages: Tremblay (218%), Stearns (91%), Moerschen (142%), Schreiber (91%), Pruzan (98%), Wong (212%), Porta (68%), Knight (55%), Hall (65%), DeHaven (98%), Hau (98%), Ling (69%)—for an average of 107% above my pay (Ex. 105, at P-3405). The only older writer, by five years, Colden started at 122% above my compensation,

based on prevailing exchange rates for the British pound. *Id.* To compare relevant experience and

skills before joining Moody's, see the CVs in Ex. 105, and in Ex. 74 – Ex. 85.

 In my case, those who replaced me earned more than double my pay, as did individual,

younger CFG and FIG research writers during my time at Moody's. If the Court views as

"similarly situated" only the similarly low pay of my predecessor in Hong Kong, G.A. Donovan,

one must adopt the straw-man reasoning of *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F. 3d 456,

468 (2nd Cir. 2001), that there were no employees similarly situated to me in Asia Pacific at the

time of my hire who did not suffer the adverse employment action:

> Under the "must" [rather than "may"] construction of the fourth *prima facie* element, it
> would be impossible for Plaintiffs to meet their *prima facie* burden, because, like the lone
> employee in the example, they have no appropriate point of comparison with which to
> show disparate treatment. *This presents the grotesque scenario where an employer can
> effectively immunize itself from suit if it is so thorough in its discrimination that all
> similarly situated employees are victimized.* [emphasis added].

Donovan, who was also a U.S. citizen, quit Moody's at the age of 41, after exactly one year as a

CFG financial writer. He was already in the protected class when he joined Moody's in early

2007 (Ex. 105, at D-1914). His not having made any formal complaint of age discrimination

does not affect the applicability of my claim. Lastly, Moody's use, at 19, of the false syllogism

that has become fashionable to quote during the past few years applies to discrimination cases

that failed to make even a *prima facie* showing, but relied on bald assertions without evidence.

### D.  Retaliation via Unpaid Suspension

 In terms of suspension, one need look only at *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,*

263 F. 3d 208, 223 (2d Cir. 2001), where the firm suspended the plaintiff shortly after the EEOC

provided notice of her complaint. The 2nd Circuit ruled that suspension without pay, *even if later

reimbursed*, constituted an adverse employment action. In the instant case, Moody's suspended

me without pay after receipt of a perfected EEOC complaint, *and did not reimburse me*. The *Lovejoy-Wilson* court added, at *id.*, "We have also noted that lesser actions may be considered adverse employment actions, citing as examples 'negative evaluation letters, express accusations of lying'…" [internal citation omitted]. The same court concluded, "*See Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446-47 (2d Cir.1999) (holding that abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier)". In the instant case, Moody's suspended me without pay within two months of receiving the perfected EEOC charge and fired me four months after I had started quasi-legal proceedings at both OSHA and the EEOC.

**E.  Moody's Willful Violation of ADEA**

My suspension and termination both constituted willful violations of the ADEA. Having received the perfected EEOC notice shortly before suspending and terminating me, Moody's knew it was violating the ADEA or, at a minimum, was indifferent as to whether its subsequent acts violated the statute. See *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 617 (1993) (defining willfulness as knowledge of, or reckless disregard of, violations of the ADEA—a standard that does *not* require a showing that the employer's conduct was outrageous or need any direct evidence of the employer's motivation). Relying solely on a frame-and-defame scheme by Cahill and Lau for the PIP, on timing in emails proven to be false, and on an alleged at-will agreement signed under duress, Moody's acted as it did, despite proof that no cause for suspension had occurred nor that any cause justified termination. Regardless of who at Moody's received the report of my call to the external hotline and the unperfected and perfected EEOC notices, "a plaintiff may rely on 'general corporate knowledge' of [his] protected activity to establish the

knowledge prong of the *prima facie* case." *Zann Kwan v. Andalex Group LLC,* 737 F. 3d 834, 844 (2d Cir. 2013) (internal citation omitted).

## F.  Other Retaliation – PIP and Switch to MNPI as Hostile Environment

The M&O (ECF 50), at 24, relied on outmoded law in stating "Plaintiff fails to allege sufficient facts that demonstrate that the PIPs materially impacted the terms and conditions of his employment." [emphasis added].  In 2010, the 2nd Circuit ruled, "Prior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment no longer represent the state of the law." *Hicks v. Baines*, 593 F. 3d 159, 165 (2d Cir. 2010). At a minimum, the PIP constituted retaliation according to the standard of *Burlington Northern v. White,* 126 S.Ct. 2405 (2006), which in the context of retaliation, prohibits and defines any materially adverse employer action as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." See *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (holding that a two-day suspension *with* pay and a 90-day "performance plan" were sufficiently adverse "to meet [the] relatively low bar" set by *Burlington Northern*). Forrey's repeated posting of the PIP to my shared calendar also constituted an adverse action by the *Burlington Northern* standard. Compare *Mogenhan v. Napolitano,* 613 F. 3d 1162, 1166 (D.C. Cir. 2010) (a supervisor's posting plaintiff's discrimination complaint to the institution's intranet would "chill a reasonable employee from further protected activity"). In the Second Circuit, "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir. 2000) [internal citations omitted]—namely, actions such as my 9 May 2012 phone call with Forrey, my 15 May 2012 call to the external hotline, my 4 June 2012 email

to senior managers in New York, and my 15 June 2012 mailing of a complaint to the EEOC.

Informal and spoken complaints to management are protected activity (*id*).

Likewise, the change in my work duties to ones involving material non-public

information ("MNPI") at the same time as Moody's adopted a new policy to force divestiture of

securities for employees with regular access to MNPI constituted an adverse employer action

under the *Burlington Northern* standard and retaliation under the ADEA. So, too, did the forced

revocation of my contractual rights. Moody's used the PIP, the shoveling of MNPI onto me, the

forced signing of an at-will Return-to-Work "Agreement" with one purpose: to get me to quit, so

all of these acts were adverse employment actions. See *Richardson v. New York State Dep't of*

*Corr. Servs.,* 180 F.3d 426, 444 (2d Cir. 1999) (holding that transfer to a slightly different

position with same salary and benefits under circumstances indicating intention to encourage

resignation does constitute an adverse employment action). Moreover, in *Richardson,* the

plaintiff consented to the transfer; whereas, in the instant case, I consented to Moody's demands

to work on MNPI only when threatened with termination if I refused.

Although ultimately an unfulfilled threat (because Moody's terminated me before

carrying it out), the change in my work duties in such a way as to justify the forced sale of my

family's securities created a hostile work environment that became severe and pervasive in the

weeks leading up to my unpaid suspension. *Cf Burlington Industries, Inc. v. Ellerth,* 524 U.S.

742, 754 (1998).

Moody's changing my duties to work on MNPI and West's refusal to grant a waiver to

the MNPI divestment policy were also retaliatory by the *Burlington Northern* standard. "[C]ourts

have held that a change in working conditions within an employee's ordinary obligations can be

retaliatory when it takes advantage of a 'unique vulnerability' that the employee faces." *Villanti*

*v. Cold Spring Harbor Cent. School Dist.,* 733 F. Supp. 2d 371, 383 (E.D.N.Y. 2010) [internal

citations omitted]. Unlike virtually all other Asia-Pacific employees, I held his securities in a

U.S.-based brokerage firm and was thus threatened with divesting six months earlier than

otherwise. See Resp. ¶54, ¶62; Stmt. 207 on my unique vulnerability in stock ownership.

## G.  Pretext in Defendants' Shifting Reasons and Contradicted Assertions

Despite the U.S. Supreme Court's ruling on the "but-for" standard of ADEA claims in

*Gross v. FBL Financial Services, Inc.,* 129 S. Ct. 2343 (2009), the Second Circuit continues to

rely on the ADEA's evidentiary standard of review laid out in *McDonnell Douglas Corp. v.*

*Green,* 411 US 792 (1973): "[W]e remain bound by, and indeed see no reason to jettison, the

burden-shifting framework for ADEA cases that has been consistently employed in our Circuit."

*Gorzynski v. JetBlue Airways Corp.*, 596 F. 3d 93, 106 (2d Cir. 2010). Under the *McDonnell*

*Douglas* standard, shifting reasons, inconsistent explanations, and temporal proximity between

protected activity and adverse employment actions such as suspension and termination create a

triable issue of fact regarding but-for causation and pretext. See *Zann Kwan v. Andalex Group*

*LLC,* 737 F. 3d 834, 847 (2d Cir. 2013) and *id.* at 846:

> "A plaintiff may prove that retaliation was a but-for cause of an adverse employment
> action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions
> in the employer's proffered legitimate, nonretaliatory reasons for its action. From such
> discrepancies, a reasonable juror could conclude that the explanations were a pretext for a
> prohibited reason." [internal citations omitted]

As noted in Resp. ¶9, ¶17, Moody's reasons for underpaying me shifted from Michael

Rowan's reference to "budgetary reasons" in May 2008 to Cahill's and Michel Madelain's

reference in September 2009 to lower pay in Asia versus elsewhere and "local market

conditions". Likewise, Moody's stated reasons for terminating me shifted from its first Motion to

Dismiss (ECF 19) (my supervisor's alleged efforts "to manage [my] poor performance") to its

amended Motion to Dismiss (ECF 28) (the supervisor's efforts "to manage [me]") to "blatantly insubordinate behavior" of its Response to Objections to Magistrate's R&R (ECF 49). Either poor performance or insubordination would have been sufficient to summarily dismiss me for cause, but Moody's did not do so. Its application to claw back my pension after terminating me made no mention of summary dismissal and implied to the external AIA firm managing the pension that I had resigned (Stmt. ¶223).

As in *Gorzynski*, at 107, Moody's did not bring alleged complaints of my behavior and performance to my attention until after I had complained of age discrimination to my supervisor on 9 May 2012. Similar to *Gorzynski*, at 108, Moody's fired me after I had completed my PIP without incident. Moreover, the *Gorzynski* court, at 110, quoted the precedent of *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) that "five months is *not* too long to find the causal relationship" [emphasis added], and at note 7, found that, "[T]he employer's treatment of younger workers, even if they are not similarly situated, is relevant evidence of the employer's attitude about age." The instant case is replete with such disparate and favored treatment for younger workers vis-à-vis Moody's abuse of me.


## IV.  CONCLUSION

For the reasons above, as supported by the detailed, authenticated evidence attached to the accompanying declaration, I respectfully ask that Your Honor deny Moody's motion for summary judgment.

Date:  17 August 2015                                    s/  Paul C. Ulrich
         Hong Kong                                           *Pro Se* Plaintiff
                                                             Four Seasons Place, #2036
                                                             8 Finance Street, Central
                                                             Hong Kong
                                                             Paul_Ulrich@aya.yale.edu
                                                             Tel. (852) 6271-9384